# SUSETTE KELO ET AL. *v.* CITY OF NEW LONDON ET AL.
## (SC 16742)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] This case originally was argued before a panel of this court consisting of Justices Borden, Norcott, Palmer, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Chief Justice Sullivan and Justice Katz were added to the panel, and they have read the record, briefs and transcript of the oral argument.

1

Argued December 2, 2002—officially released March 9, 2004

*Scott G. Bullock*, pro hac vice, and *Dana Berliner*, pro hac vice, with whom, on the brief, were *Scott W. Sawyer*, *William H. Mellor*, pro hac vice, and *Clark Neily*, pro hac vice, for the appellants-appellees (plaintiffs).

*Thomas J. Londregan*, with whom were *Jeffrey T. Londregan* and, on the brief, *Brian K. Estep*, for the appellee-appellant (named defendant).

*Edward B. O'Connell*, with whom was *David P. Condon*, for the appellee-appellant (defendant New London Development Corporation).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the public use clauses of the federal and state constitutions authorize the exercise of the eminent domain power in furtherance of a significant economic development plan that is projected to create in excess of 1000 jobs, to increase tax and other revenues, and to revitalize an economically distressed city, including its downtown and waterfront areas. The plaintiffs,[2] owners of certain real property in the city of New London, appeal[3] from the judgment of the trial court denying their request for permanent injunctive relief to prevent the defendants, the city of New London (city), a municipal corporation, and the New London Development Corporation (development corporation), a private nonprofit economic development corporation, from exercising eminent domain authority to condemn the plaintiffs' properties located on parcel 3 of the development corporation's municipal development plan (development plan). The defendants cross appeal[4] from the judgment of the trial court granting the plaintiffs' request for permanent injunctive relief with respect to those properties located on parcel 4A of the development plan.

[2] The individual plaintiffs are Susette Kelo, Thelma Brelesky, Pasquale Cristofaro, Margherita Cristofaro, Wilhelmina Dery, Charles Dery, James Guretsky, Laura Guretsky, Pataya Construction Limited Partnership and William Von Winkle.

[3] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[4] The defendants cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the cross appeal, along with the plaintiffs' appeal; see footnote 3 of this opinion; to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

On appeal, the plaintiffs claim that the trial court improperly concluded that: (1) the taking of the plaintiffs' land was authorized under chapter 132 of the General Statutes; (2) economic development constitutes a valid public use under the takings clauses of the state and federal constitutions, and that these takings will sufficiently benefit the public and bear reasonable assurances of future public use; (3) the delegation of the eminent domain power to the development corporation was not unconstitutional; (4) the taking of the plaintiffs' land on parcel 3 was reasonably necessary to the development plan; and (5) the development corporation, by allowing a private social club, but not the plaintiffs' properties to remain on parcel 3, did not violate the plaintiffs' federal and state constitutional rights to equal protection of the laws. We affirm the judgment of the trial court with respect to the claims presented in the plaintiffs' appeal.

On their cross appeal, the defendants contend that the trial court improperly concluded that: (1) the condemnation of the plaintiffs' properties on parcel 4A was not reasonably necessary to accomplish the development plan; and (2) the city's general power to widen and alter its roadways did not justify the taking of the plaintiffs' properties on parcel 4A. We reverse the judgment of the trial court with respect to the defendants' cross appeal.

The record reveals the following background facts and procedural history, as aptly set forth in the trial court's comprehensive memorandum of decision. "In 1978, the [development corporation] was established to assist the city in planning economic development. In January, 1998, the state bond commission authorized bonds to support planning activities in the Fort Trumbull area [of the city] and property acquisition to be undertaken by [the development corporation] in support of the project and other money toward the ultimate

creation of a state park at Fort Trumbull. In February, 1998, [Pfizer, Inc. (Pfizer)] announced that it was developing a global research facility on the . . . New London Mills site which is adjacent to the Fort Trumbull area. In April, 1998, the New London city council gave initial approval to prepare a development plan for the Fort Trumbull area and the [development corporation] began holding informal neighborhood meetings regarding the [development plan] process. In May, 1998, the city council authorized [the development corporation] to proceed under chapters 130, 132 and/or 588 (*l*) of the [General] Statutes.

"The state bond commission approved more funds for [the development corporation] activity. In June, 1998, the city formally conveyed the New London Mills site to Pfizer. In July, 1998, a consulting team was appointed for the state Environmental Protection Act process and to prepare the [development plan]. Six alternative plans for the project area were considered as part of the required environmental impact evaluation."

The development plan area is approximately ninety acres in size and is located on the Thames River in New London, adjacent to the proposed Fort Trumbull State Park, and the Pfizer global research facility, which opened in June, 2001. See Appendix to this opinion. It presently includes residential and commercial areas, and is comprised of approximately 115 land parcels. The development plan area also includes the presently closed United States Naval Undersea Warfare Center, which is thirty-two acres, and also the regional water pollution control facility.

In its preface to the development plan, the development corporation stated that its goals were to create a development that would complement the facility that Pfizer was planning to build, create jobs, increase tax and other revenues, encourage public access to and

use of the city's waterfront, and eventually "build momentum" for the revitalization of the rest of the city, including its downtown area.

The development plan itself is divided into seven parcels of land. Parcel 1 will include a waterfront hotel and conference center, along with marinas for both transient tourist boaters, and commercial fishing vessels. Parcel 1 also will include a public walkway along the waterfront. Parcel 2 will provide for approximately eighty new residences, organized into an urban neighborhood and linked by public walkway to the remainder of the development plan, including the Fort Trumbull State Park. Space will be reserved at the southern end of parcel 2 for the United States Coast Guard Museum (museum), which will be moved to the development plan area from the nearby United States Coast Guard Academy.

Parcel 3 is projected to have at least 90,000 square feet of high technology research and development office space and parking.[5] This office space would be located close to other research and development facilities, including those of Pfizer. The location of parcel 3 allows for direct vehicular access to the development therein, obviating the need for that traffic to pass through the rest of the development area. Parcel 3 also will retain the existing Italian Dramatic Club, a private social organization with its own building. Four properties owned by three of the plaintiffs are located on parcel 3.

Parcel 4 is subdivided into two smaller parcels, 4A and 4B. Parcel 4A is designated for "park support"; it

---

[5] A major health club complex available to hotel guests and other city residents initially had been planned for parcel 3. It subsequently was relocated to parcel 1 as part of the hotel and conference center complex because, according to Admiral David Goebel, the development corporation's chief operating officer, the development corporation and its consultants had concluded that there was "no stand-alone economic viability for such a health club." The health club constructed pursuant to the development plan, however, will remain open to the public.

will provide parking or retail services for the adjacent state park. Parcel 4B will include a marina, which will be a renovation of an existing marina and include slips for both recreational boating and commercial fishing operations. The walkway will be continued through these parcels. Eleven properties owned by four of the plaintiffs are located on parcel 4A.

Parcel 5 also is subdivided into three separate parcels, which cumulatively will include 140,000 square feet of office space, parking and retail space. Parcel 6 will be developed for a variety of water-dependent commercial uses. Parcel 7 is small and will be used for additional office or research and development use.

According to Admiral David Goebel, chief operating officer of the development corporation, the development corporation will own the land located within the development area. The development corporation will enter into ground leases of various parcels to private developers; those leases will require the developer to comply with the terms of the development plan. At the time of trial, the development corporation was negotiating with Corcoran Jennison, a developer, with the intention of entering into a ninety-nine year ground lease of parcels 1, 2 and 3 with the developer. Under the lease, Corcoran Jennison will pay the development corporation rent of $1 per year. Corcoran Jennison will actually develop the parcels, a process that includes marketing for and locating tenants.

The development corporation estimated that the development plan, which is a composite of the most beneficial features of six alternate development plans that it had considered,[6] would have a significant socio-

---

[6] The alternate plans considered by the development corporation included: (1) no action, with the assumption that some development activities would proceed under the direction of other entities, such as the United States Navy, without action by the development corporation; (2) recreational and cultural facilities to complement the adjacent state park; (3) residential construction with minor amounts of retail and office space; (4) a business

economic impact on the New London region. The development plan is expected to generate approximately between: (1) 518 and 867 construction jobs; (2) 718 and 1362 direct jobs; and (3) 500 and 940 indirect jobs. The composite parcels of the development plan also are expected to generate between $680,544 and $1,249,843 in property tax revenues for the city, in which 54 percent of the land area is exempt from property taxes. These gains would occur in a city that, with the exception of the new Pfizer facility adjacent to the development plan area that now employs approximately 2000 people, recently has experienced serious employment declines, particularly with the loss of approximately 1900 government sector positions, and the closure of the United States Naval Undersea Warfare Center in 1996, which transferred more than 1000 positions to Newport, Rhode Island.[7] Indeed, the state office of policy and management has designated the city a " 'distressed municipality.' "

The development corporation board approved the development plan in early 2000; the city council also approved it shortly thereafter.[8] When it approved the development plan in January, 2000, the city council also had authorized the development corporation to acquire properties within the development area. Thereafter, in October, 2000, the development corporation voted to

---

campus supported by the hotel and conference center; and (5) two mixed use alternates combining residences, recreational, commercial, hotel and retail uses in differing arrangements.

[7] The New London region has benefited economically by the opening and the expansion of casinos, specifically Foxwoods and Mohegan Sun. We note, however, that the city itself has not been a major beneficiary of this economic growth.

[8] As required by statute; see General Statutes § 8-191; the state department of economic and community development, the state department of environmental protection, the state office of policy and management, and the Southeastern Connecticut Council of Governments also approved the development plan. Hereafter, all references in this opinion to the department are to the department of economic and community development.

use the power of eminent domain to acquire properties within the development area whose owners had not been willing to sell them. In November, 2000, the development corporation filed the condemnation proceedings that gave rise to the actions presently on appeal. Thereafter, in December, 2000, the plaintiffs brought the present action challenging the condemnations.

The trial court noted in its memorandum of decision that "[e]ach of the plaintiffs testified and said they wished to remain in their homes for a variety of personal reasons. Two of the people referred to the fact that their families have lived in their homes for decades. They all testified that they loved their homes and the Fort Trumbull area. Several have put a lot of work into their property and all of them appeared . . . to be sincerely attached to their homes. One owner, [Susette] Kelo, loved the view her house afforded her and the fact that it was close to the water. All testified that they were not opposed to new development in the Fort Trumbull area. Also, two of the plaintiffs own their property as business investments—the rental of apartments. These two people have put much time, money and effort into renovating their properties, one has owned his property for seventeen years, the other for about eight years."

After a seven day bench trial, the court granted permanent injunctive relief to, and dismissed the pending eminent domain actions against, the four plaintiffs who live on parcel 4A of the development plan. The court, however, upheld the takings of the parcel 3 properties.[9] This appeal and cross appeal followed. Additional facts and procedural history will be set forth in greater detail as necessary for the resolution of this appeal.

[9] The trial court did, however, grant a temporary injunction to the parcel 3 property owners, pending the resolution of this case on appeal.

## I

## WHETHER CHAPTER 132 OF THE GENERAL STATUTES APPLIES TO NONVACANT LANDS AND, THEREFORE, AUTHORIZED THE TAKING OF THE PLAINTIFFS' LAND

The plaintiffs' first claim is that the trial court improperly determined that the development corporation has the authority to condemn the plaintiffs' property under chapter 132 of the General Statutes.[10] The plaintiffs contend that chapter 132; General Statutes § 8-186 et seq.; applies only to "unified land and water areas" and "vacated commercial plants," and that their homes fit neither of those categories, because under the language and legislative history of chapter 132, the statutory term "unified land and water areas" refers only to undeveloped land. The defendants claim, in response, that, in the context of the statutory language of the entire chapter, the term "unified land and water areas" includes developed land, and moreover, to conclude otherwise would frustrate the declared legislative purpose of restoring the state's economic health. We agree with the defendants.

We begin our analysis by reviewing the conclusions of the trial court on this issue. The trial court noted that it was undisputed that the development corporation attempted to exercise its eminent domain powers pursuant to only chapter 132 of the General Statutes, and stated that it would construe the eminent domain statutes strictly against the condemning authority. The trial court rejected the plaintiffs' arguments that chapter 132 applies only to: (1) multimunicipality districts; and (2)

---

[10] We first address the plaintiffs' statutory claims because "[o]rdinarily, [c]onstitutional issues are not considered unless absolutely necessary to the decision of a case." (Internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 230, 662 A.2d 1179 (1995).

undeveloped land other than vacated commercial plants. The court conducted a thorough analysis of the chapter's language and legislative history, and concluded that references throughout the chapter to "structures" and "demolition," as well as the requirement in General Statutes § 8-189 (f) that a plan exist for relocating project area occupants, indicated that the chapter applies to developed land as well as vacant land. In so concluding, the court rejected the plaintiffs' argument that the subsequent addition of "vacated commercial plants" to the chapter was necessary because, otherwise, the statute would apply only to vacant land.[11]

We first set forth the applicable standard of review, and the process by which we interpret statutes. "Statutory construction is a question of law and therefore our review is plenary." (Internal quotation marks omitted.) *Grondin* v. *Curi*, 262 Conn. 637, 649, 817 A.2d 61 (2003). "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter."[12]

---

[11] The trial court also rejected the plaintiffs' contention that chapter 132 of the General Statutes applies only to multimunicipality economic development projects on contiguous land areas. We need not address this conclusion in any detail because the plaintiffs have not challenged it on appeal.

[12] With regard to this purposive approach to statutory interpretation, our legislature recently has enacted Public Acts 2003, No. 03-154, § 1 (P.A. 03-154), which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute

(Internal quotation marks omitted.) *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 734, 830 A.2d 228 (2003).

We begin our analysis of this claim by reviewing the language of the relevant sections of chapter 132 of the General Statutes. The chapter begins with General Statutes § 8-186,[13] which is the legislative declaration of policy recognizing that the state's "economic welfare" is dependent on the "growth of industry and business . . . ." Section 8-186 provides, inter alia, that "permitting and assisting municipalities *to acquire and improve unified land and water areas* and to acquire and improve or demolish vacated commercial plants for industrial and business purposes . . . are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination."[14] (Emphasis

shall not be considered." This case does not implicate P.A. 03-154. We note that, in the present case, the relevant statutory text and the relationship of that text to other statutes is not "plain and unambiguous . . . ." P.A. 03-154. Accordingly, our analysis is not circumscribed to an examination of text alone, but rather properly may consider the various other sources helpful in the ascertainment of statutory meaning.

[13] General Statutes § 8-186 provides: "It is found and declared that the economic welfare of the state depends upon the continued growth of industry and business within the state; that the acquisition and improvement of unified land and water areas and vacated commercial plants to meet the needs of industry and business should be in accordance with local, regional and state planning objectives; that such acquisition and improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost; that permitting and assisting municipalities to acquire and improve unified land and water areas and to acquire and improve or demolish vacated commercial plants for industrial and business purposes and, in distressed municipalities, to lend funds to businesses and industries within a project area in accordance with such planning objectives are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination."

[14] Chapter 132 of the General Statutes originally had referred only to "unified land areas." Public Acts 1967, No. 760, § 1. The legislature amended

added.) General Statutes § 8-187[15] is the chapter's defini-
tions section, providing most significantly that " 'real
property' means land, subterranean or subsurface
rights, *structures*, any and all easements, air rights and
franchises and every estate, right or interest therein
. . . ." (Emphasis added.) General Statutes § 8-187 (9).
General Statutes § 8-189[16] describes the requirements

it to include the present term "unified land and water areas" in 1975. Public
Acts 1975, No. 75-480, § 1.

[15] General Statutes § 8-187 provides: "As used in this chapter, (1) 'munici-
pality' means a town, city, consolidated town and city or consolidated town
and borough; (2) 'legislative body' means (A) the board of selectmen in a
town that does not have a charter, special act or home rule ordinance relating
to its government or (B) the council, board of aldermen, representative town
meeting, board of selectmen or other elected legislative body described in
a charter, special act or home rule ordinance relating to government in a
city, consolidated town and city, consolidated town and borough or a town
having a charter, special act, consolidation ordinance or home rule ordinance
relating to its government; (3) 'development agency' means the agency desig-
nated by a municipality under section 8-188 through which the municipality
may exercise the powers granted under this chapter; *(4) 'development proj-
ect' means a project conducted by a municipality for the assembly, improve-
ment and disposition of land or buildings or both to be used principally
for industrial or business purposes and includes vacated commercial
plants; (5) 'vacated commercial plants' means buildings formerly used
principally for business or industrial purposes of which more than fifty
per cent of the usable floor space is, or which it is anticipated, within
eighteen months, shall be, unused or substantially underutilized; (6) 'proj-
ect area' means the area within which the development project is located;*
(7) 'commissioner' means the Commissioner of Economic and Community
Development; (8) 'planning commission' means the planning and zoning
commission designated pursuant to section 8-4a or the planning commission
created pursuant to section 8-19; *(9) 'real property' means land, subterra-
nean or subsurface rights, structures, any and all easements, air rights
and franchises and every estate, right or interest therein;* and (10) 'business
purpose' includes, but is not limited to, any commercial, financial or retail
enterprise and includes any enterprise which promotes tourism and any
property that produces income." (Emphasis added.)

[16] General Statutes § 8-189 provides: "The development agency may initiate
a development project by preparing a project plan therefor in accordance
with regulations of the commissioner. The project plan shall include: (a) A
legal description of the land within the project area; (b) a description of
the present condition and uses of such land or building; (c) a description
of the types and locations of land uses or building uses proposed for the
project area; (d) a description of the types and locations of present and
proposed streets, sidewalks and sanitary, utility and other facilities and the
types and locations of other proposed site improvements; (e) statements
of the present and proposed zoning classification and subdivision status of

that the development agency must follow in preparing the mandatory project plan, which include providing "a plan for relocating project-area occupants . . . ." General Statutes § 8-189 (f). General Statutes § 8-193[17] permits the development agency to acquire real prop-

the project area and the areas adjacent to the project area; (f) *a plan for relocating project-area occupants*; (g) a financing plan; (h) an administrative plan; (i) a marketability and proposed land-use study or building use study if required by the commissioner; (j) appraisal reports and title searches; (k) a statement of the number of jobs which the development agency anticipates would be created by the project and the number and types of existing housing units in the municipality in which the project would be located, and in contiguous municipalities, which would be available to employees filling such jobs; and (*l*) findings that the land and buildings within the project area will be used principally for industrial or business purposes; that the plan is in accordance with the plan of development for the municipality adopted by its planning commission and the plan of development of the regional planning agency, if any, for the region within which the municipality is located; that the plan is not inimical to any state-wide planning program objectives of the state or state agencies as coordinated by the Secretary of the Office of Policy and Management; that the project will contribute to the economic welfare of the municipality and the state; and that to carry out and administer the project, public action under this chapter is required. Any plan which has been prepared by a redevelopment agency under chapter 130 may be submitted by the development agency to the legislative body and to the commissioner in lieu of a plan initiated and prepared in accordance with this section, provided all other requirements of this chapter for obtaining the approval of the commissioner of the project plan are satisfied." (Emphasis added.)

[17] General Statutes § 8-193 provides: "(a) After approval of the development plan as provided in this chapter, the development agency may proceed by purchase, lease, exchange or gift with the acquisition or rental of real property within the project area and real property and interests therein for rights-of-way and other easements to and from the project area. *The development agency may, with the approval of the legislative body, and in the name of the municipality, acquire by eminent domain real property located within the project area and real property and interests therein for rights-of-way and other easements to and from the project area, in the same manner that a redevelopment agency may acquire real property under sections 8-128 to 8-133, inclusive, as if said sections specifically applied to development agencies.* The development agency may, with the approval of the legislative body and, of the commissioner if any grants were made by the state under section 8-190 or 8-195 for such development project, and in the name of such municipality, transfer by sale or lease at fair market value or fair rental value, as the case may be, the whole or any part of the

erty within the project area, including through the exercise of the eminent domain power as authorized by the city council. General Statutes § 8-198[18] provides for the promulgation of regulations to carry out the provisions of chapter 132. Finally, General Statutes § 8-199[19] provides that all actions taken by the development agency are taken in the name of the municipality.

The statutory term whose meaning is in dispute is "unified land and water areas"; General Statutes § 8-186; a phrase that is not defined expressly in any section of chapter 132 of the General Statutes. Thus, in construing the term, we look to its commonly approved usage, an inquiry that often is enhanced by the examination of dictionary definitions. See, e.g., *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 425, 815 A.2d 94 (2003) (utilizing Merriam-Webster's Collegiate Dictionary definition to construe statutory term "including"); see also General Statutes § 1-1 (a). Merriam-Webster's Third New International Dictionary defines "unified" as the

real property in the project area to any person, in accordance with the project plan and such disposition plans as may have been determined by the commissioner.

"(b) *A development agency shall have all the powers necessary or convenient to undertake and carry out development plans and development projects, including the power to clear, demolish, repair, rehabilitate, operate, or insure real property while it is in its possession,* to make site improvements essential to the preparation of land for its use in accordance with the development plan, to install, construct or reconstruct streets, utilities and other improvements necessary for carrying out the objectives of the development project, and, in distressed municipalities, as defined in section 32-9p, to lend funds to businesses and industries in a manner approved by the commissioner." (Emphasis added.)

[18] General Statutes § 8-198 provides: "The commissioner is authorized to make and enforce reasonable regulations to carry out the provisions of this chapter."

[19] General Statutes § 8-199 provides: "Any development agency shall exercise its powers in the name of the municipality, and all bonds issued pursuant to this chapter shall be issued in the name of the municipality and title to land taken or acquired pursuant to a development plan shall be solely in the name of the municipality."

adjective form of "unify," which means "make into a coherent group or whole . . . ." Accordingly, we conclude that, as used in § 8-186 of chapter 132, a "unified land and water [area]" is one that exists because of the combination of separate land parcels into a unitary development scheme,[20] a definition that undisputedly fits the Fort Trumbull development plan in the present case. This definition, however, does not resolve the issue of whether a unified land and water area under chapter 132 is limited to vacant land. Accordingly, we must continue our analysis by examining the term in the context of both the language of the chapter as a whole, and the legislative history.

We conclude that the term "unified land and water areas" in § 8-186 is not limited to vacant land. The language and legislative history of chapter 132 of the General Statutes in its entirety are replete with references that compel this conclusion. For example, § 8-187 (9), the chapter's definition of " 'real property,' " includes "structures" expressly within its ambit. See footnote 15 of this opinion. Moreover, the legislative history indicates that § 8-187 (9) was enacted as Public Acts 1980, No. 80-18, to clarify the meanings of the terms "land" and "real property" as used in chapter 132, and to make them consistent with the definitions provided in chapter 130 of the General Statutes, the urban renewal statutes.[21] See 23 H.R. Proc., Pt. 2, 1980 Sess., p. 453, remarks

---

[20] This definition is not inconsistent with the legislative history of Public Acts 1967, No. 760, which reveals that the act was intended to enable and encourage industrial development in districts that are comprised of more than one municipality. Representative William S. Mayer, sponsor of the legislation, stated: "This particular bill will be of interest to towns interested in industrial development not only within their own confines but within multi-town districts. A section of this particular act provides that towns can get together to develop industrial land on contiguous borders." 12 H.R. Proc., Pt. 10, 1967 Sess., pp. 4917–18.

[21] Indeed, § 8-187 (9) is identical to the definition of " '[r]eal property' " found in chapter 130 of the General Statutes, the urban renewal chapter. See General Statutes § 8-125 (f).

of Representative Joseph J. Farricielli ("This bill would attempt to remove confusing language defining land and the real property in Chapter 132 as compared to Chapter 130 of the General Statutes. It would clarify the meaning of real property as applied to state assisted municipal industrial development rights."); see also 23 S. Proc., Pt. 3, 1980 Sess., pp. 660–61, remarks of Senator Sanford Cloud, Jr. (same). Even more significantly, § 8-193 (a), which provides authorization for the acquisition of real property by eminent domain; see footnote 17 of this opinion; does not include or exclude any *specific type* of real property, leaving us only to conclude that the power applies to " 'real property,' " as broadly defined in § 8-187 (9).

Another probative definition is that of " 'development project,' " which is defined as "a project conducted by a municipality for the *assembly, improvement and disposition of land or buildings or both* to be used principally for industrial or business purposes and *includes* vacated commercial plants . . . ." (Emphasis added.) General Statutes § 8-187 (4). This definition is significant because the use of the word "includes" in the phrase "includes vacated commercial plants" indicates firmly that vacated commercial plants are not the only structures contemplated by the legislature as potentially present in a development area. See *Hasselt* v. *Lufthansa German Airlines*, supra, 262 Conn. 424–25 (Court construed General Statutes § 31-307a [c], which "imposes liability on the [second injury] fund to reimburse employers for adjustments, including lump-sum payments . . . . Construing the word including according to its ordinary usage, however, must mean that the fund is required as well to reimburse employers for something other than those retroactive [cost of living adjustments] paid in a lump sum." [Citation omitted; internal quotation marks omitted.]).

Moreover, § 8-189, which describes the requirements that the development agency must follow in preparing the required project plan, requires the agency to provide "a plan for relocating project-area occupants . . . ." General Statutes § 8-189 (f); see footnote 16 of this opinion. This is a requirement that, by definition, contradicts the plaintiffs' argument that "unified land and water areas" is limited to vacant land; it is axiomatic that vacant land has no occupants to relocate.

Furthermore, the commissioner's regulations, promulgated pursuant to § 8-198, support the conclusion that "unified land and water areas" under chapter 132 of the General Statutes include occupied, and indeed, residential, land. Section 8-198-10 of the Regulations of Connecticut State Agencies,[22] the regulation providing

---

[22] Section 8-198-10 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) The amount of funds available to a municipality for development grants is based on a percentage of the net project cost. The net project cost is the total project cost less the estimated income from the project. Eligible project costs include:

"(1) real estate acquisition and disposition financing for a period;

"(2) site clearance;

"(3) site development;

"(4) planning and engineering;

"(5) administration of the project;

"(6) interest costs for temporary and definitive financing for a period not to exceed five years on a principal amount not to exceed the required matching local share; and

"(7) *relocation.*

"The purchase of vehicles and interim and final audits are not eligible costs. Interim audits are required every two years through the duration of the development project.

"(b) The project income includes monies or the value of goods and services received from:

"(1) the sale or lease of land;

"(2) *the temporary use of land, residences or businesses prior to their dispositions*;

"(3) the sale or lease of sand, gravel, or other earthen materials;

"(4) the sale or lease of buildings, machinery, equipment or other materials of value, occupying land areas within the project area;

"(5) other state grants;

"(6) federal capital grants approved for a non-distressed municipality; and

for the determination of funding for development grants, provides that "[t]he amount of funds available to a municipality for development grants is based on a percentage of the net project cost. The net project cost is the total project cost less the estimated income from the project." Regs., Conn. State Agencies § 8-198-10 (a). We note that one factor that may be calculated into project cost is relocation expenses; Regs., Conn. State Agencies § 8-198-10 (a) (7); and that another factor that may be calculated into project income is income gained from "the temporary use of land, residences or businesses prior to their dispositions . . . ." Regs., Conn. State Agencies § 8-198-10 (b) (2). These regulations are particularly probative in light of the well established proposition that "unless [administrative regulations] are shown to be inconsistent with the authorizing statute, they have the force and effect of a statute." (Internal quotation marks omitted.) *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 520 n.15, 767 A.2d 692 (2001). We particularly are persuaded by the fact that the commissioner responsible for the implementation of chapter 132 has implemented regulations pursuant to that chapter that expressly consider residences, and their relocation, as factors for calculating the funding of development grants. Cf. *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 138, 778 A.2d 7 (2001) ("it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement" [internal quotation marks omitted]).

The plaintiffs claim that the text and legislative history of chapter 132 of the General Statutes indicate that unified land and water areas do not include land already developed with business and residences. Specifically, they contend that a construction of "unified land and

"(7) Interest income realized from the investment of project monies. . . ." (Emphasis added.)

water areas" that includes developed or occupied land renders the subsequent addition of "vacated commercial plants" superfluous. They also contend that the legislative genealogy and history indicates that the legislature did not intend the term "unified land and water areas" to include occupied land because references within the chapter pertinent to occupied land, such as those of demolition and rehabilitation, were added only after the vacated commercial plant provision was enacted in 1972. Finally, the plaintiffs contend that construing "unified land and water areas" to include occupied land would be excessively broad in light of the strict construction given to eminent domain statutes. We disagree with these contentions, and address each in turn.

We first conclude that construing "unified land and water areas" as including occupied land does not render the "vacated commercial plants" provision of § 8-186 superfluous. Indeed, the legislative history indicates that, in enacting chapter 132 of the General Statutes, the legislature envisioned two *different* types of economic development plans, one aimed at developing unified land areas, or combinations of multiple parcels of land, and the other intended to revitalize underutilized commercial buildings. In introducing the bill that was enacted as Public Acts 1972, No. 87, which added the "vacant commercial plant" language to chapter 132, Senator Lawrence J. DeNardis stated that "this Bill will allow municipalities through their development agencies, to acquire [improve] and rehabilitate vacant commercial plants. At present, municipalities can acquire and improve unified land areas as it is worded in the present Statutes. They also have the power to clear, repair, operate and insure real property. This Bill would add the additional power of rehabilitation to the list and furthermore, *it would add vacated commercial plants to the areas that can be dealt with or the matters*

*that could be dealt with. . . .* [T]he intent of this Bill is to improve the economic climate of the State by furthering industry and thereby creating jobs." (Emphasis added.) 15 S. Proc., Pt. 2, 1972 Sess., p. 785.[23] Put differently, chapter 132 does not require that a vacated commercial plant be located within a unified land and water area; they merely present two different opportunities for economic development. Accordingly, we conclude that a construction of the term "unified land and water areas" in § 8-186 that includes developed or occupied land does not render the 1972 addition of "vacated commercial plants" superfluous.

We also reject the plaintiffs' contention that the legislative genealogy of § 8-186 indicates that the legislature did not intend "unified land and water areas" to include occupied land because references within chapter 132 of the General Statutes pertinent to occupied land, such as those to demolition and rehabilitation, were added only after the vacated commercial plant provision was enacted in 1972. Our reading of the legislative history, and particularly the original 1967 Public Act, contradicts the plaintiffs' construction of the chapter. The plaintiffs note correctly that "rehabilitate" was not added to the development agency's powers under § 8-193 (b) until 1972; see Public Acts 1972, No. 87, § 3; and that the power to "demolish" vacated commercial plants was not added until 1974; see Public Acts 1974, No. 74-184, § 6 (b);[24] both of which occurred after

---

[23] See also 15 H.R. Proc., Pt. 4, 1972 Sess., p. 1439, remarks of Representative Victor Tudan ("[T]his Bill will allow municipalities through development agencies to acquire, improve and rehabilitate vacated commercial properties. *At present municipalities can acquire and improve unified land areas only.* They also have the power to clear, repair, operate and insure real property. This Bill adds rehabilitate to this list." [Emphasis added.]).

[24] Public Act 74-184, § 1, also amended § 8-186, to declare expressly that it is a public use and purpose "*to acquire and improve or demolish* vacated commercial plants for industrial or business purposes . . . ." (Emphasis added.)

vacated commercial plants were added to the scope of the chapter. Our reading, however, of the original 1967 Public Act, which only provided for the development of unified land and water areas, reveals that the legislature contemplated unified land and water areas as including occupied land. Indeed, § 8-189 (f), which requires the development agency to submit "a plan for relocating project-area occupants," was included in the 1967 act.[25] See Public Acts 1967, No. 760, § 4 (f). Accordingly, we disagree with the plaintiffs' contention that the legislative history of § 8-186 necessarily indicates that the legislature intended "unified land and water areas" to be limited to vacant land.

We next address the plaintiffs' contention that construing "unified land and water areas" to include occupied land would be excessively broad in light of the strict construction applied to eminent domain statutes. We are mindful of the well established proposition that "[t]he authority to condemn [is to] be strictly construed in favor of the owner of the property taken and against the condemnor . . . ." *State* v. *McCook*, 109 Conn. 621, 630, 147 A. 126 (1929). We also note, however, that "[t]he statute . . . should be enforced in such a way as to effectuate the purpose for which it was enacted." (Internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 601–602, 790 A.2d 1178 (2002). We conclude that construing the ambiguous term "unified land and water areas" in § 8-186 as including occupied land is not impermissibly broad; indeed, the language of other provisions in chapter 132 of the General Statutes compels this conclusion,

---

[25] Accordingly, we disagree with the plaintiffs' contention that the requirement of a relocation plan refers to the chapter's definition of vacated commercial plant, which contemplates partial occupation. See General Statutes § 8-187 (5) (" 'vacated commercial plants' means buildings formerly used principally for business or industrial purposes of which more than fifty per cent of the usable floor space is, or which it is anticipated, within eighteen months, shall be, unused or substantially underutilized").

and our review of the legislative history reveals nothing to contradict it. Moreover, a construction limiting the application of the unified land and water areas provisions of chapter 132 to vacant land would undercut severely the chapter's declared purpose of promoting economic development, particularly as the state's stock of vacant land diminishes. This construction largely would limit the applicability of chapter 132 in urban and suburban areas to vacated commercial plants standing alone; the presence of a structure in the project area that does not meet the definition of vacated commercial plant would disrupt the entire economic development plan because it would need to be built around. This would make the parcels unattractive for investment by developers, and would, therefore, thwart the declared purpose of chapter 132. See General Statutes § 8-186. Accordingly, we conclude that the trial court properly construed the term "unified land and water areas" in § 8-186 of chapter 132 as not excluding developed or occupied land.

II

WHETHER ECONOMIC DEVELOPMENT IS A PUBLIC USE UNDER THE STATE AND FEDERAL CONSTITUTIONS

We next address the principal issue in this appeal, which is the plaintiffs' claim that the trial court improperly concluded that the use of eminent domain for economic development does not violate the public use clauses of the state and federal constitutions. Specifically, the plaintiffs contend that: (1) economic development as contemplated in chapter 132 of the General Statutes is not a public use under the state and federal constitutions; (2) even if economic development is a public use, the condemnations in the present case do not promote sufficient public benefit to pass constitutional muster; and (3) the condemnation of parcels 3

and 4A lack a reasonable assurance of future public use because private parties retain control over the parcels' use. We address each contention in turn.

## A

### Whether Economic Development Is a Public Use under the State and Federal Constitutions

The plaintiffs' first contention is that the trial court improperly concluded that economic development under chapter 132 of the General Statutes, namely, the development plan in the present case, is a public purpose that satisfies the public use clauses of article first, § 11, of the Connecticut constitution,[26] and the fifth amendment to the United States constitution.[27] Specifically, they claim that the condemnation of property for economic development by private parties is inconsistent with this court's prior public use decisions because: (1) the new owner will not provide a public service or utility; and (2) the condemnation will not remove blight conditions that are, in and of themselves, harmful to the public. In response, the defendants contend that by concluding that economic development is by itself a public use justifying the exercise of the eminent domain power, the trial court properly deferred to state and municipal legislative determinations. We conclude that economic development projects created and implemented pursuant to chapter 132 that have the public economic benefits of creating new jobs, increasing tax

[26] Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

[27] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law; *nor shall private property be taken for public use, without just compensation*." (Emphasis added.) The fifth amendment's public use clause has been made applicable to the states through the fourteenth amendment to the United States constitution. See, e.g., *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229, 231, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984).

and other revenues, and contributing to urban revital-
ization, satisfy the public use clauses of the state and
federal constitutions.[28]

We begin by setting forth the applicable statutory
framework. The legislative determination at issue in the
present case is provided by § 8-186, which provides that
as a matter of legislative finding and declaration, *"that
the economic welfare of the state depends upon the
continued growth of industry and business within the
state*; that the acquisition and improvement of unified
land and water areas and vacated commercial plants
to meet the needs of industry and business should be
in accordance with local, regional and state planning
objectives; that such acquisition and improvement often
cannot be accomplished through the ordinary opera-
tions of private enterprise at competitive rates of prog-
ress and economies of cost; *that permitting and
assisting municipalities to acquire and improve uni-
fied land and water areas and to acquire and improve
or demolish vacated commercial plants for industrial
and business purposes . . . are public uses and pur-
poses for which public moneys may be expended; and
that the necessity in the public interest for the provi-*

---

[28] We note that, in *Bugryn* v. *Bristol*, 63 Conn. App. 98, 103–104, 774 A.2d
1042, cert. denied, 256 Conn. 927, 776 A.2d 1143, cert. denied, 534 U.S. 1019,
122 S. Ct. 544, 151 L. Ed. 2d 422 (2001), the Appellate Court rejected a
factual challenge to the trial court's finding that the plaintiffs' land was not
condemned for the purpose of benefiting and retaining a private manufac-
turer. The Appellate Court's decision in *Bugryn*, however, is of limited value
in resolving the particular issue in the present case, because the parties in
that case did not dispute the proposition that the development of an indus-
trial park is a public use. Id., 104. The court in that case did note that, even
if the industrial park plan did benefit the manufacturer, the public use of
industrial park development was not disputed, and "[w]here the public use
which justifies the taking of the area in the first instance exists, an element
over which there is no controversy in the present case, that same public
purpose continues even though the property is later transferred to private
persons." (Internal quotation marks omitted.) Id.; *Broadriver, Inc.* v. *Stam-
ford*, 158 Conn. 522, 533–34, 265 A.2d 75 (1969), cert. denied, 398 U.S. 938,
90 S. Ct. 1841, 26 L. Ed. 2d 270 (1970).

*sions of this chapter is hereby declared as a matter of legislative determination."* (Emphasis added.)

The trial court concluded that this language did not violate the public use clauses of either the state or the federal constitutions. In so concluding, the trial court relied on decisions from this court and the United States Supreme Court, but especially *Hawaii Housing Authority* v. *Midkiff,* 467 U.S. 229, 239–40, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984), *Berman* v. *Parker,* 348 U.S. 26, 31–32, 75 S. Ct. 98, 99 L. Ed. 27 (1954), *Katz* v. *Brandon,* 156 Conn. 521, 532–34, 245 A.2d 579 (1968), *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 141–43, 104 A.2d 365 (1954), and *Olmstead* v. *Camp,* 33 Conn. 532, 546 (1866). After reviewing the authorities, the trial court concluded that both this court and the United States Supreme Court consistently have taken a broad, purposive view of the concept of public use, and accordingly have taken a deferential approach to legislative pronouncements of public use. The trial court, however, also emphasized that the public use question is ultimately a judicial inquiry. Ultimately, the trial court concluded that the purpose of chapter 132 of the General Statutes, as expressed in § 8-186; see footnote 13 of this opinion; was an appropriate public use that passed muster under both the state and federal constitutions, stating that "[e]conomic growth and its encouragement, especially in 'distressed municipalities' is a valid public use because it obviously confers a benefit to all members of the public." Accordingly, the trial court concluded that "the language of chapter 132 authorizing the use of eminent domain power for the purpose of accomplishing economic development in designated project areas [is not] violative of the federal or state eminent domain clauses of their respective constitutions."

We note that the trial court approached the plaintiffs' general claim about whether economic development is

a constitutional public use in the context of a facial attack on the provisions of chapter 132 of the General Statutes that authorize the use of eminent domain. Although the plaintiffs do not argue expressly that these statutory provisions are unconstitutional, we will address this particular claim as a facial attack on the constitutionality of chapter 132 inasmuch as it authorizes the use of eminent domain for private economic development. Accordingly, "we proceed from the well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . The burden of proving unconstitutionality is especially heavy when, as at this juncture, a statute is challenged as being unconstitutional on its face." (Citation omitted; internal quotation marks omitted.) *State* v. *Ball*, 260 Conn. 275, 280–81, 796 A.2d 542 (2002).

Moreover, in light of the somewhat confusing constitutional posture of their principal and reply briefs,[29] we

[29] The plaintiffs, in seeking invalidation of the eminent domain provisions of chapter 132 of the General Statutes under the public use clauses of the federal and state constitutions, provide a single, unitary analysis that does *not* assert that the state constitution's public use clause offers them *greater* protection than the federal constitution's public use clause. Their approach is confusing to us because their principal brief otherwise is replete with citations to cases such as *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 135, *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, 199 Ill. 2d 225, 240–41, 768 N.E.2d 1, cert. denied, 537 U.S. 880, 123 S. Ct. 88, 154 L. Ed. 2d 135 (2002), and *Poletown Neighborhood Council* v. *Detroit*, 410 Mich. 616, 633–35, 304 N.W.2d 455 (1981), which typically would support the separate *state* constitutional analysis required as a threshold matter for review by well established Connecticut precedent. See, e.g., *State* v. *DeJesus*, 260 Conn. 466, 480 n.11, 797 A.2d 1101 (2002) (separate state analysis required); *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992) (factors governing construction of state constitution enumerated). Moreover, the plaintiffs' principal brief, does not contain a discussion of any relevant *federal* precedent, such as *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 229. We do note, however, that they do cite three significant federal cases in their reply brief.

also take the opportunity to clarify the scope of our review of the plaintiffs' constitutional claims in the present case. Inasmuch as the relevant public use language of the state and federal constitutions is virtually identical; see footnotes 26 and 27 of this opinion; the plaintiffs have not stated expressly that the Connecticut constitution offers them greater protection, and their claim presents an issue of first impression for this court, we will address simultaneously their federal and state claims. See *Donahue* v. *Southington*, 259 Conn. 783, 794 n.7, 792 A.2d 76 (2002) ("If a party does not provide an independent analysis asserting the existence of greater protection under the state constitutional provision than its federal counterpart . . . we will not of our own initiative address that question. . . . Accordingly, the federal equal protection standard is considered prevailing for the purposes of our review of both the state and federal equal protection claims in this case." [Internal quotation marks omitted.]).

We now turn to the substance of the plaintiffs' claims. This court long has taken a flexible approach to construction of the Connecticut public use clause. Indeed, our analysis begins in 1866, when this court, in *Olmstead* v. *Camp*, supra, 33 Conn. 532, first addressed the constitutional concept of public use. In *Olmstead*, the owner of a water powered mill used for the grinding of grain petitioned the court, pursuant to the flowage act, for permission to make improvements to the pond and dam that powered his mill. Id. These alterations necessarily would have resulted in flooding his neighbor's land, and the neighbor had refused to accept compensation from the mill owner for the privilege of flooding his land.[30] Id., 532–33.

---

[30] A committee appointed pursuant to the flowage act recommended that the improvement be made, in furtherance of the public use. *Olmstead* v. *Camp*, supra, 33 Conn. 534. With respect to public use, the trial court found that the mill operated generally for the public benefit in a farming community where people relied, but not exclusively, on it and other merchants to furnish food for people and animals. Id., 536. The court also found that the mill

This court concluded that the mill owner should be permitted to flood his neighbor's land. Id., 552. In interpreting Connecticut's public use clause, the court rejected a strict construction that "the term 'public use' means possession, occupation, direct enjoyment, by the public." Id., 546. Instead, it concluded that "such a limitation of the intent of this important clause would be entirely different from its accepted interpretation, and would prove as unfortunate as novel. One of the most common meanings of the word 'use' as defined by [Webster's Dictionary], is 'usefulness, utility, advantage, productive of benefit.' *Public use' may therefore well mean public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the state under its right of eminent domain for purposes of great advantage to the community, is a taking for public use.* Such, it is believed, is the construction which has uniformly been put upon the language by courts, legislatures and legal authorities."[31] (Emphasis added.) Id.

owner had no legal obligation to allow the public access to the mill, or to do milling for the public himself. Id., 537. The trial court then reserved for this court the question of whether allowing the improvements to the mill would be a public use. Id.

[31] Even more tellingly, the court in *Olmstead* stated further: "In none of the cases to which we have referred does the public as an active agent take and hold and occupy the property in actual possession. *The term 'public use' is synonymous with public benefit or advantage.* It is equivalent to the language, so familiar in our statute in relation to highways, 'of common convenience and necessity.'

"If there were any doubt on the subject on first principles, we understand it to be the settled law of the country that the flowing of land for the purposes of mills and manufactories, in view of its effect upon the community, is to be considered as a taking it for public use. It would be difficult to conceive a greater public benefit than garnering up the waste waters of innumerable streams and rivers and ponds and lakes, and compelling them with a gigantic energy to turn machinery and drive mills, and thereby build up cities and villages, and extend the business, the wealth, the population and the prosperity of the state. It is obvious that those sections of the country which afford the greatest facilities for the business of manufacturing and the mechanic arts, must become the workshops and warehouses of other vast regions not possessing these advantages; and must receive in exchange for the

Moreover, the court in *Olmstead* laid the foundation for our deferential approach to legislative declarations of public use, stating that "[t]he question is asked with great pertinence and propriety, what then is the limit of the legislative power under the clause which we have been considering, and what is the exact line between public and private uses? Our reply is that which has heretofore been quoted. From the nature of the case there can be no precise line. *The power requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever increasing necessities of society.* The sole dependence must be on the presumed wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong, controlled, by the dispassionate judgment of the courts." (Emphasis added.) Id., 551; accord *New York, N.H. & H. R. Co.* v. *Offield*, 77 Conn. 417, 421, 59 A. 510 (1904) (in taking for railroad improvements, court held "[t]hat the uses to be furthered are public, is a question the decision of which by the legislative department, while not absolutely conclusive upon the judicial department . . . is entitled to very great weight").

This court has continued to afford the public use clause a broad construction, and repeatedly has embraced the purposive formulation first articulated in *Olmstead* v. *Camp*, supra, 33 Conn. 546.[32] In *Gohld*

results of their industry and skill an abundant return of the rich products of the earth, including the precious metals. *It is of incalculable importance to this state to keep pace with others in the progress of improvements, and to render to its citizens the fullest opportunity for success in an industrial competition.*" (Emphasis added.) *Olmstead* v. *Camp*, supra, 33 Conn. 550–51.

[32] Prior to the urban renewal cases, we note that this court has construed the phrase "public purpose," in the context of spending public moneys, as synonymous with the term "public use." In *Barnes* v. *New Haven*, 140 Conn. 8, 12–14, 98 A.2d 523 (1953), a taxpayer challenged the validity of an act creating a parking authority as lacking a public purpose under the emoluments clause, article first, § 1, of the Connecticut constitution. This court upheld the act as having the legitimate public purpose of addressing severe traffic problems, a situation that "calls for an appropriate exercise of the police power of the state operating through the city as one of its municipali-

*Realty Co.* v. *Hartford*, supra, 141 Conn. 139, the owner of commercial real estate challenged the constitutionality of the eminent domain provisions of the redevelopment act, under which land in blighted urban areas could be taken, cleared and sold or leased to redevelopers. The property owner contended that use of eminent domain in this manner violated the public use clause of the state constitution. Id., 141. Utilizing the purposive definition of public use from *Olmstead* v. *Camp*, supra, 33 Conn. 546, this court relied on express legislative findings about the deleterious effects of urban blight, and concluded that "there can be no doubt that the elimination of such substandard, insanitary, deteriorated, slum or blighted areas . . . is for the public welfare. Private property taken for the purpose of eradicating the conditions which obtain in such areas is taken for a public use." *Gohld Realty Co.* v. *Hartford*, supra, 143. Moreover, with respect to the provisions of the act allowing the taken land to be sold or leased to private developers, the court concluded that "[i]f the public use which justifies the exercise of eminent domain in the first instance is the use of the property for purposes other than slums, *that same public use continues after the property is transferred to private persons.* The public purposes for which the land was taken are still being accomplished." (Emphasis added.) Id., 143–44.

ties." Id., 14. The court noted that "[w]hether the act does provide for a legitimate public purpose in the constitutional sense involves the question whether it primarily serves, in a reasonable manner, to promote the public welfare. . . . If it does, that an incidental financial benefit may result to certain individuals as distinguished from the public at large does not deprive it of its legitimate public purpose." (Citations omitted.) Id., 14–15.

Although *Barnes* is a spending case, and not a taking case, it is significant in our resolution of the present case. Indeed, the court in *Barnes* expressly used the terms "public use" and "public purpose" in an interchangeable manner, a definition that we later adopted in *Katz* v. *Brandon*, supra, 156 Conn. 532–33, a redevelopment taking case.

*Gohld Realty Co.* was followed by *Katz* v. *Brandon*, supra, 156 Conn. 521.[33] In *Katz*, a property owner brought an action to determine the validity of the taking of his home pursuant to a redevelopment plan in the city of Hartford. Id., 523. A manufacturing corporation had a plant with an employee parking lot near the plaintiff's home. Id., 525. The state had condemned this parking lot for the construction of an interstate highway. Id. The corporation had offered to build a parking garage in the area, should the city approve a redevelopment plan in the area. Id., 525–26. Subsequently, the redevelopment agency approved a redevelopment plan in the area, which included the plaintiff's land. Id., 525. The city then met with the corporation and other local manufacturers to discuss the redevelopment area, which was found by the city and the agency to be blighted and unsafe. Id., 526–27. The city did not enter into an agreement with the corporation to purchase or lease any of the land; the city was of the opinion that the project was necessary with or without the corporation's participation. Id., 527–28. Subsequently, the city approved the redevelopment project and acquired title to all properties in the area by purchase or eminent domain, including those of the plaintiff. Id., 529–31. The plaintiff brought an action, and contended that the takings were invalid because they were taken for the private purpose of inducing the corporation to remain in Hartford by providing a parking lot for its employees, rather than for a public purpose. Id., 531.

This court, relying on *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 143, rejected the plaintiff's argument, and emphasized that the public use was the clearing of the blighted land. *Katz* v. *Brandon*, supra, 156 Conn.

---

[33] For the sake of clarity, we note that this court's opinion in *Katz* v. *Brandon*, supra, 156 Conn. 532–34, does not state whether its public use analysis is based specifically on either or both of the federal and state constitutions.

534. Indeed, the court in *Katz* further broadened our approach to public use, citing *Barnes* v. *New Haven*, 140 Conn. 8, 15–16, 98 A.2d 523 (1953), a public spending case. See footnote 32 of this opinion. Indeed, this court stated in *Katz* that *"[a] public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. . . .* Courts as a rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. Promotion of the public safety and *general welfare* constitutes a recognized public purpose. . . . The modern trend of authority is to expand and liberally construe the meaning of public purpose. *The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit."* (Citations omitted; emphasis added; internal quotation marks omitted.) *Katz* v. *Brandon,* supra, 532–33;[34] *Barnes* v. *New Haven,* supra, 15. Accordingly, the court in *Katz* rejected the plaintiff's argument that the redevelopment plan violated the public use requirement. *Katz* v. *Brandon,* supra, 534.

The United States Supreme Court has afforded similarly broad treatment to the federal public use clause. In *Berman* v. *Parker,* supra, 348 U.S. 28–29, the Supreme Court addressed the constitutionality of the District of Columbia's redevelopment act, in which Congress had declared, as a matter of public policy, the acquisition

[34] Indeed, this court in *Katz* v. *Brandon,* supra, 156 Conn. 533, noted that "[i]n this day of keen competition to attract industry and business to a state or to a particular locality, public officials are expected to cooperate in helping an industry to locate in their community. They must be at all times alert in providing for future as well as present needs." (Internal quotation marks omitted.)

of property necessary to eliminate blight conditions. The act allowed the redevelopment agency, once it acquired the property, to transfer it to redevelopment companies or individuals to carry out the plan; indeed, private enterprise was preferred over public agencies for execution of the plan. Id., 30. The owner of a department store in the rehabilitation area challenged the taking of his property pursuant to the plan, and contended that it was unconstitutional because: (1) his property was not slum housing; and (2) it would be redeveloped and managed by private, and not public agencies, for private, and not public use. Id., 31.

The Supreme Court concluded that the redevelopment act was a valid exercise of the police power that Congress exercises over the District of Columbia. Id., 34. The court adopted the broad, purposive view of eminent domain, and held that the police power, while generally undefinable, "is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. *Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.* In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia . . . or the States legislating concerning local affairs. . . . *This principle admits of no exception merely because the power of eminent domain is involved.* The role of the judiciary in determining whether that power is being exercised for a public purpose is an *extremely narrow* one." (Citations omitted; emphasis added.) Id., 32.

Moreover, the court stated that "[o]nce the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to

the end." Id., 33. Accordingly, the court concluded that, because the taking was for the public purpose of clearing blighted areas, the means of redevelopment through private enterprise did not violate the public use clause.[35] Id. Indeed, the court also adopted a highly deferential approach to agency determination of necessity, allowing the agency to take the building despite the fact that it was, itself, not blighted. Id., 33–34. "If the [a]gency considers it necessary in carrying out the redevelopment project to take full title to the real property involved, it may do so. It is not for the courts to determine whether it is necessary for successful consummation of the project that unsafe, unsightly, or insanitary buildings alone be taken or whether title to the land be included, any more than it is the function of the courts to sort and choose among the various parcels selected for condemnation." Id., 36. Ultimately, the court concluded that "[t]he rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." Id.

The broad purposive approach to the interpretation of the federal public use clause reached its zenith in 1984, with the Supreme Court's decision in *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 239–40. In that case, the Hawaii state legislature had attempted to address economic problems created by severely overconcentrated land ownership that remained as a vestige

---

[35] The court stated further: "The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. What we have said also disposes of any contention concerning the fact that certain property owners in the area may be permitted to repurchase their properties for redevelopment in harmony with the over-all plan. That, too, is a legitimate means which Congress and its agencies may adopt, if they choose." *Berman* v. *Parker*, supra, 348 U.S. 33–34.

of the feudal land tenure scheme developed by the original Polynesian settlers. Id., 232–33. "The legislature concluded that concentrated land ownership was responsible for skewing the State's residential fee simple market, inflating land prices, and injuring the public tranquility and welfare." Id., 232.

In response to this property crisis, the Hawaii legislature had enacted legislation that created a mechanism for the condemnation of residential land tracts by the Hawaii housing authority, with subsequent transfer of the condemned fees simple to existing lessees. Id., 233. The act provided for a hearing process to ensure that the condemnation would further the public purpose of the act. Id. Once the housing authority acquired the land and paid compensation to the landowners, it was authorized to sell the land to the tenant residing there,[36] or to sell or lease it to other prospective purchasers. Id., 234. The act prohibited the sale or lease of more than one lot to the same person. Id. Landowners, whose land had been condemned pursuant to the act after a hearing, brought an action to have the law declared unconstitutional. Id., 235.

The Supreme Court concluded, with "no trouble," that the act was a constitutional exercise of the Hawaii legislature's police powers because "[r]egulating oligopoly and the evils associated with it is a classic exercise of a State's police powers." Id., 241–42. The court relied on *Berman* v. *Parker*, supra, 348 U.S. 31–33, and concluded that "[t]he 'public use' requirement is thus coterminous with the scope of a sovereign's police powers." *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 240. Accordingly, the court stated that "where the exercise of the eminent domain power is rationally related

---

[36] The housing authority also made loans for up to 90 percent of the purchase price available to the existing tenants. *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 234.

to a conceivable public purpose, [this] Court has never held a compensated taking to be proscribed by the Public Use Clause." Id., 241. As applied, the court concluded that the act was a "comprehensive and rational approach to identifying and correcting market failure."[37] Id., 242.

Moreover, in *Midkiff*, the Supreme Court reemphasized the *Berman* theme of judicial deference to the legislative public use determination, stating that the courts' role "in reviewing a legislature's judgment of what constitutes a public use, even when the eminent domain power is equated with the police power . . . is . . . extremely narrow . . . ." (Internal quotation marks omitted.) Id., 240. *"In short, the Court has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use unless the use be palpably without reasonable foundation."*[38] (Emphasis added; internal quotation marks omitted.) Id., 241. The court emphasized that this deference applies equally to determinations made by both Congress and the state legislatures, and that "[j]udicial

[37] In taking a broad, purposive approach to public use, the United States Supreme Court further emphasized that "[t]he mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose. . . . The [Land Reform] Act advances its purposes without the State's taking actual possession of the land. *In such cases, government does not itself have to use property to legitimate the taking; it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 243–44.

[38] The court also noted that whether the act is successful in solving Hawaii's land problems is irrelevant to whether it was passed in furtherance of a valid public purpose. *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 242 ("Of course, this [Land Reform] Act, like any other, may not be successful in achieving its intended goals. But whether *in fact* the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if . . . the . . . [state] Legislature *rationally could have believed* that the [Act] would promote its objective." [Emphasis in original; internal quotation marks omitted.]).

deference is required because, in our system of government, legislatures are better able to assess what public purposes should be advanced by an exercise of the taking power. . . . Thus, *if a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.*" (Citation omitted; emphasis added.) Id., 244.

Our analysis of the foregoing cases reveals that this state's well established approach to judicial review of legislative public use determinations, first articulated more than 125 years ago in *Olmstead* v. *Camp*, supra, 33 Conn. 546–51, is in harmony with the approach of the federal courts, as enunciated in *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 239–40, and *Berman* v. *Parker*, supra, 348 U.S. 31–32. Both federal and state courts place an overwhelming emphasis on the legislative purpose and motive behind the taking, and give substantial deference to the legislative determination of purpose. Accordingly, with this standard in mind, we turn to the plaintiffs' specific claim, which is that economic development is not, by itself, a public use under either the United States or Connecticut constitutions.

Under this broad and deferential constitutional rubric, we conclude that an economic development plan that the appropriate legislative authority rationally has determined will promote significant municipal economic development, constitutes a valid public use for the exercise of the eminent domain power under both the federal and Connecticut constitutions. Indeed, the courts of several of our sister states, using the same deferential and purposive approach to which we adhere, have arrived at the same conclusion. See *Oakland* v. *Oakland Raiders*, 32 Cal. 3d 60, 69–72, 646 P.2d 835, 183 Cal. Rptr. 673 (1982) (concluding that city was not barred as matter of law from taking professional

football franchise by eminent domain in order to keep it from moving to another city; remanding for complete determination of public benefit involved); *Shreveport v. Chanse Gas Corp.*, 794 So. 2d 962, 973 (La. App. 2001) (relying on *Berman, Midkiff,* and relevant legislative declarations to conclude that "economic development, in the form of a convention center and headquarters hotel, satisfies the public purposes and public necessity requirement of [state constitution]"), cert. denied, 805 So. 2d 209 (La. 2002); *Prince George's County v. Collington Crossroads, Inc.*, 275 Md. 171, 191, 339 A.2d 278 (1975) (concluding in condemnation for industrial park that "projects reasonably designed to benefit the general public, by significantly enhancing the economic growth of the State or its subdivisions, are public uses [under state constitution], at least where the exercise of the power of condemnation provides an impetus which private enterprise cannot provide"); *Poletown Neighborhood Council v. Detroit*, 410 Mich. 616, 633–35, 304 N.W.2d 455 (1981) (A landmark case relying on legislative and redevelopment agency declarations and upholding, under the state constitution, the taking of private homes for the construction of a major car manufacturing assembly plant. "The power of eminent domain is to be used in this instance primarily to accomplish the essential public purposes of alleviating unemployment and revitalizing the economic base of the community. The benefit to a private interest is merely incidental.");[39] *Duluth v. State*, 390 N.W.2d 757, 761–64

---

[39] The Michigan Supreme Court's decision in *Poletown Neighborhood Council* is a landmark case in the use of eminent domain. We conclude that it warrants further discussion because it illustrates amply how the use of eminent domain for a development project that benefits a private entity nevertheless can rise to the level of a constitutionally valid public benefit. In that case, General Motors Corporation (General Motors) had informed the city of Detroit that it was going to close its Cadillac plant in three years, at the cost of more than 6000 jobs, and the following "loss of millions of dollars in real estate and income tax revenues." *Poletown Neighborhood Council v. Detroit*, supra, 410 Mich. 650–51 (Ryan, J., dissenting). General Motors offered to build a new assembly complex in the city, so long as a

(Minn. 1986) (relying on *Midkiff* and deferring to city

site suitable with regard to size and transportation access could be located. Id., 638 (Fitzgerald, J., dissenting). The city proposed a number of sites, of which one, the neighborhood in question, met General Motors' specifications. Id., 637 (Fitzgerald, J., dissenting). The plaintiffs, a neighborhood association and various individual residents, brought an action to challenge the project. Id., 628.

The Michigan court concluded, in a per curiam opinion, that the taking of a residential neighborhood, for the purpose of conveying that property to General Motors for construction of an assembly plant, was public use under the state constitution because of the economic benefits of the jobs and tax revenue that would result from the plant's construction. Id., 633–34. The majority opinion noted that the legislature had stated distinctly, in the state Economic Development Corporations Act, the public purposes of revitalizing the state's economy and alleviating unemployment, and also had authorized municipalities to condemn properties for development as industrial or commercial sites, with subsequent transfer to private users. Id., 630–31.

Indeed, the court framed the issue in the case as "whether the proposed condemnation is for the primary benefit of the public or the private user." Id., 632. The majority deferred to the legislature's determination of economic development as a legitimate public purpose. Id., 633. The court stated "[w]hen there is . . . public need, [t]he abstract right [of an individual] to make use of his own property in his own way is compelled to yield to the general comfort and protection of community, and to a proper regard to relative rights in others. . . . Eminent domain is an inherent power of the sovereign of the same nature as, albeit more severe than, the power to regulate the use of land through zoning or the prohibition of public nuisances." (Citation omitted; internal quotation marks omitted.) Id., 633–34. The court then noted that the economic benefits to the city of the condemnation are "clear and significant." Id., 634. The court stated: "The power of eminent domain is to be used in this instance primarily to accomplish the essential public purposes of alleviating unemployment and revitalizing the economic base of the community. The benefit to a private interest is merely incidental." Id.

The majority, however, limited the impact of its holding. The court stated: "Our determination that this project falls within the public purpose, as stated by the [l]egislature, does not mean that every condemnation proposed by an economic development corporation will meet with similar acceptance simply because it may provide some jobs or add to the industrial or commercial base. *If the public benefit was not so clear and significant, we would hesitate to sanction approval of such a project.* . . . Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced. Such public benefit cannot be speculative or marginal but must be clear and

council legislative determination to conclude that construction of large privately operated paper mill that would alleviate unemployment and contribute to city's economic revitalization was public purpose justifying use of eminent domain under federal and state public use clauses); *Kansas City* v. *Hon*, 972 S.W.2d 407, 414 (Mo. App. 1998) (airport expansion is public use that will be furthered by subsequent transfer of land to private aviation related corporation); *Vitucci* v. *New York City School Construction Authority*, 289 App. Div. 2d 479, 481, 735 N.Y.S.2d 560 (2001) (condemnee not entitled to right of first refusal when condemnor sold land to private party for "new public purpose; the expansion of the facilities of a major employer and economic force in the area"; "[i]f a municipality determines that a new business may create jobs, provide infrastructure, and stimulate the local economy, those are legitimate public purposes which justify the use of the power of eminent domain"); *Jamestown* v. *Leevers*, 552 N.W.2d 365, 369, 374 (N.D. 1996) ("the stimulation of commercial growth and removal of economic stagnation sought by [state urban redevelopment act allowing acquisition of non-

---

significant . . . ." (Emphasis added.) Id., 634–35.

There were two dissenting opinions in *Poletown Neighborhood Council*. The dissenting opinions, by Justices Fitzgerald and Ryan, both criticized the degree of deference to the legislative public use determination and distinguished economic development from blight clearance. Id., 639, 643 (Fitzgerald, J., dissenting); id., 665, 673 (Ryan, J., dissenting). The dissenters also criticized what they deemed to be incidental public benefit, as compared to the direct benefit to General Motors from the new plant. Id., 641 (Fitzgerald, J., dissenting); id., 672 (Ryan, J., dissenting).

*Poletown Neighborhood Council* informs, but does not dictate, our decision in the present case. Specifically, we decline to follow the Michigan court's holding that when "the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced." Id., 634–35. Indeed, we conclude that the application of a "heightened scrutiny" standard; id., 635; is inconsistent with our well established approach of deference to legislative determinations of public use.

blighted urban property 'in furtherance of economic development'] are objectives satisfying the public use and purpose requirement of [federal and state public use clauses]"; reversing and remanding because "trial court made no finding whether the primary object of this development project is for the economic welfare of downtown Jamestown and its residents rather than for the benefit of private interests"); see also *Armendariz* v. *Penman*, 75 F.3d 1311, 1321 (9th Cir. 1996) (stating in dicta that "[i]f the city council . . . had by ordinance declared that a shopping center on the plaintiffs' property would serve a public use by, for example, increasing legitimate business traffic in the area and providing jobs for neighborhood residents, the city might have been able to acquire plaintiffs' property through the payment of just compensation, under the power of eminent domain");[40] *99 Cents Only Stores* v.

---

[40] We note that the Ninth Circuit Court of Appeals' decision in *Armendariz* v. *Penman*, supra, 75 F.3d 1320–21, is a significant example of judicial intervention into an alleged governmental *abuse* of property rights by agents of the city's executive branch. In *Armendariz*, city agents had conducted multiple housing code enforcement sweeps in an area of the city with low income housing owned by the plaintiffs. Id., 1313. The plaintiffs alleged that "city officials conducted the sweeps to enable a commercial developer to acquire contiguous property in [the neighborhood] on the cheap, bulldoze the low-income housing units, and replace them with a planned shopping center. According to the plaintiffs, the [c]ity effectuated these purposes by 'faking' the existence of serious housing code violations purportedly discovered on the plaintiffs' properties during the sweeps in order to invoke the [c]ity building official's emergency powers to evict the plaintiffs' tenants and revoke the plaintiffs' business licenses and certificates of occupancy." Id., 1315.

The Ninth Circuit concluded that the plaintiffs had stated a claim under 42 U.S.C. § 1983, because "[i]f the plaintiffs can prove their allegations, the defendants' actions would constitute a taking of the property. Such a taking, if the allegations are true, would seem not to have been for a 'public use' as the Fifth Amendment requires but rather for the use of another private person, the shopping-center developer." Id., 1321. Significantly, however, the court stated in dicta that "[i]f the city council . . . had by ordinance declared that a shopping center on the plaintiffs' property would serve a public use by, for example, increasing legitimate business traffic in the area and providing jobs for neighborhood residents, the city might have been able to acquire [the] plaintiffs' property through the payment of just compensation, under the power of eminent domain." Id.

*Lancaster Redevelopment Agency*, 237 F. Sup. 2d 1123, 1129–30 (C.D. Cal. 2001) (redevelopment agency's admitted use of eminent domain solely to satisfy "private expansion demands" of major anchor retailer violated federal public use clause, even under deferential analysis; court rejected as speculative argument that prevention of "future blight" upon departure of retailer was public use), appeal dismissed and remanded, 60 Fed. App. 123 (9th Cir. 2003).

This line of cases is wholly consistent with the broad[41] view of the public use clause that Connecticut and

---

The court emphasized, however, that "what [the] plaintiffs allege here is an uncompensated taking through a raw misuse of government power. If the allegations are true, the only determination that could possibly have been made that a shopping center on the plaintiffs' land was a 'public use' would have been a secret determination by the defendants as executive-branch officials of the city or as individuals using the cloak of their official positions to effect their private ends. *Thus, the usual extreme deference that courts owe to legislative determinations of public use . . . is not appropriate here.*" (Citations omitted; emphasis added.) Id.

[41] The leading treatise on eminent domain states that there are two competing definitions of the term "public use"—a "narrow" definition and a "broad" definition. 2A P. Nichols, Eminent Domain (3d Ed. Rev. 2003, J. Sackman ed.) § 7.02[2] through [7], pp. 7-26 through 7-37. The "broad" definition provides that " 'public use' means 'public advantage.' Any eminent domain action which tends to enlarge resources, increase industrial energies, or promote the productive power of any considerable number of inhabitants of a state or community manifestly contributes to the general welfare and prosperity of the whole community and thus constitutes a valid public use. Under this view of 'public use,' it has been held that the scope of eminent domain is both 'coterminous with the scope of the sovereign's police powers,' as well as its constitutional taxing authority." Id., § 7.02[3], pp. 7-29 through 7-32.

In contrast, under the "narrow" definition, "to make a use public means that the property acquired by eminent domain must actually be used by the public or that the public must have the opportunity to use the property taken." Id., § 7.02[2], p. 7-26. The treatise states that the "broad" view of eminent domain generally has gained greater acceptance among the federal and state courts; id., § 7.02[5], pp. 7-35 through 7-36; but that neither definition comprehensively can explain all eminent domain public use holdings; id., § 7.02[6] and [7], pp. 7-36 through 7-37; concluding that "[f]urther efforts at providing a precise definition of 'public use' are doomed to fail, and many courts have recognized this . . . ." Id., § 7.02[7], p. 7-37.

the federal courts follow. Accordingly, we find them persuasive, and we conclude that economic development plans that the appropriate legislative authority rationally has determined will promote municipal economic development by creating new jobs, increasing tax and other revenues, and otherwise revitalizing distressed urban areas, constitute a valid public use for the exercise of the eminent domain power under either the state or federal constitution.

The plaintiffs contend that the Connecticut blight and substandard housing clearance cases, such as *Katz* v. *Brandon*, supra, 156 Conn. 533–34, and *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 143–44, are inapposite because in those cases the private sector economic development was secondary to the primary purpose of the redevelopment act, under which the applicable public use was the removal of harmful urban blight or substandard conditions. The plaintiffs also cite a competing line of sister state cases, notably *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, 199 Ill. 2d 225, 240–41, 768 N.E.2d 1, cert. denied, 537 U.S. 880, 123 S. Ct. 88, 154 L. Ed. 2d 135 (2002), and urge this court to follow them and conclude that economic development is not, by itself, a public use that justifies the use of eminent domain. We address each of these contentions in turn.

We first address the plaintiffs' contention that the blight and substandard housing clearance cases, namely, *Katz* v. *Brandon*, supra, 156 Conn. 533, and *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 143–44, are inapplicable. Specifically, they contend that, in the present case, the primary legislative purpose is to transfer the property to private entities, which will become the primary beneficiary of the taking; accordingly, any benefit to the public from the taking is merely secondary. Their arguments contrast this scenario with that of the blight cases, wherein this court concluded that

the primary purpose of the takings was the clearance of harmful urban conditions, with any benefit to private entities being secondary. *Katz* v. *Brandon,* supra, 534; *Gohld Realty Co.* v. *Hartford,* supra, 143–44. We disagree with the plaintiffs' contentions because we already have determined that municipal economic development can be, in and of itself, a constitutionally valid public use under the well established broad, purposive approach that we take on this issue under both the federal and state constitutions. Accordingly, we also conclude that private benefit from such economic development is, just as in the blight and substandard housing clearance cases, secondary to the public benefit that results from significant economic growth and revitalized financial stability in a community.

We next address the plaintiffs' analysis of the sister state cases, particularly *Southwestern Illinois Development Authority* v. *National City Environmental, LLC,* supra, 199 Ill. 2d 235–41, that they cite in support of their contention that economic development projects do not, by themselves, constitute public use. We acknowledge that the courts of Arkansas, Florida, Kentucky, Maine, New Hampshire, South Carolina and Washington have, using a narrow[42] view of their public use clauses, ruled that economic development is, by itself, not public use for eminent domain purposes. See *Little Rock* v. *Raines,* 241 Ark. 1071, 1083–84, 411 S.W.2d 486 (1967) (utilizing narrow definition of public use and noting lack of express legislative eminent domain authorization in concluding that taking for industrial park did not satisfy public use clause); *Baycol, Inc.* v. *Downtown Development Authority,* 315 So. 2d 451, 456–58 (Fla. 1975) (condemnation of land for construction of parking garage for private shopping mall not public use solely because of economic benefits; describ-

---

[42] See 2A P. Nichols, Eminent Domain (3d Ed. Rev. 2003, J. Sackman ed.) § 7.02[2], pp. 7-26 through 7-29; see also footnote 41 of this opinion.

ing public benefit from garage construction as "incidental" and insufficient "as a basis for public necessity justifying eminent domain"); *Owensboro* v. *McCormick*, 581 S.W.2d 3, 5–8 (Ky. 1979) (using narrow view of public use under state constitution to strike statute granting city or other governmental unit "unconditional right to condemn private property which [was] to be conveyed by the local industrial development authority for private development for industrial or commercial purposes"; "the constitutional provisions involved clearly require that finding of 'public purpose' does not satisfy the requirement of a finding of 'public use' "); *Opinion of the Justices*, 152 Me. 440, 447, 131 A.2d 904 (1957) (advisory opinion following narrow view of state public use clause and concluding that statute authorizing city to use eminent domain for development of industrial park is unconstitutional); *Merrill* v. *Manchester*, 127 N.H. 234, 237–39, 499 A.2d 216 (1985) (using narrow public use analysis under state constitution and requiring direct public use in light of declared legislative policy of preserving open lands; enjoining taking of plaintiffs' open lands for industrial park construction); *Karesh* v. *City Council*, 271 S.C. 339, 342–45, 247 S.E.2d 342 (1978) (adhering to narrow view of public use under state constitution, and concluding that city could not condemn land and lease it to developer for parking garage and convention center project; noting that "guarantee that the public will enjoy the use of the facilities, so necessary to the public use concept, is absent"); *In re Seattle*, 96 Wash. 2d 616, 627–29, 638 P.2d 549 (1981) (using narrow view of state public use clause, without deference to legislature, and concluding retail shopping center "contemplated a predominantly private, rather than public, use," noting that "[a] beneficial use is not necessarily a public use").[43]

---

[43] Indeed, the Washington Supreme Court expressly has stated that the courts of its state "have provided a more restrictive interpretation of public use" than have the federal courts. *Manufactured Housing Communities of Washington* v. *State*, 142 Wash. 2d 347, 359–60, 13 P.3d 183 (2000) (regulatory

We address separately, and in greater detail, the Illinois Supreme Court's recent decision in *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 237–38, because the plaintiffs rely heavily on that case, and its analysis is distinct from the aforementioned decisions of the other states. In that case, the state legislature had created a regional economic development authority to promote industrial and economic development within a geographic project area. Id., 227–28. Under its enabling statute, the plaintiff had the authority to issue bonds and to exercise eminent domain. Id., 228.

A successful and popular racetrack in the plaintiff's region desired to expand its seating and parking capacities. Id., 229. To increase parking, it wished to acquire a large parcel of land from an adjacent metal recycling center owned by the defendant. Id. The defendant refused to discuss the matter, and the racetrack never had offered to purchase the land. Id. Instead, the racetrack had asked the plaintiff to use its eminent domain powers to take the land and transfer it to the racetrack, with the racetrack paying all expenses for the taking. Id., 229–30. Thereafter, the county legislative body issued the required approval for the plaintiff's use of its eminent domain powers, concluding that expanded parking would be beneficial for the public safety, and also would increase the region's tax revenues. Id., 230. The plaintiff followed with a similar resolution. Id. Both the plaintiff and the racetrack continued to negotiate with the defendant for the purchase of the property; the negotiations failed and the plaintiff then filed a condemnation petition, which the trial court granted.[44] Id., 231.

taking); see also *Hogue* v. *Port of Seattle*, 54 Wash. 2d 799, 827–29, 341 P.2d 171 (1959) (utilizing narrow definition of state public use clause to strike statute allowing eminent domain for industrial development).

[44] In the condemnation action, the trial court heard testimony about the positive public safety impact that the expanded parking would have on severe highway traffic generated by the racetrack, as well as on the benefits

On appeal, the Illinois Supreme Court reversed the determination of the trial court. The Supreme Court cited *Berman* v. *Parker*, supra, 348 U.S. 26, and *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 243–44, and undertook initially a generally broad, purposive police power analysis of the plaintiff's exercise of its eminent domain powers. *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 235–36. The court, however, then qualified these statements by stating that "a distinction still exists" between "public use" and "public purpose." Id., 237. Indeed, the court emphasized that "[t]he public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right." (Internal quotation marks omitted.) Id., 238. Moreover, the court stated that while it has "also recognized that economic development is an important public purpose . . . to constitute a public use, something more than a mere benefit to the public must flow from the contemplated improvement."[45] (Citations omitted; internal quotation marks omitted.) Id., 239.

Ultimately, the court concluded that the taking violated the public use clauses of both the federal and

that continued racetrack expansion would bring to the region. *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 232–34. The trial court granted the condemnation petition and ordered compensation paid to the defendant; as soon as title vested in the plaintiff, it conveyed the property to the racetrack. Id., 234.

[45] Indeed, the Illinois Supreme Court rejected the plaintiff's contention that it is the purpose of the taking alone that controls, noting that "[i]n its wisdom, the legislature has given [the plaintiff] the authority to use eminent domain power to encourage private enterprise and become involved in commercial projects that may benefit a specific region of this state. While we do not question the legislature's discretion in allowing for the exercise of eminent domain power, the government does not have unlimited power to redefine property rights. . . . The power of eminent domain is to be exercised with restraint, not abandon." (Citation omitted; internal quotation marks omitted.) *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 242.

state constitutions. Id., 235, 240. The court did "not require a bright-line test to find that this taking bestows a purely private benefit and lacks a showing of a supporting legislative purpose. . . . [M]embers of the public are not the primary intended beneficiaries of this taking. . . . This condemnation clearly was intended to assist [the racetrack] in accomplishing their goals in a swift, economical, and profitable manner." (Citations omitted.) Id., 240. The court stated that "[the plaintiff's] true intentions were not clothed in an independent, legitimate governmental decision to further a planned public use."[46] Id. It further noted the plaintiff's responsiveness to the racetrack's demands, as well as the lack of planning studies and consideration of other alternatives, such as construction of a parking garage on the existing racetrack property.[47] Id., 241.

---

[46] The court stated that "[i]t appears [the plaintiff's] true intentions were to act as a default broker of land for [the racetrack's] proposed parking plan." *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 241. The court also dismissed claims of resulting economic benefits as mere "trickle-down" of the racetrack's revenues, stating that "revenue expansion alone does not justify an improper and unacceptable expansion of the eminent domain power of the government. Using the power of the government for purely private purposes to allow [the racetrack] to avoid the open real estate market and expand its facilities in a more cost-efficient manner, and thus maximizing corporate profits, is a misuse of the power entrusted by the public." Id.

[47] The opinion in *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 254, also included a spirited dissent by Justice Freeman, who stated that "[c]ontrary to the holdings of *Hawaii Housing Authority* and *Berman*, the majority gives little deference to the legislature's public use determination. Further, the majority engrafts upon *Hawaii Housing Authority* and *Berman* a requirement that property taken by eminent domain be put into use for the public, a proposition specifically rejected by the Court in *Hawaii Housing Authority*. . . . Today's opinion is not an accurate rendition of the holdings of *Hawaii Housing Authority* and *Berman* and of the principles of law involved in this area." (Citation omitted.)

Justice Freeman also supplied a rendition of the facts that he concluded demonstrated the economic benefits of the racetrack and its proposed expansion; id., 243–53 (Freeman, J., dissenting); and noted what he considered an extreme lack of deference by the majority to "the legislative findings regarding the need to alleviate certain economic, housing and other condi-

We disagree with the plaintiffs' contention that the *Southwestern Illinois Development Authority* stands for the proposition that economic development is never a constitutionally valid public use. Indeed, despite its use of a more restrictive public use standard than the purely purposive formulation followed by this court and the United States Supreme Court; *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 243–44; *Olmstead* v. *Camp*, supra, 33 Conn. 546–51; the Illinois decision strikes us more as an illustration of when a court determines that an economic development plan cannot be said to be for the public's benefit. In our view, the facts of *Southwestern Illinois Development Authority* merely demonstrate the far outer limit of the use of the eminent domain power for economic development. Indeed, that decision did not strike the statute allowing the agency to use eminent domain; it merely assailed the agency's exercise of that power within a particularly egregious set of facts. See *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 240–41 ("[c]learly the foundation of this taking is rooted not in the economic and planning process with which [the plaintiff] has been charged"). Accordingly, the Illinois decision simply does not persuade us to abandon our conclusion that an economic development plan that the legislature rationally has determined will have the public benefits of increasing employment, tax and other revenues, and spurring the revitalization of a distressed city constitutes a valid public use for the exercise of the eminent domain power under either the state or federal constitution.

tions in the southwestern part of this state . . . [and] that alleviation of these conditions furthers certain public purposes." Id., 261–62 (Freeman, J., dissenting). Ultimately, Justice Freeman concluded in his dissent that "the majority commits great disservice to the State of Illinois and its citizens in engrafting upon the public use doctrine the requirement that property taken by eminent domain must be accessible to the general public as of right. *This requirement is the death of social legislation in furtherance of economic development and revitalization.*" (Emphasis added.) Id., 268.

Moreover, beyond the case law, we observe that many commentators within the academic community also have addressed the issue of whether economic development satisfies the constitutional public use requirement. Support for both sides of the issue, of course, may be found within this array of law review articles. We note that most, however, tend to express alarm at what they consider to be a situation rife with the potential for abuse of the eminent domain power. See, e.g., J. Lazzarotti, "Public Use or Public Abuse," 68 UMKC L. Rev. 49, 74 (1999) (cautioning against overexpansive interpretation of terms "public use" or "public purpose"; noting "if the only limit on meeting the public purpose requirement is what one can conceive or rationalize, the process is extremely vulnerable to abuse"); S. Jones, note, "Trumping Eminent Domain Law: An Argument for Strict Scrutiny Analysis Under the Public Use Requirement of the Fifth Amendment," 50 Syracuse L. Rev. 285, 288–89 (2000) (maintaining that private property rights are fundamental and proposing "an analytical framework, whereby the condemnation authority must demonstrate a 'compelling' socioeconomic need in transferring land to private interests").[48] We,

---

[48] See also W. Pritchett, "The 'Public Menace' of Blight: Urban Renewal and the Private Uses of Eminent Domain," 21 Yale L. & Policy Rev. 1, 7 (2003) (examining "how the interaction of renewal advocates and the courts changed legal conceptions of property in the middle of the twentieth century"); J. Klemetsrud, note, "The Use of Eminent Domain for Economic Development," 75 N.D. L. Rev. 783, 813 (1999) (urging, in wake of *Poletown Neighborhood Council*, that the "courts make a more meaningful examination [of] the nature of the proposed condemnation" in economic development eminent domain cases); L. Mansnerus, note, "Public Use, Private Use, and Judicial Review in Eminent Domain," 58 N.Y.U. L. Rev. 409, 411 (1983) (advocating for increased judicial review of public use determinations in public/private takings); D. Werner, note, "The Public Use Clause, Common Sense and Takings," 10 B.U. Pub. Int. L.J. 335, 358 (2001) ("Due to the current state of public use doctrine, the property of minority landowners is insecure. For that matter, any homeowner or small business owner who lacks the political clout to dissuade the government from taking his home or business is at risk.").

however, conclude that responsible judicial oversight over the ultimate public use question does much to quell the opportunity for abuse of the eminent domain power. We, of course, acknowledge the existence of particularly egregious cases, such as *Armendariz* v. *Penman*, supra, 75 F.3d 1320–21; see footnote 40 of this opinion; *99 Cents Only Stores* v. *Lancaster Redevelopment Agency*, supra, 237 F. Sup. 2d 1129–30, and *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 225. Such cases, however, would be outliers under the formulation that we adopt herein, which requires public economic benefit in order for the use of eminent domain for economic development to pass constitutional muster. As such, those cases are readily distinguishable from projects such as the carefully considered development plan at issue in the present case.[49] We, therefore, conclude that the plaintiffs have not proven beyond a reasonable doubt that the provisions of chapter 132 of the General Statutes authorizing the use of eminent domain are facially unconstitutional when used in furtherance of an economic development plan such as the development plan in the present case.

## B

## Whether the Public Will Benefit Sufficiently from the Condemnations

The plaintiffs next claim that, even if we were to assume that economic development constitutes a valid

[49] Moreover, we note that the use of the eminent domain power for economic development certainly is not without support in the academic community. See, e.g., M. Harrington, " 'Public Use' and the Original Understanding of the So-Called 'Takings' Clause," 53 Hastings L.J. 1245, 1249 (2002) (arguing "that attempts to craft devices to encourage judicial oversight of legislative takings are without warrant in the historical record . . . [and] the term 'public use' as used in the Fifth Amendment was meant to be descriptive, rather than proscriptive"); T. Merrill, "The Economics of Public Use," 72 Cornell L. Rev. 61, 65 (1986) (discussing economics of and proposing models of judicial review of public use determinations); T. Benedict, note, "The Public-Use Requirement in Washington After *State ex. rel. Washington State*

public use, the condemnations at issue in the present case do not serve that purpose because, the motives of the development corporation and the city aside, the effects of those condemnations primarily will benefit private entities, namely, the development corporation, Corcoran Jennison and Pfizer.[50] The plaintiffs claim that any public benefit is incidental and insignificant when compared to the private benefit to those entities that will result from the condemnations. The defendants contend, in response, that the public purpose is not defeated by the transfer of land to private entities, especially when successful achievement of the public pur-

_Convention & Trade Center_ v. _Evans,_" 75 Wash. L. Rev. 225, 226 (2000) (noting confusing array of standards for determining public use and advocating for application of broader public purpose standard).

[50] We note that the plaintiffs claim that the trial court improperly concluded that the parcel 3 condemnations promote sufficient public benefit to be considered in furtherance of the economic development that constitutes the public use in the present case. The plaintiffs also claim that the trial court correctly concluded that the parcel 4A condemnations do not promote sufficient public benefit to be considered in furtherance of the public use. The defendants contend, in response, that the court should not engage in a parcel-by-parcel analysis, and should consider the significant tax and employment economic benefits resulting from the development plan as a whole.

We decline to address the plaintiffs' parcel-specific claims in this context because an appropriate public use analysis necessarily requires evaluation of the development plan as a whole—the end result of the sum of all of its parts. Cf. _Broadriver, Inc._ v. _Stamford,_ 158 Conn. 521, 534, 265 A.2d 75 (1969) ("[a]lthough the plaintiff's concern is for its own parcel within the redevelopment area, the commission's responsibility was to consider conditions existing in the entire area including such matters as street layouts and the relation and significance of the plaintiff's property to the entire area"), cert. denied, 398 U.S. 938, 90 S. Ct. 184, 26 L. Ed. 2d 270 (1970); _Pet Car Products, Inc._ v. _Barnett,_ 150 Conn. 42, 52, 184 A.2d 797 (1962) (for urban renewal, "[t]he plaintiff misconceives the agency's responsibility to consider the condition obtaining in the entire area rather than the condition of the individual property"). We will, however, address the plaintiffs' parcel-specific claims in the related context of reasonable necessity; that is, whether the taking of the plaintiffs' property was reasonably necessary to achieve the public purpose of the development plan. See, e.g., _Pequonnock Yacht Club, Inc._ v. _Bridgeport,_ supra, 259 Conn. 600–604; see parts IV and VI of this opinion.

pose of economic development necessarily requires private sector involvement. We agree with the defendants.

We set forth the following additional facts that are relevant to the disposition of this claim. As stated previously, the development corporation will own the property after the condemnation; it will then lease the property to Corcoran Jennison for $1 per year for a term of ninety-nine years. With respect to Pfizer, the plaintiffs point out that it is, in the words of James Hicks, the executive vice president of RKG Associates, the firm that assisted the development corporation in the preparation of the development plan, the "10,000 pound gorilla" and "a big driving point" behind the development project. Specifically, the plaintiffs point out that Pfizer's "requirements"[51] had been met, namely, the inclusion within the development plan of a hotel for its clients and business associates, upscale housing for its employees, office space for its contractors, and other upgrades to the infrastructure of the general area.

---

[51] The term "requirements" was contained in a December, 1997 letter from Claire Gaudiani, the president of the development corporation, to George Milne, the president of Pfizer's research division. In this letter, Gaudiani had stated that the development corporation was "pleased to make the commitments outlined below to enable you to decide to construct a Pfizer Central Research Facility in New London." The letter describes the efforts to "design a land plan to ensure that the new Pfizer facility will be the centerpiece of a concentrated reuse of the area surrounding the former New London Mills." It informs Milne that "[i]n addition to your facility, the project includes the development of the state's fourth biotechnology incubator, the refurbishment of historic Fort Trumbull, the reuse of the vacant Naval Undersea Warfare Center and the development of mixed retail and residential space that will be fully integrated into the surrounding neighborhoods of the city of New London. In order to achieve these goals, it will be necessary to relocate the Calamari Bros. scrap dealer, upgrade utilities and infrastructure, and acquire a number of surrounding properties." The conclusion of the letter states that the development corporation "will work with you to refine this proposal to meet Pfizer's requirements." As the trial court correctly points out, in the letter "[n]o mention is made of a hotel or office buildings . . . or any direct link between new residential construction and any need by Pfizer executives for upscale housing."

The trial court's memorandum of decision, however, reveals that, although a great deal of consideration was given to the various demands and needs created by the new Pfizer facility, this consideration was given for the purpose of making the development plan more beneficial to the city. Indeed, Hicks testified that Pfizer's announcement was "key" because it was "unusual" for a major employer to move "into an urban area, especially into a brown site . . . that has environmental problems. They tend to go to suburban areas, tend to go to green fields. Finding them coming there just offered a unique property for New London to take advantage of a number of things that would happen at that site for development."[52]

Hicks testified that he toured Pfizer's facilities during the development plan preparation process in order to gain a better understanding of its needs and the demands that it created. Pfizer did not tell him what details to add to the development plan, although he had been told that there was a need for a hotel as a result of Pfizer's arrival in the city. Hicks testified, however, that he was never told that Pfizer would not come to the city if the hotel was not built.[53]

---

[52] Indeed, Hicks testified that "[t]he major gist of the [development corporation's] goals were to expand upon the Pfizer facilities. That is, to have not just Pfizer come in, but other ancillary economic benefits accrue before that. I mean, can you multiply it? Pfizer, with any large company, attracts other users, attracts people to provide them services. If you do what's commonly referred to as an economic analysis, cluster analysis, there's groups of firms and companies that relate to companies that also bring employment. So one of the major goals was to expand upon Pfizer for the benefit of citizens of New London to improve the tax base, [provide] employment opportunity. . . . *If you've got something that very rarely happens, in my experience, in an urban area, a major corporation moving a lot of jobs, high-paying jobs, it gives you really good opportunities to take advantage of that and expand some of the things that you see in your community.*" (Emphasis added.)

[53] We note that, during the testimony of William Longa, senior corporate counsel for Pfizer, the trial court wondered how Pfizer could move to the city without already having had the hotel and housing plans in place. In response to this, Longa testified that there were sufficient hotels and housing

The trial court also noted the testimony of William Longa, senior corporate counsel for Pfizer. Longa testified that Pfizer's only conditions for relocating its global development facility to the city were that: (1) the adjacent wastewater treatment facility be upgraded; (2) the state park be restored; and (3) its significant local investment be leveraged into a benefit for the entire city. He stated that Pfizer did make suggestions about "certain functions that the company was involved in that were natural stepping stones that the community could use to its benefit to leverage the investment that the company had made in its own site." He stated that Pfizer had informed the development corporation of certain needs and demands that it had created, such as the company's guests who would need hotel space and employees who would need places to live.[54]

Longa did testify that Pfizer never made specific demands about the locations of uses within the development plan. Pfizer will not have an ownership or management interest in any of the facilities located within the development plan area. The trial court also observed that the team who had drafted the development plan considered alternatives that did not fit the needs communicated by Pfizer. Indeed, the development plan itself does not mention Pfizer's desires in the section describing its reasoning for choosing the final of the six alternatives.

in the general area that already served its facility in nearby Groton. The Groton facility did not have housing and hotels immediately adjacent. Longa, however, testified that the hotels and housing are a significant part of ensuring that the city, rather than just the outlying towns, could take advantage of Pfizer's relocation.

[54] The trial court also noted the testimony of James Mahoney, executive director of the development corporation from 1992 to 1998. Mahoney testified that the development corporation interacted with Pfizer during the environmental impact evaluation process, as part of a market analysis intended to determine appropriate uses for the development plan area. Pfizer did at this time inform them of the demand for hotel, conference and residential space that its presence would create.

The trial court acknowledged an October 21, 1998 e-mail to George Milne, president of Pfizer's research division, from James Serbia, a Pfizer employee involved in the development and management of company facilities. In the e-mail, Serbia indicated that he had left Milne with some concept drawings because of "some confusion" about Pfizer's "expectations" regarding the development of the Fort Trumbull area. The e-mail stated that Serbia thought the issue "boils down to . . . whether or not Pfizer is flexible regarding the development plans—I believe the answer is yes per all our previous discussions on this—as long as some key components are included." It listed attractive residences, hotel and conference space, and upgrades to the wastewater treatment plant, state park and commercial space as "key components." Serbia then asked Milne whether the following items would fit with his "expectations"— seventy to eighty upscale residential units, and a 250 unit hotel. The trial court noted that the development plan incorporates these features.[55]

The trial court relied on *Katz* v. *Brandon*, supra, 156 Conn. 531–34, and *Bugryn* v. *Bristol*, 63 Conn. App. 98, 107–108, 774 A.2d 1042, cert. denied, 256 Conn. 927, 776 A.2d 1143, cert. denied, 534 U.S. 1019, 122 S. Ct. 544, 151 L. Ed. 2d 422 (2001), to begin with the proposition that a taking of land is impermissible if it is made primarily to benefit private interests. In other words, the primary purpose of the taking must be to serve the public interest; benefits to private entities must be incidental to this public purpose. The trial court also relied on *Merrill* v. *Manchester*, supra, 127 N.H. 237, for the use of a "net benefit" test, under which the

---

[55] The e-mail indicated that the state did not want to locate new residences in a floodplain area, or condemn existing residential areas to replace them with more upscale housing. The e-mail did not mention office space or the need to clear the entire Fort Trumbull area of existing residences and businesses, which were the needs that precipitated the need for the condemnations in the present case.

"benefits of the proposed project and the benefits of the eradication of any harmful characteristics of the property in its present form, [are] reduced by the social costs of the loss of the property in its present form. If the social costs exceed the probable benefits, then the project cannot be said to be built for a public use."

The trial court considered the facts in the context of these principles and concluded that, viewed in the context of the severe economic distress faced by the city, with its rising unemployment and stagnant tax revenues, the benefits to the city will outweigh those to Pfizer. The court noted that the hotel, with many of its rooms subsidized by Pfizer, will employ many people at a variety of skill levels, which would tie into the city's desire to rejuvenate its downtown area. The court did note that the concentrated high end housing would not likely have a "multiplier" effect, but would increase the tax rolls.

With respect to parcels 3 and 4A, the trial court noted that Pfizer did not press for the development of these parcels, or demand office space. Thus, with respect to these parcels, Pfizer would only "tangentially benefit" from their development. The court, therefore, concluded that the primary motivation for the city and the development corporation was to take advantage of Pfizer's presence,[56] and that the primary motivation and effect of the development plan and its condemnations was to benefit the distressed city, not Pfizer.

Moreover, with respect to private entities besides Pfizer, the trial court concluded that "[t]here is nothing in the record to indicate that as regards this project as

[56] The trial also court quoted the proposition in *Katz* v. *Brandon*, supra, 156 Conn. 533, that "[i]n this day of keen competition to attract industry and business to a state or to a particular locality, public officials are expected to cooperate in helping an industry to locate in their community. They must be at all times alert in providing for future as well as present needs." (Internal quotation marks omitted.)

a whole or considering parcel 3 and its planned office building separately . . . the city or the development corporation [was] motivated by a desire to aid particular private entities." The trial court noted that tenants for the office space had not been chosen, Corcoran Jennison was selected as developer from a group of applicants, and that the project was linked to the "rejuvenation of the downtown area." Although the trial court acknowledged the "social cost"[57] of the implementation of the development plan, the court ultimately "fail[ed] to see a relevant constitutional distinction between redevelopment cases and a situation such as this where the very fact of permitting economic development by private entities permits an economically struggling city to attempt to rejuvenate its downtown area, increase its job market, improve its housing stock and give it sufficient tax money to meet its needs."

A trial court's determination that the legislative authority primarily intended a taking to benefit the public interest, rather than a private entity, is a question of fact that we review pursuant to the clearly erroneous standard of review. *Bugryn* v. *Bristol*, supra, 63 Conn. App. 103 (applying clearly erroneous standard to trial court's determination that benefiting local manufacturer was not primary purpose for taking). It is well established that "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.)

---

[57] The trial court was not, and we are not, blind to the social costs of the development plan in the present case. In the words of the trial court: "An old New London neighborhood with all of its memories, in effect, has been destroyed. People like the plaintiffs have been or might yet be removed from homes they love and in some cases from homes where their families have lived for generations."

*DiMartino* v. *Richens,* 263 Conn. 639, 661, 822 A.2d 205 (2003).

We begin our review of the trial court's finding with the proposition that the power of eminent domain must be used for a public use or purpose, and not primarily for the benefit of private entities. Moreover, "[w]here the public use which justifies the taking of the area in the first instance exists . . . that same public purpose continues even though the property is later transferred to private persons." (Internal quotation marks omitted.) *Bugryn* v. *Bristol,* supra, 63 Conn. App. 104, quoting *Broadriver, Inc.* v. *Stamford,* 158 Conn. 522, 533–34, 265 A.2d 75 (1969), cert. denied, 398 U.S. 938, 90 S. Ct. 1841, 26 L. Ed. 2d 270 (1970); see also *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 143–44. Although the courts afford great deference to the legislature's public use or purpose determination; *Hawaii Housing Authority* v. *Midkiff,* supra, 467 U.S. 244; *Olmstead* v. *Camp,* supra, 33 Conn. 551; the public use question remains ultimately a judicial question. *New York, N.H. & H. R. Co.* v. *Offield,* supra, 77 Conn. 421. That element of judicial review, however deferential, would be hollow in the absence of a standard by which the courts can determine intelligently whether the public interest is paramount. Accordingly, we agree with the trial court's utilization of a purposive standard that also takes into account the actual public benefit from the taking.[58]

Thus, we conclude that an exercise of the eminent domain power would be an unreasonable violation of

---

[58] We take the opportunity, however, to state that the trial court's social costs analysis was an improper, but in this case, harmless, supplantation of a decision-making function better suited to legislative bodies. Although the courts remain charged with determining whether the facts and circumstances of the particular case reveal that the primary purpose of the taking is to benefit the public, the balancing of the benefits and social costs of a particular project is uniquely a legislative function.

the public use clause if the facts and circumstances of the particular case reveal that the taking was primarily intended to benefit a private party, rather than primarily to benefit the public. See *Katz* v. *Brandon*, supra, 156 Conn. 534 ("[t]here is nothing in the record to indicate that any conveyance of land has been made to [a manufacturing corporation] or that any agreement or understanding exists which would provide it with any advantage which is not available to others who may be interested as redevelopers"); *Bugryn* v. *Bristol*, supra, 63 Conn. App. 104 ("[e]ven if the taking [for an industrial park, an undisputed public use] would later provide a site for [a major local company], a consequence that would be neither undesirable to the defendants nor adverse to the goals that the park plan seeks to achieve, that fact would not support the plaintiffs' claim [of private taking] in light of the ample evidence in the record concerning the plan as a whole"); *Wilmington Parking Authority* v. *Land With Improvements*, 521 A.2d 227, 232 (Del. 1986) ("[A] primary purpose determination in a constitutional context will normally turn upon the 'consequences and effects' of a proposed project. However . . . a reviewing court may consider evidence concerning the 'underlying purpose' of a public authority in proposing a project.");[59] *Jamestown* v.

---

[59] Indeed, *Wilmington Parking Authority* v. *Land With Improvements*, supra, 521 A.2d 232–34, is noteworthy as another example of the role of judicial review in curtailing the abusive use of the power of eminent domain; it is an excellent illustration of the line between public and private takings. In that case, a parking authority attempted to take land ostensibly for garage construction, but then intended to transfer it to a neighboring newspaper company. Id., 229. The newspaper company would use the land for facility expansion, but the parking authority would pay the newspaper company for the air rights over the land, and construct a garage there. Id. The trial court blocked the parking authority's use of eminent domain for this purpose. Id., 230.

On appeal, the Delaware Supreme Court concluded that the trial court did not commit clear error when it concluded that the parking authority acted beyond its statutory authorization because "the primary purpose of the project was to retain [a newspaper company] as a corporate citizen rather than to provide the public with parking facilities." Id., 234. The court

*Leevers,* supra, 552 N.W.2d 367 (recognizing economic development as public use, but remanding for finding as to "whether the primary object of the development project was for the economic welfare of downtown Jamestown and its residents rather than for the primary benefit of private interests").

Applying this standard to the present case, we conclude that the trial court's finding that the takings were not primarily intended to benefit a private party, namely, Pfizer, is not clearly erroneous. The trial court's finding derives ample support from the record, particularly the fact that Pfizer's "requirements," complained of by the plaintiffs, do not impact parcels 3 and 4A. Moreover, the testimony of Hicks, Longa and James Mahoney, executive director of the development corporation, supports the trial court's conclusion that Pfizer did not dictate the form of the development plan. Although it is undisputed that Pfizer's presence spurred many of the plans within the development plan, we view this factor as did the trial court; Pfizer's arrival in the city afforded the development corporation an opportunity to create an economic development plan that would go a long way toward the rejuvenation of a distressed city. Indeed, had the development corporation failed to consider demands created by the new Pfizer facility, its planning would have been unreasonable.

Moreover, the trial court correctly identified the ample public benefits that the development plan, once implemented, was projected to provide. Assuming them to be correct,[60] the development plan projected the gen-

---

also considered that other parking authority actions would dispose of 500 public parking spaces, offsetting the projected gain of 950 new spaces, of which 10 percent were reserved automatically for newspaper company employees. Id.

[60] Cf. *Donahue* v. *Southington,* supra, 259 Conn. 795 (in equal protection context, "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker" [internal quotation marks omitted]); *Franklin Furniture Co.* v.

eration of hundreds of construction jobs, approximately 1000 direct jobs, and hundreds of indirect jobs. Moreover, the property tax revenues are expected to be between $680,544 and $1,249,843; this would be a significant increase for an area that presently produces $325,000 in property taxes. Most importantly, as the trial court astutely observed, these gains would occur in a city that, with the exception of the new Pfizer facility that employs approximately 2000 people, recently has experienced serious employment declines because of the loss of thousands of government and military positions. As the trial court noted, the city's unemployment rate is close to double that of the rest of the state. Indeed, as the trial court observed, the city's regional labor market was up 17 percent, in comparison to 45 percent for the region and 40 percent for the state as a whole. In light of these staggering economic figures, we conclude that the trial court did not commit clear error when it found that the development plan primarily was intended to benefit the public interest, rather than private entities.

The plaintiffs claim that "[t]he purpose put forward by the defendants for these condemnations is that greater taxes will be generated if plaintiffs' homes are replaced by office buildings. That is true of nearly every home in the country. If greater tax revenues alone becomes a sufficient basis for condemnations in Connecticut, then Connecticut homeowners will lack any constitutional protection against eminent domain. Any home will be up for grabs to any private business that wants the property." This claim, while somewhat incalescent, affords us the opportunity to reiterate that an exercise of the eminent domain power is unreasonable,

*Bridgeport,* 142 Conn. 510, 514–15, 115 A.2d 435 (1955) ("[w]hile recitals of fact in a legislative act may not be conclusive, a decent respect for a coordinate department of the government requires the courts to treat them as true until the contrary appears").

in violation of the public use clause, if the facts and circumstances of the particular case reveal that the taking specifically is intended to benefit a private party. Thus, we emphasize that our decision is not a license for the unchecked use of the eminent domain power as a tax revenue raising measure; rather, our holding is that rationally considered municipal economic development projects such as the development plan in the present case pass constitutional muster.

C

Assurances of Future Public Use

The plaintiffs next contend that the condemnations of the properties on parcels 3 and 4A lack "reasonable assurances of future public use."[61] Before we turn to the specifics of the plaintiffs' claim, we note that both the plaintiffs' briefs and our research reveal no primary or secondary authorities that actually utilize the term "reasonable assurances of future public use." Nevertheless, the plaintiffs, relying primarily on *Casino Reinvestment Development Authority* v. *Banin*, 320 N.J. Super. 342, 354–58, 727 A.2d 102 (1998), contend specifically that there is no assurance that the acquired properties will be used in accordance with the purposes of the development plan, because the development corporation owns the property, the city will not be a party to the development agreement with Corcoran Jennison, and the ultimate property uses will thus be chosen by private entities. The plaintiffs also claim that the trial court improperly concluded that supervision of the development corporation by the department, pursuant

---

[61] The trial court determined that the taking of parcel 4A was not reasonably necessary, and therefore only discussed the reasonable assurances of future public use for parcel 3. Accordingly, on appeal the plaintiffs claimed only that parcel 3 lacked reasonable assurances of future public use. In response to the defendants' cross appeal, however, the plaintiffs expanded their argument to include parcel 4A and, therefore, we will address them together.

to chapter 132 of the General Statutes, will assure the future use of the property in accordance with the development plan because that supervision is financial and does not extend to the use of eminent domain. Finally, the plaintiffs claim, solely in regard to parcel 4A, that it is impossible to find reasonable assurances of future public use when the condemnor does not know what it is going to do with that parcel. The defendants contend in response that: (1) the development plan contains land use restrictions that assure future uses will be consistent with its purpose; and (2) land projects such as the development plan require time to complete; in other words, that "Fort Trumbull will not be built in a day." We agree with the defendants.

We first set forth the standard of review. A trial court's determination that there are sufficient statutory and contractual constraints in place to provide reasonable assurances of future public use is a question of fact, and "our review is limited to deciding whether such findings were clearly erroneous." *Powers* v. *Olson*, 252 Conn. 98, 105, 742 A.2d 799 (2000). It is well established that "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *DiMartino* v. *Richens*, supra, 263 Conn. 661.[62]

---

[62] The dissent claims that this court, sub silentio, is overruling the holdings of *Connecticut College* v. *Calvert*, 87 Conn. 421, 88 A. 633 (1913), and *Evergreen Cemetery Assn.* v. *Beecher*, 53 Conn. 551, 5 A. 353 (1886). More specifically, the dissent cites those two cases for the proposition that "the question whether in any given instance the use is or will be administered as a public or as a private use, is a question which must of necessity be determined by the courts in accordance with the facts of the particular case in hand." *Connecticut College* v. *Calvert,* supra, 428. Contrary to the dissent's claim, our conclusion in the present case is consistent with the principles set forth in those two cases.

We disagree with the dissent, however, on the appropriate standard the trial court should apply to the plaintiffs' claim of lack of reasonable assurance

In the present case, the trial court concluded that the city's lack of future involvement does not mean that the development corporation and the developers are not bound to use the property in accordance with the terms of the development plan. The trial court stated that the state, functioning through the department, is a signatory to the development agreement; it "provides the funding without which nothing goes forward."[63] The

of future public use. We conclude that the trial court's factual determination about the statutory and contractual constraints on future public use is subject to the clearly erroneous standard of review. The dissent, to the contrary, proposes a new four step process of review in which one of the steps would require the development corporation to prove by clear and convincing evidence that the specific economic development contemplated by the plan will, in fact, result in a public benefit. This step essentially subjects the plaintiffs' lack of reasonable assurances argument to an evidentiary standard that no other court, or even the plaintiffs themselves, has set forth. Furthermore, this court knows of no other area of the law where we, or any other courts, have imposed a clear and convincing standard on a prediction of future events. As the dissent itself makes clear, even in other civil cases involving property disputes, the clear and convincing standard is reserved for *past events*, and not for predictions of *future events*. See, e.g., *Wildwood Associates, Ltd.* v. *Esposito*, 211 Conn. 36, 42, 557 A.2d 1241 (1989) (clear and convincing evidence required to prove elements of adverse possession claim). Additionally, it is hard for this court to imagine how any plan, proposed and adopted according to the provisions of chapter 132 of the General Statutes, would be able to prove that the economic development will, in fact, occur in the future. Thus, there is simply no basis, in reason, precedent, policy or practicality for the dissent's proffered standard.

[63] The trial court also referred to its findings on the delegation issue; see part III of this opinion; wherein the court concluded that pursuant to chapter 132 of the General Statutes, there is substantial state oversight of the operations of the development corporation with respect to the implementation of the development plan. Specifically, the court discussed § 8-189 (development plan must conform to department regulations), General Statutes § 8-190 (department may make planning grants and advise development agency), General Statutes § 8-191 (department must approve final development plan if state grants have been made), General Statutes § 8-193 (a) (if state grants have been made, department and city must approve land transfers by sale or lease in accordance with plan), and General Statutes § 8-200 (a) ("substantial" changes to development plan require approval in same manner as original plan). In discussing the delegation issue, the trial court noted that the state is a signatory to the development agreement, and it concluded that it "strain[ed] credulity to believe that the state . . . will not (1) have the wherewithal to control the activities of the [development corporation] to a sufficient degree so as not to allow that agency to be characterized as

court then discussed several provisions of the development plan that assure that future land use will be on the terms contained therein, namely: (1) the durational clause providing that "[t]he development plan and/or any modification hereof shall be in full force and effect for a period of thirty years from the date of first approval of this development plan by the city council of the city"; and (2) other land use restrictions contained therein.[64] The trial court concluded that, were a developer to violate these provisions, the development corporation could turn to the courts for relief; should the development corporation refuse to do so, the city could then terminate its arrangement with the development corporation and appoint a new development agency.

We conclude that the trial court properly determined that there are sufficient statutory and contractual constraints in place to assure that private sector participants will adhere to the provisions of the development plan. We agree with the trial court that the terms of the development plan providing parcel-specific land uses, to which private developers participating in the project must adhere, provide significant control over

being able to act according to its own 'will and caprice'; and will not (2) have the ability to ensure through the development agreement that the developer and the [development corporation] will seek to meet the goals and purposes of the [development plan], which the commissioner had to approve in the first place . . . ."

[64] The development plan provides, in addition to an antidiscrimination clause, that the redeveloper must "[agree] for itself and its successors and assigns as successors in interest to the parcel, or any part thereof, that the deed conveying the Parcel shall contain language covenanting on the part of Redeveloper and its successors and assigns that:

"The Parcel shall be devoted principally to the uses contemplated by the Plan, and shall not be used or devoted for any other purpose, or contrary to any of the limitations or requirements of said Plan. *All improvements made pursuant to the Plan and this Agreement shall be used in accordance with the Plan unless prior written consent is given by the [development corporation] and [department] for a different use*;

"The Parcel shall not be sold, leased, or otherwise disposed of for the purposes of speculation." (Emphasis added.)

the destiny of the parcels. See footnote 64 of this opinion. We also conclude that the trial court properly determined that the significant state involvement in this project, mandated by chapter 132 of the General Statutes, functions to provide a level of governmental oversight beyond that provided by the development corporation. See footnote 63 of this opinion. Finally, we conclude that despite the lack of formal commitments to the use of parcel 4A, there are sufficient assurances that the public use of the development plan will be carried out. We, therefore, reject the plaintiffs' claim that the existence of the development agreement requiring that the property be "primarily" developed in accordance with the development plan, which is in effect for thirty years, is no assurance because only the development corporation may enforce it.[65]

Accordingly, the plaintiffs' reliance on *Casino Reinvestment Development Authority* v. *Banin*, supra, 320 N.J. Super. 342, is misplaced. In that case, the casino development authority had sought to take properties by eminent domain for the declared purpose of providing parking, green space and roadway access to an adjacent renovated hotel and casino complex owned by Trump Plaza Associates (Trump). Id., 347. After the taking, the land would be transferred to Trump for redevelopment. Id. The court concluded that the primary consequence and effect of the taking was to benefit Trump because there was no adequate assurance that the property

[65] Although the present case provides no occasion for a complete exploration of the mechanisms for judicial enforcement of the development plan under chapter 132 of the General Statutes, it is elementary that the terms of the development plan, like any other "legal obligation may, of course, be dishonored. That is one reason why courts exist." *Northeastern Gas Transmission Co.* v. *Collins*, supra, 138 Conn. 589. Although we need not address its precise workings, there is "ample judicial machinery"; id.; available for enforcement of the development agreement and the development plan, in the event of breach of their terms by either the development corporation or private developers.

would be used by Trump for those purposes declared as justifications for the taking.[66] Id., 355–56. In so concluding, the court noted that the agreements between the casino authority and Trump did not: (1) impose time restrictions on changes in the land use; or (2) require expressly that Trump use the acquired properties solely for the purpose for which they were taken; rather, they used the language "hotel development project and appurtenant facilities." Id., 356.

The New Jersey court interpreted the "overbroad" term of "hotel development project and appurtenant facilities" as allowing Trump "to eliminate the park and fill the entire block with an expanded casino hotel . . . without [casino development authority] approval." Id. The court, therefore, concluded that the casino development authority's determination that the takings "fulfilled a public purpose" was unreasonable because, "[i]n looking at the consequences and effects of these condemnation actions the court must conclude that under the circumstances present here, any potential public benefit is overwhelmed by the private benefit received by Trump in the form of assemblage and future control over development and use of parcels of prime real estate in Atlantic City."[67] Id., 358; see also *Vicksburg* v. *Thomas*, 645 So. 2d 940, 943 (Miss. 1994) (The taking of property for the construction of a riverboat casino was impermissible when the "[c]ity failed to provide

---

[66] Indeed, the court distinguished the project from "redevelopment projects . . . with the public agency identifying and putting together an assemblage of land in order to attract a developer" because all of the other land already was owned by the existing neighboring hotel and casino. *Casino Reinvestment Development Authority* v. *Banin*, supra, 320 N.J. Super. 355.

[67] The court stated that, in *Casino Reinvestment Development Authority* v. *Banin*, supra, 320 N.J. Super. 357, "a public agency, through the power of eminent domain, if successful, will have effectively created an assemblage of land for future development by Trump under circumstances where [the casino authority] could not do so under [the enabling statute] and where Trump is unable or unwilling to do so itself on the open market."

conditions, restrictions, or covenants in its contract with [the casino] to ensure that the property will be used for the purpose of gaming enterprise or other related establishments. In fact, testimony indicates that [the casino] may do anything it wishes with [the defendant's] property . . . .").

Thus, we conclude that the plaintiffs' reliance on *Casino Reinvestment Development Authority* v. *Banin*, supra, 320 N.J. Super. 342, is misplaced because of the previously discussed controls that exist by statute and under the development plan in the present case, particularly when compared to the flexibility that impermissibly was afforded to the private entities in that case and in *Vicksburg* v. *Thomas*, 645 So. 2d 943. The oversight and rigorous land use restrictions that are present with the development plan simply did not exist in *Casino Reinvestment Development Authority*.[68]

### III

### WHETHER THE DELEGATION OF THE EMINENT DOMAIN POWER TO THE DEVELOPMENT CORPORATION WAS UNCONSTITUTIONAL

The plaintiffs next claim that the trial court improperly concluded that the city's delegation of the eminent domain power to the development corporation was constitutionally valid. Specifically, the plaintiffs contend that, in concluding that the delegation was constitutional, the trial court incorrectly determined that the development corporation satisfied the test for the constitutionality of delegations set forth in *Connecticut College* v. *Calvert*, 87 Conn. 421, 427, 88 A. 633 (1913), and *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn.

---

[68] Moreover, we also reiterate our previous conclusion that the public use or purpose in the present case is, in the first instance, the plan to induce the significant economic growth projected as a result of private sector development spurred by the terms of the development plan. As the defendants note correctly, such growth necessarily requires time to occur.

144–45. The defendants claim, in response, that the delegation in the present case is constitutionally valid because the development corporation is the city's statutorily authorized agent for the implementation of the development plan, a constitutionally valid public purpose, and is not acting to further its own operations. We agree with the defendants.

The record reveals the following additional undisputed facts relevant to the disposition of the plaintiffs' delegation claim. The development corporation is a Connecticut nonprofit, private economic development corporation that originally was formed in 1978, and reactivated in 1997. In May, 1998, pursuant to General Statutes § 8-188,[69] the city council had adopted a resolution approving the designation of the development corporation as the city's "[d]evelopment agency" or "[i]mplementing agency." Thereafter, in January, 2000, the city council approved the development plan as conceived by the development corporation,[70] and appointed the development corporation to implement the development plan.[71] The January, 2000 resolution also expressly

---

[69] General Statutes § 8-188 provides: "Any municipality which has a planning commission is authorized, by vote of its legislative body, to designate the economic development commission or the redevelopment agency of such municipality or a nonprofit development corporation as its development agency and exercise through such agency the powers granted under this chapter, except that the Quinnipiac Valley Development Corporation, organized and existing by virtue of the provisions of number 625 of the special acts of 1957, may be designated as a development agency, for the purposes of this chapter, to act as such within the geographical area specified in section 2 of said special act. Any municipality may, with the approval of the commissioner, designate a separate economic development commission, redevelopment agency or nonprofit development corporation as its development agency for each development project undertaken by the municipality pursuant to this chapter."

[70] The development plan, as approved by the city council prior to its authorization of the development corporation to use eminent domain, expressly listed those properties needed for its implementation.

[71] The January, 2000 resolution specifically stated in relevant part that "the New London City Council hereby resolves: (1) That the [development plan] is hereby approved . . . .

had authorized the development corporation, in the city's name, pursuant to § 8-193 (a), to use the power of eminent domain within the project area if necessary to acquire properties for development. See footnote 71 of this opinion. Subsequently, in October, 2000, the development corporation enacted a resolution that exercised its power of eminent domain to acquire, in the city's name, certain properties within the project area, including those of the plaintiffs.[72] Indeed, we note

"(6) That to carry out and administer the project, public action under Chapters 130, 132 and 588 (*l*) of the Connecticut General Statutes as amended is required; and, for the purposes of carrying out this project, that the New London City Council approves and bestows upon the [development corporation] all rights and powers that are permitted to accrue to a development agency or implementing agency under Chapters 130, 132, and 588 (*l*) of the Connecticut General Statutes as amended, including the power of eminent domain with the project area in the name of the City of New London per Chapter 130, Section 8-128, and Chapter 132, Section 8-193."

[72] The October, 2000, development corporation resolution provided in relevant part: "WHEREAS, the New London City Council has designated the [development corporation], a nonprofit development corporation, as its development agency pursuant to the Connecticut General Statutes, and

"WHEREAS, the [development corporation] has prepared a project plan for [development plan] Area pursuant to Section 8-189 of the Connecticut General Statutes, and

"WHEREAS, the project plan for the [development plan] Area has been duly approved and adopted pursuant to Section 8-191 of the Connecticut General Statutes, and

"WHEREAS, it is necessary to acquire certain properties located in the [development plan] Area of [the city] in order to carry out and administer said project plan, and

"WHEREAS, pursuant to Section 8-193 of the Connecticut General Statutes the [development corporation] has the approval of the New London City Council to acquire by eminent domain properties within the [development plan] Area.

"NOW, THEREFORE, IT IS RESOLVED that the [development corporation], in the name of the [city], acquire certain properties located in the [development plan] Area of [the city] through the exercise of the power of eminent domain as granted to it under Chapter 132 of the Connecticut General Statutes. Said properties are more particularly described . . . .

"IT IS FURTHER RESOLVED, that the [development corporation] take such steps as are necessary to effectuate such acquisition in the manner provided in Sections 8-128 through 8-133 of the Connecticut General Statutes."

that the development corporation resolution empha-
sized specifically the city's approval of the use of emi-
nent domain, pursuant to § 8-193.

The trial court concluded that "from the perspective
of political control over the [development corporation]
by the city's legislative body, it can hardly be said that
the [development corporation] vis-a-vis that entity is
some free-wheeling private body attendant to its own
affairs and acting as only it sees fit."[73] The trial court
then cited the analysis of *Connecticut College* v. *Calvert*,
supra, 87 Conn. 427, 430, as discussed in *Gohld Realty
Co.* v. *Hartford*, supra, 141 Conn. 144, for the proposi-
tion that "the exercise of eminent domain by the govern-
ment itself or a public agency thereof is different from
its exercise by a private person to whom the govern-
ment has granted the power. And, in the second place,
the basis of the decision is . . . that when a private
person is granted the power to appropriate property,
it must be for a use to which 'the public will have a
common right upon equal terms, independently of the
will or caprice of the corporation.' " The trial court then
stated that this court, in *Gohld Realty Co.*, seemed to
presume, without actually ruling, that an urban redevel-
opment agency is a public agency, before it concluded
that blight removal was a public use in and of itself,
regardless of the subsequent transfer to private develop-
ers. Id., 145. On the basis of its analysis of the statutory
framework governing the operation of the development
corporation; see General Statutes §§ 8-188, 8-189 and
8-193 (a); the trial court then concluded that it did not

[73] The plaintiffs also had argued in the trial court that the development
corporation was entirely a private entity not subject to control by the state
or city governments, and that the benefits of its actions accrued wholly to
private parties, such as Corcoran Jennison. The trial court rejected these
arguments after reviewing the extensive statutory framework under chapter
132 of the General Statutes governing the development corporation's use
of eminent domain. See footnote 63 of this opinion. On appeal, the plaintiffs
challenge only the trial court's constitutional analysis.

accept the plaintiffs' delegation argument because: (1) it deemed the development corporation more a public agency than a private entity; and (2) the public use prong of the test was more appropriately analyzed in the context of whether economic development was a public use.

We first set forth the appropriate standard of review. The plaintiffs' claim involves only the trial court's application of the constitutional standard of *Connecticut College* v. *Calvert*, supra, 87 Conn. 427, 430, to the undisputed facts. Our review of this question of law, therefore, is plenary. See, e.g., *Cunha* v. *Colon*, 260 Conn. 15, 18 n.6, 792 A.2d 832 (2002).

Our analysis begins with a brief review of this court's decision in *Connecticut College* v. *Calvert*, supra, 87 Conn. 427–30. In *Connecticut College*, the petitioner had challenged an act whereby the legislature had granted the right of eminent domain to a private educational corporation. Id., 423. The court "accept[ed] and endorse[d] the legislative declaration that the higher education of women is in its nature a public use," stating, however, that "the question whether in any given instance the use is or will be administered as a public or as a private use, is a question which must of necessity be determined by the courts in accordance with the facts of the particular case in hand." Id., 428. The court relied on *Evergreen Cemetery Assn.* v. *Beecher*, 53 Conn. 551, 552–53, 5 A. 353 (1886), in which this court refused to permit a private cemetery association to take land by eminent domain for cemetery purposes,[74] and

---

[74] In *Evergreen Cemetery Assn.* v. *Beecher*, supra, 53 Conn. 552, this court acknowledged the public necessity of the proper burial of the dead, as a matter of "[t]he safety of the living . . . ." The court also noted that the legislature provided for associations to exist with power to provide, maintain and protect public burial places, and that "[t]he use of land by them for this purpose does not cease to be a public use because they require varying sums for rights to bury in different localities; not even if the cost of the right is the practical exclusion of some." Id., 553.

The court also noted that the cemetery association was a private facility

stated that the fundamental inquiry in cases of the delegation to private parties is "whether it appears that the public will have a common right upon equal terms, *independently of the will or caprice of the corporation,* to the use and enjoyment of the property sought to be taken." (Emphasis added.) *Connecticut College* v. *Calvert, supra,* 430. The court expanded further, stating that "the right of eminent domain cannot constitutionally be delegated to a private person or corporation unless for a use which is governmental in its nature, and unless the public has or can acquire a common right on equal terms to the use or benefit of the property taken; *except only that the use, or right of use by the public, may be dispensed with when a public benefit results from the taking, which cannot otherwise be realized, and which continues to exist although the public has no use or benefit of the property taken."* (Emphasis added.) Id., 435.

The court applied this principle, and concluded that, even having accepted the college's argument that "the higher education of women is a matter of great public utility"; id., 436; the public would not necessarily have the right to enjoy the benefits of the land because the college did not have a legal obligation to admit "to its courses of instruction all qualified candidates, to the extent of its capacity, without religious, racial, or social distinction." Id., 435–36. The court relied on a series of sister state public spending cases that distinguished private colleges like Connecticut College from public universities open to all qualified candidates, ultimately

not necessarily open to all, a category of cemetery whose "proprietors . . . cannot take land for such continued private use by right of eminent domain." Id. It, therefore, was distinguishable from public access cemeteries, as well as privately operated mills, toll roads and bridges, which, while they benefit their private operators, "[remain] a public use as long as all persons have the same measure of right for the same measure of money." Id. The court, therefore, denied the cemetery association's petition to take land by eminent domain. Id.

concluding that the grant of the eminent domain power was unconstitutional because of the exclusively private benefits from that grant of the eminent domain power to a private condemnor. Id., 438–39.

We most recently restated the rule of *Connecticut College* in *Carofano* v. *Bridgeport*, 196 Conn. 623, 632, 495 A.2d 1011 (1985), wherein this court rejected a claim that General Statutes § 7-473c, the mandatory binding arbitration statute, was an unconstitutional delegation of the legislative power because "the arbitrators are not public officials accountable to the electorate." The court in *Carofano* discussed, inter alia, delegations of the eminent domain power, and cited *Connecticut College* as standing for the proposition that "the delegation of the governmental power of eminent domain to private persons rather than to public officials has frequently been approved where *a public purpose is thereby advanced and where the benefit of the property taken is considered to be available to the general public.*" (Emphasis added.) Id., 633. Indeed, this court "perceive[d] no inherent vice that should preclude enlistment by the legislature of private individuals or agencies to achieve a public purpose by the exercise of a governmental power so long as adequate safeguards are provided. Although elected officials and those appointed by them as public officers may be more directly answerable to the electorate for their doings, the principle of accountability remains viable in the ability of legislators to terminate or modify any delegation of legislative power that has been made and in the ultimate authority of the people to change the law by electing those amenable to the public will." Id., 633–34.

Although *Carofano* v. *Bridgeport*, supra, 196 Conn. 633–34, is not an eminent domain case, we find persuasive its rearticulation of the *Connecticut College* formulation that is applicable when the eminent domain authority has been delegated to a private entity. Its

emphasis on public purpose and benefit is more harmonious with the well established purposive approach that we follow presently in resolving questions of public use, than the claim that *Connecticut College* requires actual access by the public. See, e.g., *Olmstead* v. *Camp*, supra, 33 Conn. 551. Indeed, this court implicitly recognized this in *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 143–44, when the court concluded that the rule of *Connecticut College* did not apply because, "[i]f the public use which justifies the exercise of eminent domain in the first instance is the use of the property for purposes other than slums, that same public use continues after the property is transferred to private persons. The public purposes for which the land was taken are still being accomplished." Moreover, the *Carofano* approach to delegation analysis is especially compatible with the concept that many governmental endeavors, such as economic development or urban renewal, may be accomplished more expeditiously when governmental authorities are afforded the opportunity to utilize the expertise and resources of the private sector. Accordingly, we conclude that *Carofano* sets forth the appropriate standard to apply to the eminent domain delegation in the present case.

We now apply the *Connecticut College* standard, as articulated in *Carofano* v. *Bridgeport*, supra, 196 Conn. 633–34, to the delegation in the present case.[75] At the outset, we note that it is undisputed that the development corporation is a private entity. We next turn to the second prong, which itself is bifurcated into two factors: (1) whether "a public purpose is thereby advanced"; and (2) "where the benefit of the property

[75] The power of eminent domain, which emanates from the *state* legislature; see, e.g., *Northeastern Gas Transmission Co.* v. *Collins*, supra, 138 Conn. 586–87; initially had been granted to the city through chapter 132 of the General Statutes. See General Statutes §§ 8-186, 8-193 (a) and 8-199. The plaintiffs did not challenge this initial grant to the city, only the subsequent grant from the city to the development corporation.

taken is considered to be available to the general public." Id., 633. Accordingly, we also note that we previously have concluded that the development plan in the present case constitutes an economic development plan that is, by itself, a public use or purpose under either the federal or state constitution. See part II A of this opinion. The "advancing a public purpose" factor, therefore, is satisfied because the delegation effectuates the public purpose directly, by giving the development corporation the power to acquire real property for the implementation of the development plan.

A more complex inquiry in the present case, however, is whether "the benefit of the property taken is considered to be available to the general public." *Carofano* v. *Bridgeport*, supra, 196 Conn. 633. The plaintiffs claim that, under *Connecticut College*, availability to the general public requires public entrance into, or the benefits of tenancy in, the office buildings planned for construction on parcel 3. They further claim that such direct benefit is unavailable because the tenants will be selected solely by Corcoran Jennison, and not the development corporation or the city.[76] The defendants contend, in response, that direct access is not required because the public use of economic development necessarily requires the development corporation to turn the property over to private developers and their tenants, and that the development corporation is, unlike the college in *Connecticut College*, not acting in furtherance of its own benefit. We agree with the defendants.

We note that the *Connecticut College* rule as stated in *Carofano*, requires only that the "benefit" of the taking be available to the general public. Id. We conclude that the public benefit of the taking in the present

---

[76] Goebel testified that Corcoran Jennison will select the tenants for the office buildings; the development corporation has no say over who the tenants will be.

case is the dramatic economic benefit that the development plan is expected to have for the public in the New London community, namely, the massive projected growths in employment and tax and other revenues. Indeed, the rule of *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 144, is particularly applicable, because in the present case, the public use and benefit in the first instance is the economic revitalization; accordingly, that "same public use continues after the property is transferred to private persons. The public purposes for which the land was taken are still being accomplished." Id., 143–44.

Moreover, in the present case, the development corporation is not acting exclusively for its own benefit, unlike in *Connecticut College,* wherein the college sought to acquire property to further its own operations. *Connecticut College* v. *Calvert,* supra, 87 Conn. 423–24. In the present case, the development corporation is acting to implement a development plan whose property acquisition provisions already have been accepted by the city itself; indeed, as the city resolved in January, 2000, after approving the development plan, the development corporation acquired the properties in the name of the city, pursuant to § 8-193 (a).[77] Accordingly, we conclude that the delegation of the eminent domain authority to the development corporation was not unconstitutional.

---

[77] We note that the parties dispute whether an agency relationship exists between the development corporation and the city, and that the plaintiffs cite several instances of the development corporation being less responsive to the inquiries of the city than an agent customarily should be to the questions of a principal. The trial court, however, concluded that an agency relationship did in fact exist between the city and the development corporation, as well as the development corporation and the department. Nevertheless, in light of our resolution of the plaintiffs' claim by a straightforward application of the rule set forth in *Carofano* and *Connecticut College,* we note that the existence of an agency relationship is immaterial to the resolution of this appeal.

## IV

### PARCEL 3 REASONABLE NECESSITY CLAIMS

#### A

##### Whether the Taking of the Properties on Parcel 3 Was Reasonably Necessary

The plaintiffs next claim that the trial court improperly concluded that the taking of the four homes located on parcel 3 was "reasonably necessary" to achieve the intended public use because keeping the homes there would make the marketing and development of the intended office space more "difficult." Specifically, they claim that expert testimony introduced at trial indicated that there were alternatives available that would permit the office space intended for parcel 3 to be constructed exactly as planned without taking the homes. The defendants contend, in response, that the trial court properly deferred to the legislative determination of necessity, with respect to the parcel 3 properties, because there was no evidence that the takings were unreasonable, the product of bad faith, or an abuse of the power conferred. We agree with the defendants.

The record and the trial court's memorandum of decision reveal the following additional facts and procedural history. The trial court began its review of the necessity of taking the properties on parcel 3 by stating that it would follow the deferential approach articulated in *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 146, and would review the legislative determination of necessity to "discover if it was unreasonable or in bad faith or was an abuse of the power conferred." The court reviewed the governing legal principles and the competing testimony submitted by the parties' planning experts. The trial court then began its factual analysis by discussing the testimony of the plaintiffs' expert, John Mullin, a professor of economic and industrial

development at the University of Massachusetts.[78] Mullin testified that he had reviewed the development plan and had visited the Fort Trumbull area, and that the plaintiffs' four properties occupied slightly more than three quarters of one acre of parcel 3. He testified that it is uncommon for land and housing to be cleared entirely for new development in urban waterfront areas. Mullin testified that, in his opinion, the taking of the four homes on parcel 3 was not reasonably necessary to carry out the goals of the development plan in that parcel, which included offices, parking, and the retention of the Italian Dramatic Club. He testified that retaining the homes was a "no-brainer" because of the small amount of land that they occupy, as well as their location on the parcel in "reasonable clusters"; three homes together in a row and one immediately adjacent to the Italian Dramatic Club.

Mullin then discussed an alternate proposal that he had created in conjunction with an architectural firm. He testified that this proposal provided the same parking and office space as the present development plan, without taking the plaintiffs' homes, but also added new homes. On cross-examination, Mullin testified that his plan would have located the office buildings and new homes overlooking a sewage treatment plant; a location that ideally was better suited for parking than these structures, although such uses could be mixed.[79] Mullin testified that, in his opinion, the development plan was a good plan with the exception of its treatment of the existing housing.

[78] The trial court acknowledged that Mullin "is a highly qualified and obviously knowledgeable individual." His qualifications included numerous fellowships, teaching positions, academic publication, military experience and government planning work.

[79] Mullin also testified that, in his opinion, prospective purchasers of single-family detached homes would not necessarily "be more inclined to look in the suburbs or someplace other than immediately adjacent to a [sewage] treatment plant."

The court then discussed the defendants' evidence, which consisted chiefly of the testimony of Hicks from RKG Associates,[80] which is the real estate planning and economic development consulting firm that aided the development corporation in preparing the development plan. Hicks stated that the team that prepared the plan primarily had wished to take advantage of Pfizer's unique decision to build a major facility in the city.[81]

Hicks discussed the six alternate plans that were considered; see footnote 6 of this opinion; and testified that, although two of the plans provided for the retention of existing housing, they were unworkable because it is difficult to turn residential properties into office space, which would frustrate the plan's goal of economic development. Hicks then explained how clearing all of the parcels was necessary to the success of the development plan, stating that RKG Associates had recommended this approach to the development corporation because it would make the area far more attractive for the crucial private sector investment and development. Moreover, Hicks testified that, even if retaining the homes under a plan like Mullin's was feasible, in his professional opinion, "it would make it much, much more difficult for [the development corporation] and probably would lead to a situation that certain parts of the site would probably have a much higher degree of difficulty in being developed."[82]

---

[80] Hicks has had experience in planning waterfront development projects in other cities, including Lewiston, Maine, and Fall River, Massachusetts. He also has governmental and academic experience in addition to his private sector work. Hicks also has worked as a developer, in addition to planning.

[81] In preparing the development plan, RKG Associates also worked on the statutorily required environmental impact evaluation, which described the city in great detail. Hicks testified that the environmental impact evaluation reflected the city's declining population, housing stagnation and rising unemployment, particularly in light of the closing of the United States Naval Undersea Warfare Center.

[82] Specifically, Hicks testified as follows: "What they finally adopted was they would get a private sector develop[er] to come in. What that basically means is a common redevelopment approach as you prepare the site. *You*

The trial court also reviewed the deposition testimony of Marty Jones, the president of Corcoran Jennison.[83] She testified that in early 1999, the development corporation selected Corcoran Jennison through a competitive bidding process to develop parcels 1, 2 and 3 of the development plan. A full development agreement between Corcoran Jennison and the development corporation still was being negotiated at the time of trial; there would, however, be a ground lease of the Fort Trumbull development area land from the development corporation to Corcoran Jennison for nominal rent, such as $1 per year. While the agreement was being negotiated between the development corporation, the department, and Corcoran Jennison, with the city being "intimate[ly]" involved, the development corporation

---

give them raw land with the necessary infrastructure, and the developer makes an investment. This site, though, has a lot of risk. It's got hazardous waste. It's got [geographic] constrainment. It's got a lot of regulations dealing with it, and it's in an urban setting. That's not the most attractive for investment, and that's the reality you have to face. There's not a lot of people coming and investing in [the city]. So if you're [going to] attract a private developer to this type of site setting, you've got to try to minimize as much uncertainty as much as possible. Most developers are good at understanding risks, but not uncertainty. If you said we'll give you something that looks like a spotted leopard—

"Q. What's the spotted leopard?

"A. It's where a leopard has spots, spots are things that stay the same and you've got to work around them. Spotted leopard is just a way to refer at the configuration of land uses. If you're [going to] attract developers, if you're [going to] put out what you call requests for proposals and get them interested in the site, and after they overcome all the inherent problems with redevelopment, say to them also, well, you've got to work around this contingency . . . you greatly diminish your ability to finding competent capable people to come in. You take things that would possibly [be] risk and turn them into uncertainty. Developers operate with very short time frame financial conditions, and it was our recommendation that because the housing wasn't adaptable and a long-term use to the office related things, and that three, four kinds of the hodgepodge of certain things that we recommended, that most of those facilities be demolished." (Emphasis added.)

[83] The parties had stipulated to the admission into evidence of the deposition of Jones.

and Corcoran Jennison had been working cooperatively under a letter of intent.

Corcoran Jennison's architectural staff has created site plans that comply with the terms of the development plan for the actual development of the parcels.[84] With respect to parcel 3, the trial court credited Jones' testimony that it would be "difficult [for Corcoran Jennison] to attract a commercial tenant to these commercial office buildings without a full site available for the development of an office building and the associated parking."[85]

After reviewing the testimony[86] and the relevant exhibits, the trial court credited the effort that went into the creation and formatting of the development plan. The court stated that, although it did "not conclude there is an absolute necessity to take the property at the present time, [it] believes and, at the least, has no basis to doubt the reasonableness of the testimony of . . . Hicks and . . . Jones that development would be

[84] Jones testified that public-private partnerships frequently have design review processes wherein the agency that selected the developer has a role in reviewing the developer's site plan. Jones and Goebel testified that, in the present case, the development corporation and the department would be the reviewing agencies, and that they had in fact engaged in informal reviews of Corcoran Jennison's plans. Jones also testified, however, that the formal process would occur pursuant to the development agreement, which had not yet been finalized.

[85] Jones testified that it is important for Corcoran Jennison to have a full site because "[f]irst of all to be able to develop the amount of parking needed for economic feasibility, and also . . . that the grading issues in . . . [p]arcel 3 are very complicated and the retention of isolated properties within that area could make it very difficult to develop this sort of property."

[86] The trial court also heard the testimony of Goebel, who stated that retention of the plaintiffs' homes in parcel 3 did not conform with the development plan. He also described the process by which the present development plan was chosen, and eventually approved by the city, development corporation and department, and the fact that it was a composite of six alternate plans. See footnote 6 of this opinion. Goebel also stated that the development corporation's decision to utilize the development plan at issue was informed by public comments during the selection process.

more difficult if these residences were allowed to remain." The trial court concluded that accepting the plaintiffs' argument would result in it "choos[ing] an alternative to development different from the alternative chosen by the agency appointed to prepare the [development plan]," and stated ultimately that "[t]he decision on which the necessity for the takings as set forth in the [development plan] and the present need for the takings of these particular properties involve the weighing of factors for which courts are not well equipped and which reflect broad 'legislative' type judgments which are best left to the appointed agencies of legislative bodies at state and local level and experienced state agencies all of which were involved and are involved in this taking process and the decisions which have led to it." Accordingly, the trial court denied the plaintiffs' request for permanent injunctive relief against the condemnation of their properties located in parcel 3, although it did grant temporary injunctive relief pending the appellate resolution of this case.

We begin by setting forth the standard of review. As an initial matter, the question of "[w]hether the purpose for which a statute authorizes the condemnation of property constitutes a public use is, in the end, a judicial question to be resolved by the courts . . . but, in resolving it, great weight must be given to the determination of the legislature." (Citation omitted.) *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 141. In part II of this opinion, we concluded that economic development projects created and implemented pursuant to chapter 132 of the General Statutes that have the public economic benefits of creating new jobs, increasing tax and other revenues, and contributing to urban revitalization, namely, the development plan in the present case, satisfy the public use clauses of the federal and state constitutions.

The level of judicial review applicable to a development agency's determination of what land is reasonably necessary for the effectuation of an economic development plan, such as the development plan in this case, presents a matter of first impression for this court. The Appellate Court, however, in *Bugryn* v. *Bristol*, supra, 63 Conn. App. 107–108, has concluded that the deferential standards of review applicable to that determination by a redevelopment agency in a redevelopment case under chapter 130 of the General Statutes; see, e.g., *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 599–601; *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146; also apply to the use of eminent domain in an economic development case under chapter 132 of the General Statutes. Thus, "[i]t is well settled that '[t]he determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclusive; it is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred.' *Gohld Realty Co.* v. *Hartford*, supra, [146]." *Bugryn* v. *Bristol*, supra, 107. We agree with the Appellate Court, and we conclude that this is the appropriate standard to apply during judicial review of the implementation of an economic development plan. Moreover, under this standard it is "the plaintiff [who has] the burden of establishing that the taking . . . was unreasonable, in bad faith or an abuse of power." *Hall* v. *Weston*, 167 Conn. 49, 66, 355 A.2d 79 (1974); accord *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 598; *Gohld Realty Co.* v. *Hartford*, supra, 146.

The trial court, of course, makes the first judicial assessment of the legislative or agency determination

of necessity. Thus, "[a]s a reviewing court, we are bound to determine whether the court's *factual* determination that the defendants did not act unreasonably in seeking to acquire all of the plaintiffs' property was clearly erroneous." (Emphasis added.) *Bugryn* v. *Bristol,* supra, 63 Conn. App. 108. Whether the legislative body acted in "bad faith or . . . abuse[d] . . . the power conferred" also are questions of fact for the trial court that an appeals court reviews for clear error. (Internal quotation marks omitted.) Id., 107; cf. *AvalonBay Communities, Inc.* v. *Orange,* 256 Conn. 557, 565, 579–80, 775 A.2d 284 (2001) (municipality's project plan was "pretext . . . to thwart affordable housing"; "the record fully support[ed] the trial court's finding that the [chapter 132] project plan was hastily assembled, poorly envisioned and incomplete"). It is well established that "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *DiMartino* v. *Richens,* supra, 263 Conn. 661.

Furthermore, "[t]he governing principles for our standard of review as it pertains to a trial court's discretion to grant or deny a request for an injunction [are]: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citations omitted;

internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 598.

We conclude that the trial court did not commit clear error in upholding as a factual matter the development corporation's determination that the parcel 3 takings were reasonably necessary to effectuate the goals of the development plan. Noting that "there is *no evidence,* credible or otherwise, that the condemnations in parcel 3 as originally envisaged in the [development plan] or at the time of the taking were done in bad faith, or not with an honest motive, or based on [any] pretext given any reasonable definition of the word," the court recognized that economic development planning is not the province of the courts and thus, properly deferred to the development corporation's necessity determination. (Emphasis added.) The trial court's determination with respect to parcel 3 derives ample support from the record, particularly as it credited the testimony of Goebel, Hicks and Jones as they described the deliberative process that ultimately produced the development plan. Accordingly, we conclude that the trial court did not commit clear error when it determined that the development corporation's reasonable necessity determination was not the product of bad faith, unreasonableness, or an abuse of the power conferred. The court, therefore, did not abuse its discretion by denying the plaintiffs the injunctive relief requested.

We note that the plaintiffs rely on our reasoning in *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 592, and contend that the taking of their property is not reasonably necessary just because that taking will make it easier for Corcoran Jennison to market the office buildings to potential tenants. Specifically, the plaintiffs refer to our statements in *Pequonnock Yacht Club, Inc.,* a redevelopment case under chapter 130 of the General Statutes, quoting the trial court as stating that "[j]ust because the property may be desirable to

the defendants does not justify its taking by eminent domain"; (internal quotation marks omitted) id., 606; and that "[t]he city provided no specific reasons, other than to enhance desirability of the area to investors, as to why the plaintiff's property, which both parties stipulated to be in good condition, is essential to the accomplishment of the redevelopment plan." Id., 605.

The plaintiffs' reliance on *Pequonnock Yacht Club, Inc.*, however, is misplaced because our holding in that case specifically was based on General Statutes § 8-125 (b),[87] which provides that nonblighted property located in a blighted area "may be taken by eminent domain when the property is essential to complete a development"; id., 604–605; as well as case law "establish[ing] that a redevelopment agency must make reasonable efforts to negotiate and consider the integration of the property that is not substandard into the overall redevelopment plan." Id., 603. In *Pequonnock Yacht Club, Inc.*, the plaintiff yacht club's property was in good condition, but was surrounded by a blighted area with deteriorating properties. Id., 604. The city, however, had refused to negotiate or correspond with the yacht club, or to consider integrating the yacht club's property into the plan, despite the yacht club's expressed willingness to be incorporated into the final redevelopment plan,

---

[87] General Statutes § 8-125 (b) provides: " 'Redevelopment area' means an area within the state which is deteriorated, deteriorating, substandard or detrimental to the safety, health, morals or welfare of the community. An area may consist partly or wholly of vacant or unimproved land or of land with structures and improvements thereon, and *may include structures not in themselves substandard or insanitary which are found to be essential to complete an adequate unit of development, if the redevelopment area is deteriorated, deteriorating, substandard or detrimental.* An area may include properties not contiguous to each other. An area may include all or part of the territorial limits of any fire district, sewer district, fire and sewer district, lighting district, village, beach or improvement association or any other district or association, wholly within a town and having the power to make appropriations or to levy taxes, whether or not such entity is chartered by the General Assembly . . . ." (Emphasis added.)

which included making changes to its property if necessary. Id., 605–606. We concluded that the trial court properly ordered the city to reconvey the property back to the yacht club because "the defendants acted unreasonably when they failed to consider or even discuss integration of the plaintiff's property into the redevelopment plan and that the defendants had failed to establish that taking of the plaintiff's property by eminent domain was therefore necessary and essential to the redevelopment plan." Id., 606.

We conclude that the present case is readily distinguishable from *Pequonnock Yacht Club, Inc.* First, *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 599–600, is a redevelopment case under chapter 130 of the General Statutes; in such cases, the public use is blight clearance. Thus, the public use in such cases is accomplished as soon as the blighted conditions are cleared, regardless of the land's subsequent attractiveness to investors. See, e.g., *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 143–44. Thus, nonblighted property located in blighted areas is subject to the essentiality requirement of § 8-125 (b), a statutory requirement that does not exist under chapter 132 of the General Statutes. See *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 603–606. In contrast, in the present case, the public use is, by itself, the economic revitalization of the city. See part II of this opinion. Thus, for the development corporation to ignore considerations of investment and marketability would frustrate the effectuation of its project's public purpose, and would be an unreasonable and arbitrary legislative act. We, therefore, conclude that our decision in *Pequonnock Yacht Club, Inc.*, does not require us to hold that the parcel 3 taking in the present case was not reasonably necessary.

## B

## Whether the Parcel 3 Takings Are for Reasonably Foreseeable Needs

The plaintiffs next contend that the trial court improperly concluded that the parcel 3 development was not impermissibly speculative because the office buildings will not be constructed unless a market develops for them. The defendants contend, in response, that the trial court properly concluded that the development of parcel 3 was not impermissibly speculative because of the logical progression that such long-term development projects necessarily follow. We agree with the defendants.

The record reveals the following additional facts relevant to the disposition of this claim. A market analysis completed in January, 1999, by RKG Associates for the preparation of the development plan stated that, at that time, rent levels for class A office buildings had stabilized and that "[r]eal estate conditions in the [city] have shown signs of modest recovery," as evidenced by a greater than 90 percent occupancy rate in those buildings. It acknowledged that those rent levels "remain below the level needed to support new speculative construction," and that "the historic sales values of [c]lass A office space, created by the past imbalances in the market, have not recovered sufficiently to justify new construction except for an end-user." It did state, however, that by 2010, a shortage of office and research and development space is expected within the Fort Trumbull area, and that "land area at Fort Trumbull should be reserved for the future development of office buildings."

In addition to the development plan, the trial court also considered a report entitled, "Marketing Plan for Commercial Development Space" (report), which was presented by Jones to other Corcoran Jennison officers

in January, 2001. The report echoed the development plan's analysis and concluded that then current "market conditions do not justify [the] construction of new commercial space at Fort Trumbull on a speculative basis." In the short term, the report recommended the renovation of "[b]uilding 2," which is an existing office building constructed in 1991 and located at the closed United States Naval Undersea Warfare Center. The report, however, stated that long-term commercial development would have a "target market" of "newly recruited companies evidencing Pfizer-related demand, whether it is for general office use or biotech/bioscience use. This demand will most likely come from out-of-region companies that contract with Pfizer and value proximity to Pfizer's [g]lobal [d]evelopment [f]acility."

The trial court noted that a major goal of the development plan is to capitalize on the presence of Pfizer, and that the report and the development plan both were prepared prior to the construction and occupancy of the new global research facility. The court then credited the testimony of Bruce Hyde, the city's director of real estate development and planning, who testified that, although the market for office space in the city was "on the softer side," since the Pfizer announcement in 1998, there had been increased interest in real estate development in the city.[88] The court also noted Hicks' testimony that Pfizer's business associates likely would occupy future office space in the Fort Trumbull area.

Finding no Connecticut authority directly on point, the trial court relied on sister state authority for the

---

[88] Hyde testified that when the United States Naval Undersea Warfare Center was in the city, "spin-off development" occurred as satellite companies opened up in the city to service it. He testified that these satellite companies then followed the sound lab to Newport, Rhode Island, when it relocated there. Hyde stated that he would expect similar spin-off development in the city as a result of Pfizer, although he personally was unsure about the kind of outside contractors with whom Pfizer interacts.

proposition that there need not be an immediate need for the property taken; planning for the future and changes in public needs are permissible, so long as the public use will be accomplished within a reasonable period of time. The trial court noted that "whether the effort is speculative in a particular case depends to a great extent on the nature of the public use involved," and that the legislature's assessment of whether a need is speculative receives the same judicial deference as other legislative necessity determinations; thus, the court will only disturb it if it is the product of bad faith, unreasonableness, or an abuse of discretion.

Applying these standards, the court concluded that "at least that in selected cases, cities like New London, given its economic situation, should be given time to develop a site which has built-in features that would be attractive to users—here, we have a city just beginning to come out of the economic doldrums, with a major international company alighting in its midst that has the ability to attract other businesses . . . ." Noting the prediction of a demand for space by 2010, and that substantial state and local resources and funds already had been spent on preparing the Fort Trumbull area for economic development, the court concluded that it could not "say that under the circumstances of this case that the planned development of parcel 3 is too speculative given the purpose of the development plan—economic development of an economically distressed community."

We will review the trial court's decision, as we do other reasonable necessity determinations, for clear error in determining the existence of bad faith, unreasonableness, or abuse of power on the part of the legislature in making the initial determination of whether the need is speculative, and therefore, not reasonably foreseeable. See *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 599–601; *Gohld Realty Co.* v.

*Hartford,* supra, 141 Conn. 146; *Adams* v. *Greenwich Water Co.,* 138 Conn. 205, 213–14, 83 A.2d 177 (1951); *Bugryn* v. *Bristol,* supra, 63 Conn. App. 107–108.

We begin our analysis of the trial court's conclusion by reviewing the applicable legal principles. A taking that is purely speculative is not reasonably necessary. *New Haven Water Co.* v. *Russell,* 86 Conn. 361, 369–70, 85 A. 379 (1912) (population growth and increasing demand justify taking of streams by water company). We note, however, that "[o]n the question of the necessity of a taking, needs which will arise in the reasonably foreseeable future must be taken into consideration." *Adams* v. *Greenwich Water Co.,* supra, 138 Conn. 214 (considering ten year water demand projections and stating that it was reasonably necessary for water company to create reservoir by damming river); accord *Phoenix* v. *McCullough,* 536 P.2d 230, 236 (Ariz. App. 1975) ("[T]he condemning authority may, in acquiring private property for public use, take not only such property as is necessary to satisfy present needs, but may acquire such additional property as will be put to public use within a reasonable time thereafter. In determining what constitutes a reasonable time, the surrounding circumstances must be considered."); *Grand Rapids Board of Education* v. *Baczewski,* 340 Mich. 265, 271–72, 65 N.W.2d 810 (1954) (school board could not justify taking property thirty years before its need was anticipated solely on basis of saving future taxpayers' money).

Several sister state cases also considered by the trial court in its memorandum of decision have expanded upon these basic principles. For example, in an airport expansion case, the Florida Court of Appeals has stated that, the "condemning authority need not present evidence pinpointing the need for the specific property, rather it is sufficient to show that the taking is necessary for the accomplishment of an overall plan of develop-

ment. . . . *Funds need not be on hand, nor do plans and specifications need be prepared for a condemnor to determine the necessity of a taking; in fact, it is the duty of public officials to look to the future and plan for the future.* . . . Thus, there need not be an immediate need for the property sought to be taken." (Citations omitted; emphasis added.) *Test* v. *Broward County*, 616 So. 2d 111, 113 (Fla. App. 1993); cf. *Alsip Park District* v. *D & M Partnership*, 252 Ill. App. 3d 277, 286, 625 N.E.2d 40 ("[A] condemning authority should 'anticipate the future increased demands for the public use to which the land is to be devoted.' . . . The advance acquisition of parkland is practical in a society with a growing population and changing recreational needs." [Citation omitted.]), cert. denied, 152 Ill. 2d 553, 622 N.E.2d 1199 (1993); but see *Phoenix* v. *McCullough*, supra, 536 P.2d 237 ("if the condemning body is uncertain when future use shall occur, the future use becomes unreasonable, speculative and remote as a matter of law and defeats the taking").

The condemnor's right "to acquire land for future expansion," however, is tempered by the need for "a suitable investigation" to inform its assessment of future needs. *In re Pittsburgh School District Condemnation Case*, 430 Pa. 566, 573–74, 244 A.2d 42 (1968). Indeed, the Pennsylvania court emphasized that the acquisition of land may not be "for real estate speculation and future sale," but rather, must be, in the "intelligent, informed judgment" of the condemnor, in furtherance of "an authorized public use . . . ." Id., 574; see also *Kansas City* v. *Hon*, supra, 972 S.W.2d 415 (deferring to city's necessity conclusion that "it needs to acquire the land now so that it can compete with other cities for the location of aviation-related facilities").

With these principles, and the clearly erroneous standard of review, to guide our inquiry, we turn to the trial

court's decision in the present case. We conclude that the trial court's determination that the parcel 3 takings were not impermissibly speculative was not clearly erroneous. Although the class A office building market was less than conducive to development and new construction at the time that the development plan was created, the trial court's deference to the legislative determination nevertheless was amply supported by the projections of future demand as a result of the new Pfizer facility. Numerous market studies were available and considered by the development corporation. Indeed, the trial court astutely observed that, at the time of the trial, the Pfizer facility had just opened; it, therefore, did not have the opportunity to create demand. Moreover, the report formulated by RKG Associates for the development plan predicted demand in the Fort Trumbull area by 2010, which is less than seven years away, which certainly is reasonably foreseeable temporally. Compare *Adams* v. *Greenwich Water Co.*, supra, 138 Conn. 214 (ten year water demand projections acceptable for foreseeability), with *Grand Rapids Board of Education* v. *Baczewski*, supra, 340 Mich. 271–72 (taking unjustified when school board anticipated need for property thirty years after time of taking). In light of our previous conclusion that the trial court properly had found that the reasonable necessity determination was not the product of bad faith, unreasonableness, or an abuse of power, we also conclude that the trial court properly determined that the parcel 3 takings were not impermissibly speculative.

The plaintiffs rely on the holding in *Phoenix* v. *McCullough*, supra, 536 P.2d 237, in support of their contention that the parcel 3 takings are impermissibly speculative. Their reliance on *McCullough* is misplaced. We acknowledge that the Arizona court concluded that, "if the condemning body is uncertain when future use shall occur, the future use becomes unreasonable, specula-

tive and remote as a matter of law and defeats the taking." (Internal quotation marks omitted.) Id. In *McCullough*, the Arizona court arrived at that standard after applying a reasonableness standard to a fact pattern wherein the city sought to acquire the plaintiffs' property for airport expansion purposes, but did not have a reasonably accurate time line for that expansion; the city planners' estimates for the date of use varied from fifteen to forty-six years. Id., 236–37. Moreover, the city in *McCullough* had admitted that it did not have a specific plan for the use of the plaintiffs' properties within that expansive time frame. Id.

We conclude that the reasoning of *McCullough* is inapposite to the present case because it developed out of a vastly different set of facts. In contrast to the airport expansion plans in *McCullough*, the development plan in the present case contains carefully considered predictions of development and market growth, spurred by the opening of Pfizer's major facility. It also projects demand for space by 2010, which is less than ten years from now, and thus, presents a dramatically different time frame than the uncertain fifteen to forty-six year gap of *McCullough*.[89] We, therefore, conclude that the

---

[89] Additionally, in support of their claim that courts reject projects that are on uncertain timetables, the plaintiffs point us to *San Diego Gas & Electric Co.* v. *Lux Land Co.*, 194 Cal. App. 2d 472, 479–80, 14 Cal. Rptr. 899 (1961), *State* v. *0.62033 Acres of Land*, 49 Del. 174, 179–80, 112 A.2d 857 (1955), and *Meyer* v. *Northern Indiana Public Service Co.*, 254 Ind. 112, 113–15, 258 N.E.2d 57 (1970), superseded on other grounds, 259 Ind. 408, 287 N.E.2d 882 (1972). Their reliance on these cases is misplaced because of the considered effort that went into the development plan in the present case, and the fact that the marketing studies and other evidence have indicated a foreseeable need for office space as a result of the new Pfizer facility.

In contrast, we note that the California court concluded that, on the facts of that case, "the taking of the defendants' property by the plaintiff [power company] for [gas and telephone lines] is not necessary . . . because the plaintiff has no present or prospective plans to use it for that purpose." *San Diego Gas & Electric Co.* v. *Lux Land Co.*, supra, 194 Cal. App. 2d 481. Similarly, the Indiana court rejected the electric company's attempt to maintain a 200 foot right-of-way for electric lines when the company had admitted that all it needed for the near future was the 150 feet that they already had;

trial court did not commit clear error when it deferred to the legislative necessity determination and concluded that the parcel 3 takings were not impermissibly speculative.

Accordingly, we further conclude that, because the trial court's decision regarding reasonable necessity was not the product of a legal error or an abuse of its discretion, we must uphold its denial of permanent injunctive relief to the plaintiffs with respect to those properties that are located on parcel 3. See *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 598–99.

## V

## EQUAL PROTECTION CLAIMS

The plaintiffs next claim that the condemnation of the properties located on parcel 3 violated the equal protection clauses of the Connecticut[90] and United States[91] constitutions because the development corporation spared the Italian Dramatic Club (club) that also was located on that parcel. Specifically, they contend that the trial court improperly concluded that: (1) the club and the homes were not similarly situated; and (2) even if the club and the homes were similarly situated, the trial court utilized an improper legal standard by focusing on the defendants' subjective motivation in

there was no evidence of plans that would require more room. *Meyer* v. *Northern Indiana Public Service Co.*, supra, 254 Ind. 115. Moreover, the Delaware court concluded that the taking for highway construction was impermissible when no present or future need had been established, and the department of transportation had taken "no official action" toward the highway's construction. *State* v. *0.62033 Acres of Land*, supra, 49 Del. 179–80. Accordingly, these cases are distinguishable from the present case wherein a carefully considered projection of need, and plans for achieving it, were in place prior to the taking.

[90] Article first, § 20, of the constitution of Connecticut provides in relevant part: "No person shall be denied the equal protection of the law . . . ."

[91] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

making the condemnation decision, rather than on whether the decision itself was arbitrary or irrational. The defendants claim, in response, that the trial court properly determined that the condemnations did not violate the equal protection clause of the federal constitution because: (1) the homes and the club are not similarly situated under the terms of the development plan or the relevant zoning laws; and (2) the development corporation's distinction between the two uses had a rational basis.[92] We agree with the defendants, and we conclude that the development corporation did not violate the plaintiffs' equal protection rights by condemning their properties, but not the club's building.

The trial court's memorandum of decision reveals the following additional facts relevant to our resolution of this claim. The club is a long-standing private social organization[93] in the Fort Trumbull area; its building is located on parcel 3 of the development plan. Originally, the club's building had been slated for acquisition and demolition in the development plan as approved by the city in January, 2000. In October, 2000, however, the development corporation determined that the club's building could remain on parcel 3.

The trial court concluded that the plaintiffs did not satisfy the "preliminary step" of establishing that they and the club were "similarly situated";[94] the court, there-

---

[92] In their brief, the plaintiffs do not "provide an independent analysis asserting the existence of greater protection under the state constitutional provision than its federal counterpart . . . [and] we will not of our own initiative address that question. . . . Accordingly, the federal equal protection standard is considered prevailing for the purposes of our review of both the state and federal equal protection claims in this case." (Internal quotation marks omitted.) *Donahue* v. *Southington*, supra, 259 Conn. 794 n.7.

[93] Membership in the club is limited to descendants of people who emigrated from a certain region in Italy. The club holds dinners for its members; they may bring guests to the dinners.

[94] In so concluding, the trial court rejected the defendants' contention that the club and the plaintiffs were not similarly situated because the club's building was a commercial property while the plaintiffs' homes were residential. The court expressly noted that the club was not commercial property.

fore, concluded that it did not need to proceed further with the equal protection analysis. The trial court based this conclusion on the properties' locations within the parcel; it concluded that the club's building was on the border, while two of the plaintiffs' properties were within the interior and ultimately would lack roadway access. The trial court also cited the previously credited testimony of Hicks and Jones that retaining the residences would pose problems for the future development of the parcel, while the club's building would not.

Nevertheless, the trial court did not end its equal protection analysis with the similarly situated issue. It went on to assume hypothetically that the properties were similarly situated, and it addressed the plaintiffs' claim that their right to equal protection was violated because the development corporation's decision was the "irrational"[95] result of politically motivated favoritism toward the club. The court analyzed the record and testimony with respect to the development plan's process of creation and approval, and concluded that it was "being asked to rely on speculation and conjecture by parties who . . . have the burden of proof."[96]

The trial court, however, also rejected the plaintiffs' contention that they were similarly situated because both were slated for acquisition and demolition under the development plan and wanted to stay, but that the club's building was spared. The court concluded that this was more "[a] statement of the problem, not the solution."

[95] The plaintiffs had claimed in the trial court that the taking implicated a fundamental right to property ownership, and that the development corporation's decision thus was subject to the strict scrutiny standard of review. The trial court concluded that the right to property ownership was not fundamental for equal protection purposes and, therefore, the development corporation's action was subject only to the rational basis standard of review. On appeal, the plaintiffs do not contest the trial court's decision to use the rational basis standard of review.

[96] Specifically, the trial court noted the testimony of Mahoney and James Dunn, the director of real estate acquisition for the development corporation, to the effect that condemnation of the club and a nearby church could be politically difficult. Nevertheless, the trial court concluded that in January, 2000, the city council approved the development plan with the club condemnation intact. The trial court also noted the testimony of Goebel and Damon

The court, therefore, rejected the plaintiffs' equal protection claim.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is essentially a direction that all persons similarly situated should be treated alike." (Internal quotation marks omitted.) *Thomas* v. *West Haven*, 249 Conn. 385, 392, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000). Thus, we ordinarily would have to address the plaintiffs' claim that the trial court improperly concluded, as a preliminary matter, that they were not similarly situated with the club's building. In light of the trial court's comprehensive memorandum of decision and the parties' thorough briefing, however, we will assume without deciding[97] that the plaintiffs' homes and the club are similarly situated for equal protection purposes.[98] Accordingly,

Hemmerdinger, a consultant to, and former director of real estate development for the development corporation, to the effect that, even after the city had approved the development plan, the development corporation, in response to public comments, continued to consider not demolishing other properties in addition to the club.

The trial court concluded that the plaintiffs' claim that Milne spoke to the governor about retaining the club was pure speculation, particularly because Milne was never deposed or called to testify, and the development corporation officers were never questioned about their involvement in this conversation. The trial court also noted multiple substantial state expenditures in support of the project, many months before the decision was made to retain the club's building.

[97] See, e.g., *State* v. *Ferguson*, 260 Conn. 339, 365–66, 796 A.2d 1118 (2002) ("[e]ven if we were to assume, without deciding, that the statement had been made with knowledge of its falsity and that this fact should therefore be excised from the affidavit, we conclude that probable cause still existed for the warrant to issue").

[98] "[E]qual protection does not just mean treating identically situated persons identically. . . . Moreover, the requirement imposed upon [p]laintiffs claiming an equal protection violation [is that they] identify and relate specific instances where *persons situated similarly in all relevant aspects* were treated differently . . . ." (Citation omitted; emphasis altered; internal quotation marks omitted.) *Thomas* v. *West Haven*, supra, 249 Conn. 402, quoting *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989); accord *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner*

we now will proceed to determine whether the trial court properly determined that the development corporation's decision had a rational basis and, therefore, did not violate the plaintiffs' equal protection rights. We conclude that the trial court correctly determined that there was a rational basis for the development corporation's condemnation decision.

Whether the development corporation's action sparing the club's building, but not the plaintiffs' residences, from condemnation violated the equal protection clause "must be gauged under the rational basis test. In the context of an equal protection challenge to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group, the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest. *Nordlinger* v. *Hahn*, 505 U.S. 1, 8, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 439–41, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). . . .

"The United States Supreme Court has recently summarized the rational basis test as applied to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group. *Nordlinger* v. *Hahn*, supra, [505 U.S. 11–12]. In general, the Equal

*of Environmental Protection*, 253 Conn. 661, 672, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001). Entities are "situated similarly in all relevant aspects" if "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the relevant aspects are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." (Internal quotation marks omitted.) *Dartmouth Review* v. *Dartmouth College*, supra, 19; accord *Equus Associates, Ltd.* v. *Southampton*, 37 F. Sup. 2d 582, 599 (E.D.N.Y. 1999) (utilizing test); *Kirschner* v. *Zoning Board of Appeals*, 924 F. Sup. 385, 392 (E.D.N.Y. 1996) (same).

Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 174, 179 [101 S. Ct. 453, 66 L. Ed. 2d 368 (1980), reh. denied, 450 U.S. 960, 101 S. Ct. 1421, 67 L. Ed. 2d 385 (1981)], the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 464 [101 S. Ct. 715, 66 L. Ed. 2d 659, reh. denied, 450 U.S. 1027, 101 S. Ct. 1735, 68 L. Ed. 2d 222] (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center, Inc.*, [supra, 473 U.S. 446]. *Nordlinger* v. *Hahn*, supra, [11]. . . .

"Therefore, the presumption of constitutionality can be overcome only by the most explicit demonstration that the classification is a hostile and oppressive discrimination against particular persons and classes. *The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.* . . . *Miller* v. *Heffernan*, 173 Conn. 506, 509–10, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978). . . . *Johnson* v. *Meehan*, 225 Conn. 528, 535–37, 626 A.2d 244 (1993). Furthermore, when a court determines whether a legislative classification is a hostile and oppressive discrimination against a particular class, the challenger must establish that the legislature selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn.

551, 567–69, 715 A.2d 46 (1998); accord *City Recycling, Inc.* v. *State,* 257 Conn. 429, 445–46, 778 A.2d 77 (2001).

Armed with these well established principles, we now turn to whether the trial court properly concluded that the plaintiffs failed to prove that there was no conceivable rational basis for the development corporation's decision to spare the club's building, but not the plaintiffs' residential properties, from condemnation. At the outset, we note that the parties do not dispute that this is a pure question of law; accordingly, we will engage in plenary review of the trial court's conclusion.

The plaintiffs contend that in determining whether there was a rational basis for the development corporation's decision, the trial court utilized an improper legal standard by focusing on the defendants' subjective motivation in making the condemnation decision, rather than on whether the decision itself was arbitrary or irrational. The plaintiffs also contend that the "defendants did not provide to the trial court a rational justification for its differential treatment between the property owners." The defendants claim, in response, that the plaintiffs have not carried their burden of proof, and that the decision to retain the club's building was rationally related to the achievement of the urban mixed-use community atmosphere of the development plan as a whole. We address each contention in turn.

We first address the plaintiffs' claim that the trial court applied an improper legal standard in its rational basis determination. Specifically, the plaintiffs contend that the trial court incorrectly had focused on the fact that they did not demonstrate adequately an improper or political motivation for the retention of the club's building, in violation of the United States Supreme Court's holding in *Willowbrook* v. *Olech,* 528 U.S. 562, 565, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), as adopted by this court in *City Recycling, Inc.* v. *State,* supra, 257

Conn. 447. We disagree, and we conclude that the trial court did in fact apply the correct legal standard in evaluating the plaintiffs' claims.

In *Willowbrook* v. *Olech*, supra, 528 U.S. 564, the United States Supreme Court concluded that "[o]ur cases have recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. . . . In so doing, we have explained that [t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." (Citations omitted; internal quotation marks omitted.) The court concluded that allegations of " 'irrational and wholly arbitrary' " treatment by village officials "quite apart from the [v]illage's subjective motivation, [were] sufficient to state a claim for relief under traditional equal protection analysis."[99] Id., 565.

---

[99] In *Willowbrook* v. *Olech*, supra, 528 U.S. 563, property owners had asked village officials to connect their property to the municipal water supply. The village conditioned the connection on the property owners granting the village a thirty-three foot easement, despite the fact that it had connected other properties to the water supply upon the grant of fifteen foot easements. Id. After a three month delay, the village relented and connected the subject property to the water supply with a fifteen foot easement. Id. Thereafter, the property owners brought an action, contending that their equal protection rights had been violated by the thirty-three foot demand, which they alleged was " 'irrational and wholly arbitrary' " and the result of ill will by the village toward them because of a prior action between the parties. Id. The District Court dismissed the claim; on appeal, the "Seventh Circuit reversed, holding that a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a 'spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective.' " Id., 563–64.

Applying this reasoning, the Supreme Court affirmed the Seventh Circuit's decision and concluded that the property owners' complaint stated a cause of action, stating that the allegations that "the [v]illage's demand was 'irratio-

We discussed the principles set forth in *Willowbrook* in *City Recycling, Inc.* v. *State,* supra, 257 Conn. 429. In that case, the commissioner of environmental protection (commissioner) had refused to process a recycling facility's application to expand its existing facility. Id., 431. The commissioner's refusal was pursuant to General Statutes § 22a-208a (a), as amended by No. 97-300, § 2, of the 1997 Public Acts (P.A. 97-300), which "prohibit[ed] the commissioner . . . from approving, for a city with a population of greater than 100,000, the establishment or construction of 'a new volume reduction plant or transfer station located, or proposed to be located, within one-quarter mile of a child day care center . . . .' The statute also excepts from its purview existing volume reduction facilities and transfer stations without regard to their location." *City Recycling, Inc.* v. *State,* supra, 431–32.

After reviewing the extensive factual findings and the relevant legislative history, this court concluded in *City Recycling, Inc.,* that "[u]nder the principles of our equal protection jurisprudence, we conclude that P.A. 97-300, § 2, is unconstitutional as applied, because it is violative of the plaintiff's equal protection rights. The factual findings of the trial court negate any rational basis of which we can conceive, the most obvious of which is that the expansion of the plaintiff's facility would have some negative impact on children in the day care center located within one-quarter mile of the facility. The plaintiff's equal protection claim is particularly compelling in light of the legislative history of P.A. 97-300, § 2, which demonstrates that the legislation was aimed solely at the plaintiff's permit application." Id., 449.

nal and wholly arbitrary' and that the [v]illage ultimately connected [the] property after receiving a clearly adequate [fifteen] foot easement . . . quite apart from the [v]illage's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." Id., 565. In so concluding, the court expressly did "not reach the alternative theory of 'subjective ill will' relied on by [the Seventh Circuit]." Id.

Our review of the trial court's memorandum of decision in the present case indicates that, as the plaintiffs claim, the court did in fact devote a great deal of analysis to the evidence of the process by which the decisions to condemn properties, and later to spare the club's building, were made. The memorandum states, however, that the court did so because the plaintiffs "strenuously argued that the true and only motive of the decision to allow the [club] to remain while the same right was not extended to [the plaintiffs] was based not on any purpose to accomplish the [development plan's] goals, but to placate important political interests represented by the [club], its supporters and members." Our review indicates that the trial court's analysis and discussion of the decisional process supports its conclusion that the plaintiffs failed to carry their burden of proving that the development corporation acted arbitrarily or irrationally in making its decision to spare the club's building.

Moreover, our review of the record, including the plaintiffs' trial briefs and the trial court's memorandum of decision, indicates that beyond claims of preferential treatment for the club, the plaintiffs failed to offer arguments in support of the determinative proposition that the development corporation's decision to spare the club completely lacked any conceivable rational basis. Indeed, the trial court expressly found that the club's social functions were related to the community and social aspects of the development plan, including the hotel. The court also found that, with respect to the goal of tying the development plan to other development in the downtown New London area, it "cannot say [that] it is beyond the realm of rational consideration to want to have a social club of admittedly some political clout, with members and guests from outside the Fort Trumbull area, remain in that area."

The plaintiffs also claim that the "defendants did not provide to the trial court a rational justification for its differential treatment between the property owners." The plaintiffs misstate the applicable burden of proof; indeed, as the trial court noted, they bear the burden of proving that there is no conceivable rational basis for the retention of the club's building. See, e.g., *City Recycling, Inc.* v. *State*, supra, 257 Conn. 446. Indeed, the plaintiffs' principal brief to this court discusses the applicable legal standard, but does not attempt to negative all conceivable reasons for keeping the club's building, but not their properties. Moreover, the city offers as a rational basis for the decision that the club's social functions are consistent with the social elements and community atmosphere of the development plan as a whole. Although the plaintiffs attack this determination in their reply brief as not worthy of being taken seriously, when engaging in analysis under the rational basis standard of review, we are constrained by the well established proposition, that "the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . ." (Citations omitted; internal quotation marks omitted.) Id., 445. Thus, the rational basis proffered by the city, in combination with the plausible reasons found by the trial court, and the plaintiffs' failure to carry their high burden of proof, compel us to conclude that the plaintiffs' rights to the equal protection of the laws have not been violated by the development corporation's decision to retain the club's building, but not their properties.

## VI

### CROSS APPEAL: WHETHER THE TAKING OF PARCEL 4A WAS REASONABLY NECESSARY

We now turn to the defendants' cross appeal, wherein they contend, inter alia, that the trial court improperly concluded that the takings of the plaintiffs' properties on parcel 4A were not reasonably necessary and, therefore, improperly granted the plaintiffs permanent injunctive relief. Specifically, the defendants claim that the trial court's conclusion that the properties on parcel 4A were not reasonably necessary because proposals, but no definite plan, were yet in place for the use of that parcel, was the product of an improperly broad review that did not afford the appropriate deference to the legislative necessity determination. The development corporation also contends that the trial court incorrectly allocated the burden of proof to the defendants. The plaintiffs contend, in response, that the trial court: (1) utilized the correct legal standard in its inquiry; and (2) correctly concluded that the properties on parcel 4A were not reasonably necessary because, unlike with parcel 3, the trial court did not have sufficient information before it to pass on the necessity of those properties to the development as a result of the lack of plans for parcel 4 development. We agree with the defendants, and we conclude that the trial court did not utilize the correct legal standard in evaluating the plaintiffs' parcel 4A claims and, therefore, improperly granted the plaintiffs permanent injunctive relief.

We begin by setting forth the standard of review applicable to a legislative or agency determination of reasonable necessity. As an initial matter, the question of "[w]hether the purpose for which a statute authorizes the condemnation of property constitutes a public use is, in the end, a judicial question to be resolved by the courts . . . but, in resolving it, great weight must be

given to the determination of the legislature." (Citation omitted.) *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 141. In part II of this opinion, we concluded that economic development projects created and implemented pursuant to chapter 132 of the General Statutes that have the public economic benefits of creating new jobs, increasing tax and other revenues, and contributing to urban revitalization, namely, the development plan in the present case, satisfy the public use clauses of the federal and state constitutions.

Once this court concludes that the enabling statutes support a public purpose, however, our review becomes much more limited in scope. "The determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclusive. . . . The agency's decision, however, is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred." (Citation omitted; internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 600; *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146; accord *Adams* v. *Greenwich Water Co.*, supra, 138 Conn. 213–14; *Bugryn* v. *Bristol*, supra, 63 Conn. App. 107–108. Moreover, under this standard it is "the *plaintiff* [who has] the burden of establishing that the taking . . . was unreasonable, in bad faith or an abuse of power." (Emphasis added.) *Hall* v. *Weston*, supra, 167 Conn. 66; accord *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 598; *Gohld Realty Co.* v. *Hartford*, supra, 146.

As stated in part IV A of this opinion, on appeal this court will apply the clearly erroneous standard of review to the trial court's underlying factual determination of whether the legislative or agency determination

of necessity " 'was unreasonable or in bad faith or was an abuse of the power conferred.' *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 146." *Bugryn* v. *Bristol,* supra, 63 Conn. App. 107. It is well established that "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *DiMartino* v. *Richens,* supra, 263 Conn. 661.

Furthermore, "[t]he governing principles for our standard of review as it pertains to a trial court's discretion to grant or deny a request for an injunction [are]: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citations omitted; internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 598.

The record reveals the following additional facts relevant to our resolution of this claim. As mentioned previously in this opinion, parcel 4 is subdivided into two smaller parcels, 4A and 4B. Eleven properties owned by four of the plaintiffs are located on parcel 4A; they occupy 0.76 acres out of the 2.4 acre parcel. Under the development plan, parcel 4A is designated for "park support" or "marina support . . . ." There is no development commitment or formal site plan in place for parcel 4A.

Although the development plan does not define the term "park support" expressly,[100] in describing the parcel's intended use, it states that "[a] portion of [p]arcel 4A will be redeveloped for uses that support the state park, such as parking, or for uses such as retail that will serve park visitors and members of the community." As the trial court correctly noted, the development plan later describes an alternative use for parcel 4A, which is "the development of support facilities for a marina, or a marina training facility, to be developed to the south on [p]arcel 4B and the Fort Trumbull State Park to the east. Any development of ancillary buildings that may be located on these two parcels shall be oriented to help define their edges . . . . Surface parking developed on either of these parcels shall be appropriately screened."[101]

Claire Gaudiani, president of the development corporation, testified that the development corporation also was working with the United States Coast Guard to

---

[100] In its memorandum of decision, the trial court expressed its concern that the phrase "park support" is vague and undefined. Damon Hemmerdinger, who had been the development corporation's director of real estate development and presently serves as a consultant to the development corporation, called it "broad" and "[not] a statutory term," stating that parcel 4A would serve uses such as parking or "other ancillary uses" for the park or marina. Indeed, Claire Gaudiani, president of the development corporation, also was not sure of the exact definition of the phrase "park support."

We note, as did the trial court, that Mullin, the plaintiffs' expert, testified that he had never heard the term before, but understood it to mean "parking, storage [and] warehousing." Mullin also referred to parcel 4A as "a big nothing," but then acknowledged that it could provide parking for both the parcel 4B marina, as well as the state park. He did state that he had insufficient information to estimate the parking demand as a result of those two facilities.

[101] This section of the development plan also states that parcel 4B "is intended to accommodate a mix of water-dependent uses centered around the rehabilitated Fort Trumbull Marina, which will provide boat slips and upland support. The Marina may be developed as a working marina training center, with facilities designed in conjunction with improvements made to parcel 4A."

explore the possibility of placing its museum on parcel 4A.[102] The development corporation has not, however, obtained a commitment from the Coast Guard for museum development on parcel 4A, because the Coast Guard was still choosing sites; indeed, the museum also had been considered for parcel 2, as well. Gaudiani testified that, to her personal knowledge, parcel 4A was the "preferred" and more likely site for the museum.[103]

The trial court began its analysis with the proposition that, "it is not necessary that the officials proceed to make *immediate* use of the property thus acquired, or that they have 'plans and specifications prepared and all other preparations necessary for *immediate* construction before it [the county] can determine the necessity for taking private property for public purpose.' *Carlor Co.* v. [*Miami*, 62 So. 2d 897, 902 (Emphasis added.) (Fla. 1953)]." *Wright* v. *Dade County*, 216 So. 2d 494, 496 (Fla. App. 1968), cert. denied, 225 So. 2d 527 (Fla. 1969), cert. denied, 396 U.S. 1008, 90 S. Ct. 565, 24 L. Ed. 2d 500 (1970). The trial court then stated that when the Florida court applied this proposition in *Miami Beach* v. *Broida*, 362 So. 2d 19, 20 (Fla. App. 1978), cert. denied, 372 So. 2d 466 (Fla. 1979), it had noted that there was a partially completed plan in place that justified taking the condemnees' property for a convention center. The trial court then cited *State Highway Commission* v. *Yost Farm Co.*, 142 Mont. 239, 243–44, 384 P.2d 277 (1963), and *Krauter* v. *Lower Big Blue Natural Resources District*, 199 Neb. 431, 439, 259 N.W.2d 472 (1977),[104] for the proposition that the

---

[102] Gaudiani testified that the museum would not be on the tax rolls, but would provide jobs and generate revenue by attracting thousands of visitors. If built, the museum would preclude the use of parcel 4A for parking.

[103] Goebel also testified that he was hoping for the museum to be located on parcel 4A.

[104] The trial court quoted *Krauter* v. *Lower Big Blue Natural Resources District*, supra, 199 Neb. 439, as stating that "[t]he landowner's right to own, possess, and enjoy his property free from an unlawful and unconstitutional exercise of the sovereign power of eminent domain may best be insured

"[condemnor] must in the first instance produce suffi-
cient evidence to establish facts indicating the taking
is necessary."

The trial court then stated that, under these stan-
dards, the statements in the development plan regarding
parcel 4A are "too vague and uncertain to allow [it] to
conclude [that] the takings here are necessary and
would not be unreasonable." It concluded that the
hopes of placing the museum on the parcel were too
speculative to justify the condemnations, and that the
other plans were too vague to allow it to engage in a
necessity analysis; in other words, "[e]ven if the court
were prepared to give the legislative agency all the
deference in the world under these circumstances . . .
the court just cannot make the requisite constitutionally
required necessity determination based on the informa-
tion before it." On the basis of this conclusion, the
court granted permanent injunctive relief against the
demolition of the plaintiffs' properties located on parcel
4A, and ordered that the statements of compensation
and certificates of taking with respect to those proper-
ties be dismissed.

On the basis of our review of the record and the trial
court's memorandum of decision, we conclude that the
trial court's review of the parcel 4A taking utilized a
legal standard that permitted review far in excess of
that provided for by our well established case law. More
specifically, although the trial court did acknowledge
nominally the judicial deference owed to the legislative
necessity determination, our review of its analysis, par-
ticularly the inclusion of the Montana and Nebraska
cases, indicates that it did not utilize the proper legal
standard, as set forth in *Pequonnock Yacht Club, Inc.*

by requiring specific pleadings and proof. We hold that in a condemnation
action under the power of eminent domain, the *condemn[or] must allege
the specific public purposes for which the condemn[or] seeks to acquire
and use the property sought to be taken.*" (Emphasis added.)

v. *Bridgeport,* supra, 259 Conn. 598–601, and *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 146, in reviewing the parcel 4A takings.

The trial court cited *State Highway Commission* v. *Yost Farm Co.,* supra, 142 Mont. 243–44, and *Krauter* v. *Lower Big Blue Natural Resources District,* supra, 199 Neb. 439, for the proposition that the "[condemnor] must in the first instance produce sufficient evidence to establish facts indicating the taking is necessary." As the development corporation correctly contends, this proposition improperly interposes burdens of production and persuasion that are dramatically different than the burden our state applies in cases wherein the necessity of a taking is attacked. In Connecticut it is not the condemnor, but rather "the *plaintiff* [who has] the burden of establishing that the taking . . . was unreasonable, in bad faith or an abuse of power." (Emphasis added.) *Hall* v. *Weston,* supra, 167 Conn. 66; accord *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 598; *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 146.

We note further that the Montana and Nebraska decisions followed by the trial court utilize an approach to the necessity determination that is dramatically different from the deferential standard that our state applies in cases wherein the necessity of a taking is attacked. Unlike Connecticut, these courts consider necessity to be a question of fact for the judiciary. For example, in *State Highway Commission* v. *Yost Farm Co.,* supra, 142 Mont. 243–44, the court stated: "The foregoing statutes and cases clearly reflect that under [Montana's] eminent domain statutory provisions, the trial judge not only has the power to determine the question of necessity, but has been directed to make a finding that the public interest requires the taking of the lands before he has power to issue an order of condemna-

tion."[105] In Connecticut, to the contrary, a trial court is limited to the factual determination of whether the legislative or agency determination of necessity "was unreasonable or in bad faith or was an abuse of the power conferred." *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146. Despite acknowledging this deferential standard of review, and properly applying it in its review of the necessity of the taking of parcel 3 properties, the trial court improperly conducted a necessity review that went beyond the scope of review permitted and based its decision to grant permanent injunctive relief on an incorrect statement of the law with respect to the parcel 4A properties.[106] Accordingly, its decision to grant permanent injunctive relief to those plaintiffs who own property located on parcel 4A was an abuse of its discretion.[107]

---

[105] The court in *State Highway Commission* v. *Yost Farm Co.*, supra, 142 Mont. 243–44, stated: "In an action to condemn private property for a public use, the question of necessity is one of fact, to be determined as other questions of fact, in view of all the evidence in the case. The evidence should show that the land is reasonably required for the purpose of effecting the object of its condemnation. . . . The question of necessity in a given case involves a consideration of facts which relate to the public and also to the private citizens whose property may be injured. The greatest good on the one hand and the least injury on the other are the questions of fact to be determined in passing upon the question of necessity. . . .

"The foregoing statutes and cases clearly reflect that under our eminent domain statutory provisions, the trial judge not only has the power to determine the question of necessity, but has been directed to make a finding that the public interest requires the taking of the lands before he has power to issue an order of condemnation." (Citations omitted; internal quotation marks omitted.)

Similarly, the court in *Krauter* v. *Lower Big Blue Natural Resources District*, supra, 199 Neb. 439, stated that "[i]n a condemnation case issues as to the amount of property needed and the estate or interest in such property are questions of fact for the court." See also footnote 104 of this opinion.

[106] Accordingly, we need not address the plaintiffs' factual contentions in support of the trial court's opinion because they are offered in support of a factual finding that was the product of the application of an improper legal standard.

[107] We also need not address the defendants' other claim in support of their cross appeal, which is that the trial court improperly refused to permit

Furthermore, we note that the plaintiffs claim only that the trial court properly determined that the taking of parcel 4A was not reasonably necessary. As previously discussed, this argument is premised on the trial court applying a standard of review that is not applicable in Connecticut. The plaintiffs did not claim that the development corporation's decision violated the proper standard utilized in Connecticut for reviewing such decisions—whether the decision was "unreasonable or in bad faith or was an abuse of the power conferred." *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146. In reviewing the plaintiffs' parcel 3 claim, we affirmed the trial court's determination that "there is no evidence, credible or otherwise, that the condemnations in parcel 3 as originally envisaged in the [development plan] or at the time of the taking were done in bad faith, or not with an honest motive, or based on [any] pretext given any reasonable definition of the word . . . ." See part IV A of this opinion. Similarly, our review of the record as it concerns the development corporation's necessity determination for parcel 4A reveals that it was not the product of bad faith, unreasonableness, or an abuse of the power conferred. Compare *AvalonBay Communities, Inc.* v. *Orange*, supra, 256 Conn. 565, 579–80 (municipality's project plan was "pretext . . . to thwart affordable housing"; "the record fully support[ed] the trial court's finding that the [chapter 132] project plan was hastily assembled, poorly envisioned and incomplete").

While there was no development commitment or formal site plan in place for parcel 4A, this is not necessarily indicative of bad faith, unreasonableness or abuse of power. As the trial court stated, "master planning is a process that evolves over time and must be flexible

the defendants to take the plaintiffs' properties on parcel 4A for the purpose of roadway and infrastructure improvements.

and subject to change as conditions warrant."[108] Similarly, this court has rejected a challenge to a town's condemnation based upon the town's lack of a detailed plan designating exactly what part of the defendants' land it needed for what purpose. *West Hartford* v. *Talcott*, 138 Conn. 82, 91, 82 A.2d 351 (1951); cf. *American Trading Real Estate Properties, Inc.* v. *Trumbull*, 215 Conn. 68, 79, 574 A.2d 796 (1990) ("land is indeed held for public use even when a municipality is not presently making use of the land but is simply holding it for development at some later time"). Furthermore, the development plan reveals that intended uses of parcel 4A include parking for a state park, or retail that will serve visitors and members of the community, or support facilities for a marina or a marina training facility. These intended uses, while not subject to definite commitments, do demonstrate that the development corporation has given reasonable attention and thought to the potential use of parcel 4A. Accordingly, under our deferential standard of review, the record does not support a finding that the development corporation acted in bad faith, unreasonably or in abuse of its power when it decided that parcel 4A was necessary to accomplish

---

[108] As the development corporation points out, accomplishment of the development plan's general plan for development requires that the development corporation have flexibility in carrying out the plan. The general plan states that "[t]he Fort Trumbull [development plan] area shall be developed as a dynamic mixed-use urban district that fully develops the opportunities presented by its waterfront location and its adjacency to the developing regional assets of the Fort Trumbull State Park and the Pfizer [g]lobal [d]evelopment [f]acility. The development of its proposed land uses shall support the formation of a vibrant Waterfront Urban Village, which binds each of its components into a highly cohesive urban district.

"The integrated nature of the proposed development shall (a) increase public access and use of the waterfront, (b) maintain a community atmosphere, and (c) enhance the location's attractiveness and desirability. *The establishment of strong functional, spatial and physical interrelationships between the district's various buildings, streets, public spaces and the waterfront, shall orient the development of each of the proposed land use components*." (Emphasis added.)

the objectives of the development plan. See *Berman* v. *Parker*, supra, 348 U.S. 35–36 ("It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."); *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146 (necessity determination open to judicial review only to discover if it was "unreasonable or in bad faith or was an abuse of the power conferred").

The judgment is affirmed with respect to the parcel 3 takings; the judgment is reversed with respect to the parcel 4A takings, and the case is remanded to the trial court with direction to render judgment for the defendants.

In this opinion BORDEN, PALMER and VERTEFEUILLE, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., and KATZ, J., join, concurring in part and dissenting in part. Another court observed in a different context: "A man's home may be his castle, but that does not keep the Government from taking it." *Hendler* v. *United States*, 952 F.2d 1364, 1371 (Fed. Cir. 1991). That is because, "[a]s an incident to its sovereignty, the Government has the authority to take private property for a public purpose."[1] Id. At the time that our federal constitution was written, a government taking meant just that, namely, a taking for a government purpose such as for

---

[1] "It is a fundamental principle of law that the power to appropriate private property for public use is an attribute of sovereignty and essential to the existence of government. . . . It attaches to every man's land and is paramount to his right of ownership. . . . It lies dormant in the state until set in motion by legislative enactment." (Citations omitted.) *Northeastern Gas Transmission Co.* v. *Collins*, 138 Conn. 582, 586, 87 A.2d 139 (1952).

a public building. Id. As the population grew and the collective needs of our society changed, however, the takings power was construed more broadly. Governmental authorities condemned private properties not just for a "public use," but also to achieve a "public benefit" such as the elimination of urban blight. Today, an even more expansive interpretation of public use in certain jurisdictions permits the taking of property for private economic development. To many, this represents a sea change in the evolution of the law of takings because it blurs the distinction between public purpose and private benefit and cannot help but raise the specter that the power will be used to favor purely private interests. This case therefore presents the court with a rare and timely opportunity to address a constitutional issue of great significance, that is, whether there are limits to the government's authority to take private property by eminent domain when the public purpose is private economic development, and, if so, how those limits should be defined and enforced.

I believe that the majority reaches the wrong result with respect to the plaintiffs' properties, in part because it overlooks the fact that private economic development differs in many important respects from how we have defined a public use in the past. Accordingly, although I concur in parts I,[2] III and V[3] of the majority opinion regarding the applicability of chapter 132 of the General Statutes[4] to nonvacant land, the constitutionality of delegating the eminent domain power to the New London

[2] I disagree in large part with the majority's analysis in part I of its opinion. Any discussion about this issue is unnecessary, however, in light of my conclusion that chapter 132 of the General Statutes applies to nonvacant land.

[3] Although I agree with the majority's conclusion in part V of its opinion, my conclusion that the taking of the plaintiffs' properties is unconstitutional for other reasons is dispositive of the appeal, and, thus, the court need not reach the plaintiffs' equal protection claims.

[4] General Statutes §§ 8-186 through 8-200b.

Development Corporation (development corporation), and the plaintiffs' equal protection claims, respectively, I disagree with the majority's conclusions in parts II, IV and VI pertaining to private economic development[5] as a public use under the Connecticut and federal constitutions and the taking of the plaintiffs' properties on parcels 3 and 4A.

I begin by noting that, because this is a case of first impression, this court has not considered, prior to today, many of the issues raised by the parties to this appeal, including whether chapter 132 of the General Statutes is constitutional. I further note that this court has not examined, for nearly a century, the authority of the state to exercise its power of eminent domain for the public benefit when accompanied by a corresponding benefit to private interests.[6] See *Connecticut College* v. *Calvert*, 87 Conn. 421, 424–28, 88 A. 633 (1913); *Evergreen Cemetery Assn.* v. *Beecher*, 53 Conn. 551, 553, 5 A. 353 (1886). Thus, it is important to undertake a review of property rights, the eminent domain power and the evolution of the public use requirement before addressing the issues raised by the plaintiffs in this appeal.

Part I A of this dissent briefly explores, from a historical standpoint, both the nature of the sovereign's taking authority and the development of the concept of private property rights. Part I B examines the historical development of the takings clauses of the state and federal constitutions, with particular emphasis on the changing concept of public use.

---

[5] The term "private economic development," as used in this opinion, refers to the type of development permitted under chapter 132 of the General Statutes.

[6] In redevelopment projects, it is the elimination of blight, and not the development that follows, that constitutes the public benefit. See generally General Statutes § 8-124.

Part II examines the degree of deference due to the legislature in its determination of what constitutes a public use, as well as the appropriate role of the court in ensuring that the condemnees' constitutional rights under the state and federal constitutions are not infringed. This part of the opinion also addresses whether different levels of judicial review are required depending on the nature of the public use under consideration.

Part III applies the principles enunciated in part II to the specific facts of this case as found by the trial court. Part IV summarizes my concerns, expressed throughout this opinion, as to the use of the eminent domain power in furtherance of private economic development.

In summary, I conclude that the legislature should be accorded great deference in determining what constitutes a public use, that the courts have a limited role in reviewing that determination, that chapter 132 of the General Statutes is facially constitutional, that, as the category of public use changes from one of direct public use to indirect public benefit in the form of private economic development, the level of judicial inquiry must increase in order to protect the legitimate interests of the condemnee, and, finally, that the taking of homes on parcels 3 and 4A, as described in the development plan, was not warranted on the basis of the facts found by the trial court and the principles set forth in this opinion.

I

HISTORICAL DEVELOPMENT OF PRIVATE
PROPERTY RIGHTS, EMINENT DOMAIN
AND THE PUBLIC USE CLAUSE
A

Private Property Rights and Eminent Domain

I agree with this court's observation that "[a] public use defies absolute definition, for it changes with vary-

ing conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation." (Internal quotation marks omitted.) *Katz* v. *Brandon*, 156 Conn. 521, 532, 245 A.2d 579 (1968). I also recognize that the concept of public use has evolved over the course of our nation's history from the taking of private property for actual use by the public to the taking of property to further the public good or to secure some public benefit. See 2A P. Nichols, Eminent Domain (3d Ed. Rev. 2003, J. Sackman ed.) § 7.01[1], p. 7-16. I believe, however, that when this court is called upon to decide claims arising under chapter 132 of the General Statutes, it must be ever mindful, not only of a sovereign's historical power to acquire private property for a public use, but also of our nation's long-held commitment, shared by this state, to protect private property from unnecessary takings. See J. Lazzarotti, "Public Use or Public Abuse," 68 UMKC L. Rev. 49, 55 (1999); see also *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 601, 790 A.2d 1178 (2002) (authority to condemn strictly construed against taking party).

Private property rights developed as a legal concept in Europe during the demise of feudalism. See J. Lazzarotti, supra, 68 UMKC L. Rev. 53. The Magna Carta recognized the necessity of protecting private property rights in 1225 in providing that "[n]o Freeman shall be . . . desseised of his Freehold . . . but by lawful Judgment of his Peers, or by the Law of the Land." Magna Carta, c. XXIX (1225). The text of our federal constitution reflects a similar intent that private property rights be fully protected. See, e.g., U.S. Const., amends. V and XIV. The idea that the protection of private property is a principal aim of our society was affirmed by former United States Representative John A. Bingham, drafter

of the fourth amendment, when he declared that "natural or inherent rights, which belong to all men irrespective of all conventional regulations, are by this constitution guarantied by the broad and comprehensive word 'person' . . . guarding those sacred rights which are as universal and indestructible as the human race, that 'no person shall be deprived of life, liberty, or property but by due process of law, nor shall private property be taken without just compensation.' " Cong. Globe, 35th Cong., 2d Sess., p. 983 (1859). Bingham also declared that "the absolute equality of all, and the equal protection of each, are principles of our Constitution . . . . It protects not only life and liberty, but also property, the product of labor." Cong. Globe, 34th Cong., 3d Sess., App., p. 140 (1857). In Connecticut, private property rights were so firmly entrenched by the time of the state constitutional convention in 1818 that the takings clause of the new constitution, which provided that "[t]he property of no person shall be taken for public use without just compensation therefor"; Conn. Const. (1818), art. I, § 11; was adopted without debate. W. Horton, The Connecticut State Constitution: A Reference Guide (1993) p. 70.

Nevertheless, the right of the sovereign to condemn private property also has deep historical roots, purportedly dating back to the Romans. L. Berger, "The Public Use Requirement in Eminent Domain," 57 Or. L. Rev. 203, 204 (1978). The term "eminent domain" was used in the seventeenth century work, De Jure Belli et Pacis, in which Hugo Grotius, a renowned legal scholar, discussed the government's authority "to take private property for reasons of extreme necessity or public utility upon payment of compensation." Id. In our own country, the taking of private property for a public use was a well accepted principle in colonial times. 2A P. Nichols, supra, § 7.01[3], p. 7-17. Eminent domain was employed to support mills, to create roads, to build

canals and bridges; id., § 7.07[3], p. 7-200.1; and to drain private lands. Id., § 7.01[3], p. 7-17. As the power was used more frequently, however, controversy ensued. Id., pp. 7-17 through 7-18. Beginning with Pennsylvania and Vermont, in 1776 and 1777, states sought in their early constitutions to place specific limitations on the power of eminent domain. Id., p. 7-18. Since that time, courts have sought, and sometimes struggled, to interpret the public use clause in light of state regulations and changes in the nation's economy that have transformed our society in unforeseen ways.

## B

### Evolution of the Public Use Requirement

A review of the law on takings reveals that the definition of "public use," when considered in the context of the eminent domain power, has no precise or fixed meaning. Id., § 7.02[1], p. 7-24. Some courts have narrowly construed the public use clause to mean that property acquired by eminent domain actually must be used by the public, or that the public must have the opportunity to use the acquired property. Id., § 7.02[2], p. 7-26; see, e.g., *Rockingham County Light & Power Co.* v. *Hobbs*, 72 N.H. 531, 534, 58 A. 46 (1904). Under a narrow reading of the term, public use includes public buildings, utilities, schools and roads. *Pocantico Water-Works Co.* v. *Bird*, 130 N.Y. 249, 259, 29 N.E. 246 (1891); 2A P. Nichols, supra, § 7.02[6], p. 7-36.1.

Other courts have construed the public use clause more broadly to include a use that furthers the public good or the general welfare, or one that secures some public benefit. 2A P. Nichols, supra, § 7.01[1], pp. 7-15 through 7-16; see id., § 7.02[3], p. 7-29; see also *Olmstead* v. *Camp*, 33 Conn. 532, 546 (1866) (" '[p]ublic use' may . . . mean public usefulness, utility or advantage, or what is productive of general benefit"). Under this more expansive interpretation of the term, the United States

Supreme Court has held that the scope of eminent domain is "coterminous with the scope of a sovereign's police powers."[7] *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229, 240, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984). Historically, the most dramatic example of takings under a broad construction of the public use clause is the acquisition of property for the redevelopment of blighted areas, whereby the stated public purpose is to reduce the menace to the public health, safety, morals and welfare of the community by "eliminating substandard, insanitary, deteriorated, deteriorating, slum or blighted conditions . . . [and] preventing recurrence of such conditions in the area . . . ." General Statutes § 8-124.

Private economic development pursuant to chapter 132 of the General Statutes can be distinguished in at least two important respects from previous notions of public use. First, traditional takings almost always are followed by an immediate or reasonably foreseeable public benefit. See, e.g., *Gohld Realty Co.* v. *Hartford*, 141 Conn. 135, 138–39, 104 A.2d 365 (1954) (condemnation of properties followed soon thereafter by relocation of project area residents and demolition of substandard structures); *Olmstead* v. *Camp*, supra, 33 Conn. 551 (land taken by flooding contemporaneously with continuous operation of grist mill). In contrast, large-scale, private economic development projects authorized under chapter 132 of the General Statutes may not be completed for decades. In the present case, the municipal development plan (development plan), by its own terms, will be in full force and effect for a

---

[7] The police power has been described as "extensive, elastic, and constantly evolving to meet new and increasing demands for its exercise for the benefit of society and to promote the general welfare. It embraces the state's power to preserve and to promote the general welfare and it is concerned with whatever affects the peace, security, safety, morals, health, and general welfare of the community . . . ." 16A Am. Jur. 2d 251, Constitutional Law § 315 (1998).

period of thirty years.[8] Accordingly, there may be much more uncertainty as to when and how the public may benefit when property is condemned for private economic development.

Second, the public benefit derived from a conventional taking typically flows from the actions of the taking party. See, e.g., *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 229 (public benefit achieved as result of housing authority's transfer of title from lessors to lessees); *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 142 (public benefit achieved by redevelopment agency's elimination of substandard structures and other evidence of blight on condemned properties); *Olmstead* v. *Camp*, supra, 33 Conn. 551 (public benefit achieved by private property owner's operation of grist mill). In contrast, takings for private economic development require the taking party to transfer ownership of the condemned land to private developers who subsequently execute a plan to accomplish the public purpose. Because public agencies must work hand in glove with private developers to achieve plan objectives, the taking agency may employ the power to favor purely private interests. See, e.g., *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, 199 Ill. 2d 225, 240–41, 768 N.E.2d 1 (taking of property for expansion of private parking facility deemed not for public purpose), cert. denied, 537 U.S. 880, 123 S. Ct. 88, 154 L. Ed. 2d 135 (2002). The trial court in the present case recognized this problem when it stated in its memorandum of decision that "powerful business groups or companies [may] exercise their influence to gain their ends with . . . little corresponding benefit to the public." The majority makes a similar

---

[8] Section 12.0 of the development plan provides in relevant part: "This [development plan] and/or any modification hereof shall be in full force and effect for a period of thirty . . . years from the date of first approval . . . by the City Council of the City of New London. . . ."

observation. See part II A of the majority opinion (recognizing "potential for abuse of the eminent domain power").

A direct comparison of the statutory provisions on redevelopment and the corresponding provisions pertaining to private economic development illustrates the unique constitutional problem that may arise when the taking of private property for a public purpose also bestows significant benefits on private developers. Under chapter 130 of the General Statutes,[9] the redevelopment scheme, an area in need of revitalization is identified, properties are acquired, structures are demolished as necessary to eliminate blighted conditions and site improvements are made prior to the disposition of the cleared and improved land. See generally General Statutes § 8-124 et seq. The declaration of public policy contained in chapter 130 expressly provides that the disposition of property is "incidental to" the elimination of blight and the activities surrounding the elimination of blight enumerated in the statute,[10] which are "public uses and purposes for which public money may be expended and the power of eminent domain exercised . . . ." General Statutes § 8-124. Consequently, the public benefit in a redevelopment project is clearly defined and well understood. It also can be accomplished relatively quickly and with a high degree of certainty because a public agency, funded with public money, is charged with bringing it about.

In contrast, municipal development projects undertaken pursuant to chapter 132 of the General Statutes involve the expenditure of funds to acquire and to improve land, water and vacated commercial plants for the far more abstract and ill-defined goals of promoting

[9] General Statutes §§ 8-125 through 8-169w.

[10] Pursuant to § 8-124, those activities include the acquisition of property, the removal of structures, the improvement of sites, the exercise of powers by municipalities, and any assistance offered by any public body.

the "continued growth of industry and business within the state" and "meet[ing] the needs of industry and business . . . ."[11] General Statutes § 8-186. The statutory scheme contains no clear description of how those goals are to be accomplished, except by conveyance of the properties to private parties. Disposition of the properties is thus essential, rather than incidental, to achieving the public purpose. Although the properties, once conveyed, are subject to land use restrictions and, in some cases, oversight by state agencies, there is no *statutory* assurance that the public will benefit from the development to follow or that the development even will occur. As the trial court observed, "[t]he very nature of economic development-type projects is such that their accomplishment [is] based on financial predictions and possibilities that cannot be certain and [is] dependent on equally uncertain competitive factors."

The underlying uncertainty as to whether the public benefit will be achieved as planned in private economic development projects is expressly recognized in General Statutes § 8-200 (b). That statute provides that a development plan may be abandoned within three years of its approval, and that any properties acquired thereunder may be conveyed free of the plan's restrictions if they cannot be conveyed to a private party at fair market value pursuant to the plan.[12] General Statutes

---

[11] General Statutes § 8-187 (10) defines the term "business purpose" as "includ[ing] . . . any commercial, financial or retail enterprise and . . . any enterprise which promotes tourism and any property that produces income." This definition does little, however, to illuminate the meaning of "private economic development" as that term is used in chapter 132 of the General Statutes.

[12] General Statutes § 8-200 provides in relevant part: "(b) If after three years from the date of approval of the development plan the development agency has been unable to transfer by sale or lease at fair market value or fair rental value, as the case may be, the whole or any part of the real property acquired in the project area to any person in accordance with the project plan, and no grant has been made for such project pursuant to section 8-195, the municipality may, by vote of its legislative body, abandon the project plan and such real property may be conveyed free of any restric-

§ 8-200 (b). The statutory scheme dealing with redevelopment contains no similar provision, and need not, because the public purpose of eliminating blight is accomplished at the time of the taking. Whatever occurs thereafter is irrelevant to the takings issue. Accordingly, under chapter 132 of the General Statutes, the possibility that a project may be abandoned after properties have been taken by eminent domain, when combined with the inherent uncertainty that the expected public benefit will be achieved in any particular case, raises serious concerns regarding the limits of the takings power that cannot be ignored.

Recent developments in the law of certain jurisdictions that permit condemnations for private economic development have caused one commentator to remark that most observers believe that the public use limitation on the power of eminent domain is a "dead letter." T. Merrill, "The Economics of Public Use," 72 Cornell L. Rev. 61, 61 (1986). Critics question the propriety of condemning private property merely because a newly proposed use promises a greater public benefit than an existing use. See, e.g., *Poletown Neighborhood Council v. Detroit*, 410 Mich. 616, 647, 676, 304 N.W.2d 455 (1981) (Ryan, J., dissenting). They note that "[a]ny business enterprise produces benefits to society at large," and, consequently, "there is virtually no limit to the use of condemnation to aid private businesses." Id., 644 (Fitzgerald, J., dissenting). Thus, it is not surprising, as the majority concedes, that many "express alarm at what they consider to be a situation rife with the potential for abuse of the eminent domain power." Part II A of the majority opinion. In its memorandum of decision, the trial court acknowledged the danger of rendering the takings clauses of the federal and state constitutions meaningless and ignoring the private values of home

tion, obligation or procedure imposed by the plan but shall be subject to all other local and state laws, ordinances or regulations."

and property "by allowing free rein to expanding capital markets." Ironically, the controversy has developed notwithstanding the existence of well established law advising that "[t]he authority to condemn is to be strictly construed in favor of the owner and against the condemnor." *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 601; accord *State* v. *McCook*, 109 Conn. 621, 630, 147 A. 126 (1929); see also 3 P. Nichols, supra, § 9.02[3], pp. 9-19 through 9-20.

Growing fears regarding the potential abuse of the eminent domain power cannot be dismissed as idle speculation on the part of commentators. As municipalities increasingly struggle to provide public services with limited financial resources, governmental authorities are encouraging more intensive economic development to generate additional tax revenue, to create new jobs and to jump start local economies. Accordingly, there is a gathering storm of public debate as to whether the use of eminent domain to acquire property for private economic development in nonblighted areas is justified. I believe that such debate is essential to clarify the role of the legislature in making determinations of public use and the corresponding role of the courts in safeguarding the rights of private property owners who fear that the takings power will be used solely to benefit private interests. The complementary roles of the legislature and the judiciary as interpreters and guardians of the takings power thus require further examination.

## II

### JUDICIAL DEFERENCE TO LEGISLATIVE DETERMINATIONS OF PUBLIC USE

### A

### Determinations by State Legislatures

The suggestion frequently is made that courts have abdicated their role as interpreter of the law by showing

unusual deference to legislative determinations of public use. See, e.g., S. Jones, note, "Trumping Eminent Domain Law: An Argument for Strict Scrutiny Analysis Under the Public Use Requirement of the Fifth Amendment," 50 Syracuse L. Rev. 286, 301 (2000). Proper consideration of the issue, however, requires that a distinction be made between public use determinations by state legislative bodies and determinations by local public authorities that specific properties should be condemned.

It is well established that judicial deference to determinations of public use by state legislatures is appropriate. E.g., *Berman* v. *Parker*, 348 U.S. 26, 32, 75 S. Ct. 98, 99 L. Ed. 27 (1954) ("[s]ubject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive"); see *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 241. The logic behind this principle is that the power to take property is a function of the "principle of consent inherent in a representative government." M. Harrington, " 'Public Use' and the Original Understanding of the So-Called 'Takings' Clause," 53 Hastings L.J. 1245, 1247 (2002). "[L]egislatures are better able to assess what public purposes should be advanced by an exercise of the taking power." *Hawaii Housing Authority* v. *Midkiff*, supra, 244.

Nevertheless, judicial deference to legislative declarations of public use does not require complete abdication of judicial responsibility. Id., 240 ("There is . . . a role for courts to play in reviewing a legislature's judgment of what constitutes a public use . . . . But . . . it is an extremely narrow one." [Internal quotation marks omitted.]); *Olmstead* v. *Camp*, supra, 33 Conn. 551 ("[t]he sole dependence must be on the presumed wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong, controlled, by the dispassionate judgment of the courts"). In fact, the

last Connecticut case to address the issue recognized that the question of "[w]hether the purpose for which a statute authorizes the condemnation of property constitutes a public use is, in the end, a judicial question to be resolved by the courts . . . but, in resolving it, great weight must be given to the determination of the legislature." (Citation omitted.) *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 141. Accordingly, I agree with the majority that judicial deference to determinations of public use by state legislative bodies is appropriate, but emphasize that the courts are empowered to resolve disputes when such determinations are challenged.

B

Determinations by Local Public Agencies

The majority notes, with respect to the decisions of local public authorities regarding specific condemnations, that "[t]he determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power." (Internal quotation marks omitted.) Part IV A of the majority opinion; accord *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146. The majority further notes that Connecticut courts typically defer to the legislative determination of necessity and limit their review to whether the decision of the taking agency was unreasonable, had been made in bad faith or constituted an abuse of power. See part IV A of the majority opinion; see also *Gohld Realty Co.* v. *Hartford*, supra, 146; *Adams* v. *Greenwich Water Co.*, 138 Conn. 205, 213–14, 83 A.2d 177 (1951); *Water Commissioners* v. *Johnson*, 86 Conn. 151, 159, 84 A. 727 (1912).

For example, when a local legislative body determines that a new road is required, the court must defer to the local determination as to where the prospective

road should be located and which properties should be taken to accomplish that purpose. In the absence of unreasonableness, fraud, or abuse of power, the determination regarding the location of the prospective road falls within the discretion of the local legislative body. The fact that there may be another possible road location that would accomplish the same objective will not avail a property owner who seeks to challenge the taking because local legislative determinations concerning what constitutes a public use and what properties need to be taken to effectuate that use are entitled to judicial deference. I agree with the majority with respect to these principles.

Where I part company from the majority is on the issue of whether the *actual* use to be implemented will serve the public purpose described in the development plan at issue in the present case. The trial court and the majority frame the issue as whether there are reasonable assurances of a future public use. They treat the matter as one of control over development of the property *following* its disposition and focus on the statutory and contractual constraints in place to ensure that private sector participants will adhere to the provisions of the development plan. The majority concludes that the terms of the development plan regarding parcel-specific uses and continuing state oversight during the development process will provide sufficient assurances that the properties will be developed in accordance with the plan's objectives.

I submit that such an analysis must focus not only on the possible statutory, contractual and planning constraints that would ensure a public use, but also on the *temporal* question of whether there is any reasonable prospect that the expected development will, *in fact*, occur. Moreover, in determining whether the actual use to be implemented will serve a public purpose, I would follow the standard established in two earlier cases and

grant no deference to the legislative authority because such a determination lies within the province of the trial court. See, e.g., *Connecticut College* v. *Calvert*, supra, 87 Conn. 428.

In *Connecticut College*, this court "accept[ed] and endors[ed] the legislative declaration that the higher education of women is in its nature a public use" for which the eminent domain power may be exercised. Id. The court reserved for itself, however, the authority to resolve questions regarding the *implementation* of the claimed public use in any specific case. See id., 423–24, 428. "It is for the legislature to say whether any given use is governmental in its nature or not, subject to review by the courts only in exceptional cases of extreme wrong . . . . But the question whether in any given instance the use is or will be *administered* as a public or as a private use, is *a question which must of necessity be determined by the courts in accordance with the facts of the particular case in hand.*" (Emphasis added.) Id., 428.

In making the foregoing distinction, the court relied on *Evergreen Cemetery Assn.* v. *Beecher*, supra, 53 Conn. 551, in which the court sustained a demurrer to a petition for the appointment of appraisers in condemnation proceedings brought under state law concerning the taking of property for the establishment of cemeteries. Id., 552–53; see *Connecticut College* v. *Calvert*, supra, 87 Conn. 428–29. The court in *Connecticut College* noted: "[I]n the course of its opinion [the court in *Evergreen Cemetery Assn.*] pointed out that although the establishment of cemeteries was a use which was public in its nature . . . the petition was insufficient because it did not appear that the petitioner's cemetery was one in which the public had or could acquire the right to bury their dead . . . ." *Connecticut College* v. *Calvert*, supra, 429; see *Evergreen Cemetery Assn.* v. *Beecher*, supra, 553. That precedent, which the majority,

sub silentio, overrules today, stands for the proposition that a trial court charged with determining whether the *actual* use of the property taken will in fact be for a public or private purpose need not defer to the views of the local legislative body.[13] See *Connecticut College* v. *Calvert,* supra, 428.

Connecticut is not alone in concluding that courts may inquire into the *actual* purpose for which property is to be condemned, even when it is claimed that the condemnation is for a public purpose. See 27 Am. Jur. 2d 112–13, Eminent Domain § 555 (1996). In *State ex rel. Tacoma Industrial Co.* v. *White River Power Co.,* 39 Wash. 648, 82 P. 150 (1905), the respondent power company was authorized to build and operate water-generated power plants that supply electricity to, inter alia, public users in designated cities in the state of Washington. Id., 661. The power company filed a petition seeking to condemn certain private property. Id. At a preliminary hearing on the matter, the lower court found that the proposed use was public in nature and ordered a jury impaneled to assess the damages owed to the property owners. Id. In reviewing the lower court's order, the Washington Supreme Court concluded that "the grounds of public benefit upon which the taking is proposed are vague, and the use which the public is to have of the property, or how the public is to be

---

[13] The majority's claim that its "conclusion in the present case is consistent with the principles set forth in [*Connecticut College* and *Evergreen Cemetery Assn.*]"; footnote 62 of the majority opinion; is misplaced. The majority misses the point in concluding "that the trial court properly determined that there are sufficient statutory and contractual constraints in place to [ensure] that private sector participants will adhere to the provisions of the development plan." Part II C of the majority opinion. As I note in this opinion, the question is not whether the development plan and the statutes reasonably ensure adherence to the development plan, but, rather, whether "private sector participants" are available and willing to develop the property and whether the terms by which they agree to develop the property will result in a public benefit such that the private benefit will be incidental thereto.

benefited by the use of it . . . is by no means fixed and definite. . . .

"It is not claimed that there is a present demand for the 50,000 electrical horse power. It is not claimed that the [power company] has a franchise to enter any of the cities or towns mentioned, or that it will or can obtain one. It does not appear that there are any street or other railways to utilize its product. It is not under contract or obligation to furnish electricity to any person, or for any purpose." Id., 667. The court determined that the proposed condemnation was not for a public purpose and, therefore, reversed the lower court's order. Id., 670–71.

Significantly, the Washington Supreme Court did not rely merely on the stated purpose of the taking in reaching its conclusion but, rather, examined all of the available evidence to determine whether the actual use would, in fact, be for a public or private purpose. See id., 667–71. Many other courts have adopted similar reasoning. See *Kessler* v. *Indianapolis*, 199 Ind. 420, 426, 157 N.E. 547 (1927) (courts not limited to consideration of whether use described in condemnation proceedings is public but may consider "surrounding facts and circumstances tending to show what is the *actual, principal and real use to be made* of the property" [emphasis added]); see also *Walker* v. *Shasta Power Co.*, 160 F. 856, 860 (9th Cir. 1908) (corporation's right of eminent domain is not tested solely by description of public uses and private purposes contained in articles of incorporation, but may be determined "by evidence aliunde showing the *actual* purpose in view" [emphasis added]); *Wilton* v. *St. Johns*, 98 Fla. 26, 47, 123 So. 527 (1929) ("courts have the ultimate power and duty to determine . . . whether . . . [condemnation in any given case] is *in fact* for [a] public or a private use" [emphasis added]); *Brown* v. *Gerald*, 100 Me. 351, 357, 61 A. 785 (1905) (*actual purpose* of taking authorized

by power company's charter was "open to judicial inquiry"); *Kirkwood* v. *Venable*, 351 Mo. 460, 466–68, 173 S.W.2d 8 (1943) (inasmuch as evidence indicated that condemned property was needed for public park, was suitable for public park and would be used by city for public park, court determined that condemnation was for public use); *Kansas City* v. *Liebi*, 298 Mo. 569, 591, 593, 252 S.W. 404 (1923) (evidence established that protective ordinance restricting use of and condemning rights to property would prevent overcrowding and make city more attractive, thereby promoting health, general welfare, growth and general prosperity of city, and that considerable part of community would *actually use or benefit from* contemplated improvement); *Charlotte* v. *Heath*, 226 N.C. 750, 754, 756, 40 S.E.2d 600 (1946) (evidence established that intended use of right-of-way allowing property owners living outside city limits to connect to sewer lines *would be* public); *State ex rel. Harlan* v. *Centralia-Chehalis Electric Ry. & Power Co.*, 42 Wash. 632, 639–40, 85 P. 344 (1906) (in determining question of public use in case in which power company sought to condemn land, court was "not confined to . . . the description of those objects and purposes as set forth in the [company's] articles of [incorporation], but [could consider] evidence aliunde . . . showing the *actual* business proposed to be conducted" [emphasis added; internal quotation marks omitted]); cf. *Linggi* v. *Garovotti*, 45 Cal. 2d 20, 27, 286 P.2d 15 (1955) (private party authorized by statute to acquire easement by eminent domain for sewer connection to existing public sewer system must make strong evidentiary showing establishing that taking *will* benefit public). Accordingly, judicial review to determine whether a particular use will *in fact* be for a public or private purpose has been an accepted practice for nearly a century.

The importance of judicial review in determining whether property taken by eminent domain for private

economic development will in fact be used for a public purpose cannot be underestimated. Economic growth is a far more indirect and nebulous benefit than the building of roads and courthouses or the elimination of urban blight. Indeed, plans for future hotels and office buildings that purportedly will add jobs and tax revenue to the economic base of a community are just as likely to be viewed as a bonanza to the developers who build them as they are a benefit to the public. Furthermore, in the absence of statutory safeguards to ensure that the public purpose will be accomplished, there are too many unknown factors, such as a weak economy, that may derail such a project in the early and intermediate stages of its implementation.

The economic conditions that existed when this court rendered its earliest decision regarding a taking for private economic development;[14] *Olmstead* v. *Camp*, supra, 33 Conn. 532; were very different in nature from the economic conditions that now define our world. The petitioner in that case, Samuel E. Olmstead, was a grocery merchant in a manufacturing community in which the public relied on Olmstead's store for all of their supplies, including ground feed for pigs, poultry, cows and other domestic animals. Id., 536 (reporter's case summary). Olmstead owned land upon which he had erected a water mill "for the purpose of grinding [the] flour and feed [that were sold at his store] and for doing custom work such as is usually done in a country mill . . . ."[15] Id., 533 (reporter's case sum-

[14] In *Olmstead*, a private party effected the taking; see *Olmstead* v. *Camp*, supra, 33 Conn. 532 (reporter's case summary); but for a purpose that the court concluded was public. Id., 551.

[15] The court found that Olmstead had leased the mill to his brother-in-law, Jonathan Camp, Jr., for an indefinite period. *Olmstead* v. *Camp*, supra, 33 Conn. 535 (reporter's case summary). The court also found that "there was no agreement that Camp should do custom grinding for the public, which obligated him to do it; but such had been the practice from the time when the mill was erected, and it was the expectation of the parties to the lease that the practice would be continued." Id., 535–36 (reporter's case summary).

mary). The land also contained a mill pond and a dam. Id. Olmstead found it necessary to raise the dam and flood the property of the respondent, Samuel R.P. Camp, in order to ensure the proper operation of the mill. Id. Olmstead petitioned the court under the Flowage Act of 1864[16] to grant him the right to flood Camp's land and to determine the damages owed. Id., 532 (reporter's case summary).

A court-appointed committee concluded that the flooding of Camp's property was for a public use. Id., 534 (reporter's case summary). The committee determined that Olmstead could raise the dam, had a right to keep and to maintain it permanently and, consequently, owed certain damages to Camp. Id. Camp appealed from the committee's decision.

On appeal, this court upheld the committee's decision and found in favor of Olmstead. Id., 552. The court characterized the issue to be decided as one "involving [the] rights of property guaranteed by the fundamental law, and . . . the interests of business and the prosperity of the state." Id., 545. The court concluded: "From the first settlement of the country grist-mills of this description have been in some sense peculiar institutions, invested with a general interest. Towns have pro-

---

[16] Public Acts 1864, c. XXVI, §§ 1 and 2, codified as amended at General Statutes (1866 Rev.) tit. 1, c. 16, § 388, provided: "Sec. 1. That when any person shall desire to set up a water mill on his own land, or upon land of another with his consent, and to erect a dam on the same, for working such mill by water, which dam would flow water on to land belonging to any other person, he may obtain the right to flow said land upon the terms and conditions, and subject to the regulations, hereinafter expressed.

"Sec. 2. Any person wishing to flow land as aforesaid, if he can not agree with the owner, or owners, as to the damages to be paid, may bring his petition to the superior court for the county where the land to be overflowed, or any part of it, lies, which petition shall contain such a description of the land to be overflowed and of the dam, its location, and proposed height, as that the record will show with certainty the matter that shall be determined, and shall be served on the respondent according to law requiring service of petitioners in such court."

cured them to be established and maintained. The state has regulated their tolls. In many instances they have been not merely a convenience, but almost a necessity in the community." Id., 552.

The court thus observed that grist mills played an integral part in the subsistence of the local community because they ground the feed and flour upon which the economic lifeblood of the community depended. The court described the proper functioning of grist mills not only as consonant with the public interest, but, in certain instances, as essential to the community's continued viability. Accordingly, the raising of the height of the dam and the taking of Camp's property were akin to the taking of property today for use by a public utility. See, e.g., *Connecticut College* v. *Calvert*, supra, 87 Conn. 426 (characterizing public use for which land was taken in *Olmstead* as "governmental" in nature because of great advantage to community). In stark contrast, the private development contemplated under chapter 132 of the General Statutes only can be described as "governmental" in nature if the benefits of increased tax revenue and new jobs are actually realized.

I therefore submit that, just as the taking of non-blighted property in a blighted area is subject to additional scrutiny to determine whether the taking is "essential" to the redevelopment plan; see *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 605; so, too, should a heightened standard of judicial review be required to ensure that the constitutional rights of private property owners are protected adequately when property is taken for private economic development under chapter 132 of the General Statutes. Justice demands no less.

## C

### Heightened Judicial Review

Other jurisdictions with similar concerns have attempted to create more exacting standards of judicial scrutiny in the context of takings for private economic development. In *Poletown Neighborhood Council* v. *Detroit,* supra, 410 Mich. 616, in which property was to be acquired for the construction of a General Motors assembly plant; id., 628; the majority adopted a standard of heightened scrutiny requiring substantial proof of a clear and significant public benefit in determining whether the contemplated use constituted a legitimate public purpose. Id., 634–35. Finding that standard insufficient, one of the two dissenting justices in *Poletown Neighborhood Council* proposed a stricter standard of review that would require a showing of "1) *public* necessity of the extreme sort, 2) continuing accountability to the *public,* and 3) selection of land according to facts of independent *public* significance." (Emphasis in original.) Id., 674–75 (Ryan, J., dissenting). More recently, the suggestion has been made that property rights should be elevated to the status of a "fundamental" right and that a strict scrutiny analysis should be conducted when property is taken for private economic development. See S. Jones, note, supra, 50 Syracuse L. Rev. 314.

In its memorandum of decision, the trial court in the present case declared that "[t]here are, in fact, limits on the constitutional propriety of using the power of eminent domain for . . . 'pure economic development . . . .' " The trial court rejected a standard of heightened scrutiny, however, on the basis of *Bugryn* v. *Bristol,* 63 Conn. App. 98, 774 A.2d 1042, cert. denied, 256 Conn. 927, 776 A.2d 1143, cert. denied, 534 U.S. 1019, 122 S. Ct. 544, 151 L. Ed. 2d 422 (2001), in which the Appellate Court stated that "our Supreme Court has

not applied a heightened standard of review in previous disputes concerning the nature of a taking . . . ." Id., 102 n.7. The present case, therefore, provides this court with an opportunity to consider the heightened standard of judicial review that the court in *Bugryn* identified as lacking.

I submit that judicial review of the condemnations in the present case should consist of a four step process in which the burden of proof is shifted between the respective parties at various stages in the analysis. See, e.g., *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 235–37, 694 A.2d 1319 (1997) (setting forth evidentiary framework through which burden of proof is shifted between parties in product liability action). Judicial review should begin with consideration of whether the statutory scheme is facially constitutional. In light of well established judicial deference to determinations of public use by state legislative bodies, the party opposing the taking should bear the initial burden of proving that the contemplated public use of private economic development is unconstitutional. Should that party succeed in meeting its difficult burden, the inquiry should end and no taking should be permitted.

If the court concludes, however, that the proposed economic development is a valid public use, the party opposing the taking should bear the additional burden of proving, in accordance with the deferential standard of review afforded to legislative determinations of public use, that the primary intent of the particular economic development plan is to benefit private, rather than public, interests. Should that burden also be met, any taking pursuant to the plan should be deemed unconstitutional and the inquiry should end.

In the event that the court concludes that the plan is constitutional, the burden should shift to the taking party to prove that the specific economic development

contemplated by the plan will, in fact, result in a public benefit.[17] "[T]he burden [of proof] properly rests upon the party who must establish the affirmative proposition, to whose case the fact in question is essential, who has the burden of pleading a fact, who has readier access to knowledge about the fact, or whose contention departs from what would be expected in the light of everyday experience." *Albert Mendel & Son, Inc.* v. *Krogh*, 4 Conn. App. 117, 124 n.6, 492 A.2d 536 (1985). Accordingly, shifting the burden of proof is appropriate at this point in the inquiry because the taking party has greater access than the opposing party to information regarding developer interest in the properties and the progress of negotiations relating to the disposition of the properties.

The level of proof necessary to meet the burden of establishing that the anticipated economic development will result in a public benefit should be clear and convincing evidence. The clear and convincing standard traditionally applies in civil cases "to protect particularly important individual interests . . . ." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 211 n.22, 833 A.2d 363 (2003), quoting *Addington* v. *Texas*, 441 U.S. 418, 424, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). "[I]n cases governed by this burden, because

---

[17] The majority's conclusion that there is "no basis, in reason, precedent, policy or practicality" for judicial review to determine whether the proposed economic development will, in fact, occur; footnote 62 of the majority opinion; reflects a complete misunderstanding of the law of this and other jurisdictions. See part II B of this opinion; see also *Walker* v. *Shasta Power Co.*, supra, 160 F. 860; *Connecticut College* v. *Calvert*, supra, 87 Conn. 428; *Evergreen Cemetery Assn.* v. *Beecher*, supra, 53 Conn. 553; *Linggi* v. *Garovotti*, supra, 45 Cal. 2d 27; *Wilton* v. *St. Johns*, supra, 98 Fla. 47; *Kessler* v. *Indianapolis*, supra, 199 Ind. 426; *Brown* v. *Gerald*, supra, 100 Me. 357; *Kirkwood* v. *Venable*, supra, 351 Mo. 466–68; *Kansas City* v. *Liebi*, supra, 298 Mo. 591; *Charlotte* v. *Heath*, supra, 226 N.C. 754, 756; *State ex rel. Harlan* v. *Centralia-Chehalis Electric Ry. & Power Co.*, supra, 42 Wash. 639–40; *State ex rel. Tacoma Industrial Co.* v. *White River Power Co.*, supra, 39 Wash. 667–71.

society regards the individual interests involved to be very important, and because society imposes most of the risk of error on the party so burdened, we also require a very high degree of subjective certitude for the burden to be satisfied: the fact finder must be persuaded to a high degree of probability."[18] *State* v. *Rizzo*, supra, 211 n.22. In other words, the party must prove that "the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . . [The clear and convincing standard is] a very demanding standard that should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Citation omitted; internal quotation marks omitted.) *Durso* v. *Vessichio*, 79 Conn. App. 112, 123, 828 A.2d 1280 (2003).

In civil cases involving property disputes, differing levels of proof are required depending on the type of claim under consideration. For example, clear and convincing evidence is required to prove a claim that land has been taken by adverse possession. E.g., *Wildwood*

---

[18] I contrast this standard of proof with the standard of proof in the typical civil case between private parties, i.e., preponderance of the evidence. In the typical civil case, society is minimally concerned with the outcome, and the litigants share the risk of error in roughly equal fashion. E.g., *State* v. *Rizzo*, supra, 266 Conn. 210. In such a case, "we require only a modicum of subjective certitude on the part of the fact finder: [as] long as the fact finder is persuaded that the plaintiff's assertions are probably more true— by no more than a ratio of fifty-one to forty-nine—the plaintiff has met his burden of persuasion.

"At the other end of the spectrum is the criminal case. In such a case, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error on itself . . . by requiring . . . that the state prove the guilt of an accused beyond a reasonable doubt." (Internal quotation marks omitted.) Id., 210–11.

*Associates, Ltd.* v. *Esposito*, 211 Conn. 36, 42, 557 A.2d 1241 (1989). This is because title becomes absolute in the adverse possessor if that standard of proof is satisfied. Takings for private economic development resemble takings by adverse possession because property owners in both situations lose title to their land. Accordingly, it is consistent with existing law to place the burden on the taking party and to require that the standard of proof be clear and convincing evidence when property is taken by eminent domain for private economic development.

I also believe that the clear and convincing standard is compelled in this context because of the tremendous social costs of the takings, costs that are difficult to quantify but that are nonetheless real. The fact that certain families have lived in their homes for decades and wish to remain should not, in my view, be summarily dismissed as part of a cost-benefit analysis typically performed by the legislature. At a minimum, the distress suffered by the plaintiffs because of their relocation to another neighborhood that lacks the same comforting familiarity and associations as their old neighborhood should be considered as additional justification for a higher level of proof. I therefore believe that the best way to protect the rights of property owners in cases involving takings for private economic development is to require that the taking party prove by clear and convincing evidence that development prospects are such that the condemned property will, in fact, be used for the intended public purpose.

Courts and legislatures have employed the clear and convincing standard of proof in other constitutional, legislative and common-law contexts involving important questions of fact. *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 796, 700 A.2d 1108 (1997). For example, when constitutional rights are at stake, as in the present case, a nonparent petitioning for visita-

tion pursuant to General Statutes § 46b-59 must prove the requisite relationship and the harm that would result from the denial of visitation by clear and convincing evidence in order to protect the parents' liberty interests in the care, custody and control of their children. *Roth* v. *Weston*, 259 Conn. 202, 228, 232, 789 A.2d 431 (2002). "[D]ue process [also] requires [that] the clear and convincing test be applied to the termination of parental rights because it is the *complete severance* by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." (Emphasis in original.) Id., 231. In still another context, we have held that, in order to protect a criminal defendant's constitutional right of confrontation, the state must prove "a compelling need for excluding the defendant from the witness room during the videotaping of a minor victim's testimony"; *State* v. *Jarzbek*, 204 Conn. 683, 704, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); by establishing, by clear and convincing evidence, that the defendant's presence would seriously call into question the trustworthiness of the victim's testimony. Id., 704–705. I submit that the taking of private property for private economic development is equally deserving of this very demanding standard of proof for all of the foregoing reasons,[19] especially in light of the fact that

---

[19] The majority's assertion that the clear and convincing standard should not be applied to evidence that the proposed development will, in fact, occur because the standard "is reserved for past events, and not for predictions of future events"; footnote 62 of the majority opinion; is not only incorrect, but entirely misses the point of the present analysis. As to the assertion's validity, the majority need only consider the fact that when the state wishes to exclude a criminal defendant from the witness room during the videotaping of a minor victim's testimony, it must establish by clear and convincing evidence that the defendant's presence "would . . . seriously [call] into question" the trustworthiness of the victim's testimony. *State* v. *Jarzbek*, supra, 204 Conn. 704–705. Obviously, the testimony in question is the *future* testimony of the minor victim. The clear and convincing standard also is used in proceedings involving the termination of parental rights to determine whether the evidence is sufficient to establish that "the natural parent cannot or *will not* provide a normal family home for the child." (Emphasis added;

such projects may be abandoned within three years of their approval if market conditions change and the plan of development cannot be implemented. See General Statutes § 8-200 (b).

The trial court's subsidiary findings as to the actual future use of the properties taken are findings of fact that should not be overturned unless they are clearly erroneous. See, e.g., *State* v. *Pinder*, 250 Conn. 385, 420, 736 A.2d 857 (1999); *State* v. *Atkinson*, 235 Conn. 748, 759, 670 A.2d 276 (1996). In light of the constitutional interests at stake, however, the issue of whether the properties actually will be used for a public purpose is an ultimate issue that should be reviewed by this court on the basis of its own "scrupulous examination" of the record. *State* v. *Pinder*, supra, 420. This is necessary to ensure that judicial review "comports with constitutional standards of due process." (Internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 298, 746 A.2d 150 (trial court's finding that confession was voluntary closely scrutinized to protect defendant's constitutional rights), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

Finally, if the trial court concludes that the condemned property will be used for a public purpose, it should be incumbent upon the party opposing the tak-

internal quotation marks omitted.) *Santosky* v. *Kramer*, 455 U.S. 745, 767, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), quoting N.Y. Soc. Serv. Law § 384-b (1) (a) (iv) (McKinney Sup. 1981). More important, however, is the fact that the evidentiary showing suggested in the present case does not require a prediction of future events, but testimony and documentation as to the *present development environment,* which, if persuasive, might include signed development agreements, marketing studies that indicate a near-term demand for the proposed uses and evidence of economic trends that would support economic development within the three year time period before the condemnor is permitted to abandon the project and convey the acquired properties to developers free of the plan's restrictions. See General Statutes § 8-200 (b). In other words, although the purpose of such evidence is to document the probability that future development will occur as planned, the evidence itself would be grounded in present realities.

ing, on the basis of the deferential standard of review that we accord to legislative determinations of public use, to prove that the specific condemnation at issue is not reasonably necessary to implement the plan.

The shifting of the burden of proof, as suggested, is not unusual in circumstances in which we have deemed constitutional interests to be extremely significant. For example, a burden shifting analysis has been adopted in employment discrimination cases. *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802–805, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) (after complainant establishes prima facie case of discrimination, employer must articulate legitimate, nondiscriminatory reasons for adverse employment action and complainant then must prove employer engaged in intentional discrimination); see also *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142–43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 505–506, 832 A.2d 660 (2003). The burden of proof also is shifted to the decision-making party in affordable housing land use appeals. General Statutes § 8-30g (in administrative appeal from decision to deny application, burden on local commission to prove that decision is supported by sufficient evidence in record); see *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 733, 780 A.2d 1 (2001); see also *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 514, 636 A.2d 1342 (1994) (legislature "placed the burden of proof on the commission . . . and not, as in traditional land use appeals, on the applicant" [internal quotation marks omitted]). Claims that a prosecutor has used peremptory challenges in violation of the equal protection clause are treated in a similar manner. See, e.g., *Batson* v. *Kentucky*, 476 U.S. 79, 97–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (following defendant's prima facie showing that prosecutor exercised peremptory

challenge on basis of race, burden shifts to prosecutor to articulate race-neutral explanation for striking juror after which burden shifts to defendant to show that prosecutor's articulated reasons are insufficient or merely pretextual); see also *State* v. *Dehaney*, 261 Conn. 336, 344–45, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). Harmless error analysis involves a comparable approach when the alleged impropriety is of constitutional magnitude in that the burden to prove that the constitutional error was harmless beyond a reasonable doubt rests with the state. E.g., *State* v. *Francis*, 267 Conn. 162, 188, 836 A.2d 1191 (2003); *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996). Accordingly, the adoption of a burden shifting analysis in cases involving the taking of property for private economic development is consistent with our approach in other contexts in which a constitutional right is at stake.

The adoption of a burden shifting analysis also is consistent with the takings procedure followed in other jurisdictions that do not place the burden of attacking a routine taking on the property owner, as Connecticut does. See generally 27 Am. Jur. 2d 45, supra, § 479. General Statutes § 48-23 provides in relevant part: "When, under the provisions of any statute authorizing the condemnation of land in the exercise of the right of eminent domain, an appraisal of damages has been returned to the clerk of the Superior Court . . . and when the amount of appraisal has been paid or secured to be paid or deposited with the State Treasurer . . . any judge of the Superior Court may, upon application and proof of such payment or deposit, order such clerk to issue an execution commanding a state marshal to put the parties entitled thereto into peaceable possession of the land so condemned."[20] The procedure for taking property by eminent domain in Connecticut is

[20] See also General Statutes §§ 8-128 through 8-133.

less hospitable to the property owner than in most other jurisdictions because "the party to whom is delegated the right to determine whether particular land is necessary for a public use need only allege in his application to the court that he has so determined, leaving the burden of attack upon the adverse party." *Bridgeport Hydraulic Co.* v. *Rempsen,* 124 Conn. 437, 442, 200 A. 348 (1938); see also *Hall* v. *Weston,* 167 Conn. 49, 63, 355 A.2d 79 (1974) ("burden of attacking [town's statutory] authority [to condemn land] rested upon the [property owner]"). The primary means available to challenge the condemnation are: (1) an action to enjoin the taking; e.g., *Bridgeport Hydraulic Co.* v. *Rempsen,* supra, 442; or (2) a request that the court review the statement of compensation filed by the taking party. See General Statutes § 8-132.

In contrast, the most common method of condemning land in other jurisdictions is for the taking party to file in court a petition to take the property. 27 Am. Jur. 2d 45, supra, § 479. After the property owner and all other persons having an interest in the land sought to be condemned are joined in the action, a hearing is held at which the condemnor first must establish "its right to condemn the land, and, in some [jurisdictions], the necessity of the taking." Id. If the court is satisfied that the taking is justified, damages are assessed and a final award is rendered. Id. In jurisdictions that follow this procedure, the burden, therefore, is not on the property owner to attack the condemnation but, rather, on the condemnor to establish its right to condemn. See id. A similar approach has been adopted for use in the federal courts. Pursuant to rule 71A of the Federal Rules of Civil Procedure, the condemning party files a complaint identifying the property to be taken. Fed. R. Civ. P. 71A (c) (2). If the property owner objects to the taking, he may file an objection or defense, and the issue subsequently may be tried to the court or a jury. Fed. R. Civ.

P. 71A (e) and (h). Accordingly, shifting the burden of proof, as proposed in this opinion, is consistent with the allocation of the burden of proof in other jurisdictions.

## III

## JUDICIAL REVIEW OF THE CONDEMNATIONS

Applying the foregoing principles to the facts of this case, I agree with the majority that the legislative determination of public use, as expressed in chapter 132 of the General Statutes, is constitutional. I also agree that the primary purpose of the takings is to benefit the public. I do not agree, however, that the condemnations are constitutional in light of the fact that the record does not contain clear and convincing evidence to establish that the properties actually will be developed to achieve a public purpose. The foregoing conclusion being dispositive of this appeal, the court need not reach the issue of whether the condemnations are reasonably necessary to implement the development plan.

## A

### The Facial Constitutionality of Chapter 132 of the General Statutes

The first issue to be addressed under the proposed standard of review is whether chapter 132 of the General Statutes—§ 8-186 in particular—is facially constitutional insofar as it authorizes the use of the eminent domain power for private economic development. The majority explains that its analysis of this issue will be guided by the principle that the challenging party must prove the unconstitutionality of the statute beyond a reasonable doubt; e.g., *State* v. *Ball*, 260 Conn. 275, 280–81, 796 A.2d 542 (2002); and that it will review the statutory scheme pursuant to the well settled standard of substantial deference to the legislature's determination of public use. See part II A of the majority opinion. After examining the relevant case law of our state, our

sister states and the United States Supreme Court, the majority ultimately concludes that private economic development projects, created and implemented pursuant to chapter 132 of the General Statutes, which create new jobs, increase tax revenue, and contribute to urban revitalization, satisfy the takings clauses of the federal and state constitutions. See id.

I agree with the conclusion of the majority but do not agree entirely with the majority's analysis. Although the plaintiffs must prove the unconstitutionality of the statutory scheme beyond a reasonable doubt, the proper standard for reviewing the underlying claim is whether the state legislature *"rationally could have believed* that the [statute] would promote its objective." (Emphasis in original.) *Western & Southern Life Ins. Co.* v. *State Board of Equalization*, 451 U.S. 648, 672, 101 S. Ct. 2070, 68 L. Ed. 2d 514 (1981); accord *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 242; see also *Housing Authority* v. *Higginbotham*, 135 Tex. 158, 165, 143 S.W.2d 79 (1940) (legislative declaration of particular use is "binding upon the courts unless such use is clearly and palpably of a private character" [internal quotation marks omitted]); 26 Am. Jur. 2d 503, Eminent Domain § 61 (1996).

In *Hawaii Housing Authority*, the United States Supreme Court declared that "[t]he 'public use' requirement is . . . coterminous with the scope of a sovereign's police powers." *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 240. As was previously noted; see footnote 7 of this opinion; the police power is commonly understood as "the state's power to preserve and to promote the general welfare and . . . whatever affects the peace, security, safety, morals, health, and general welfare of the community . . . ." 16A Am. Jur. 2d 251, Constitutional Law § 315 (1998); see also *Reid* v. *Zoning Board of Appeals*, 235 Conn. 850, 855, 670 A.2d 1271 (1996); *Raybestos-Manhattan, Inc.* v. *Planning &*

*Zoning Commission*, 186 Conn. 466, 471, 442 A.2d 65 (1982). Guided by the principle of judicial deference to the legislative determination of public use, I therefore conclude, like the majority, that takings for private economic development are facially constitutional because Connecticut and federal courts have embraced, for more than a century, a broad construction of the public use clauses of the federal and state constitutions.

Almost 140 years ago, this court expressly rejected a narrow interpretation of the term "public use" as "possession, occupation . . . [or] direct enjoyment . . . by the public"; *Olmstead* v. *Camp*, supra, 33 Conn. 546; and determined, instead, that the term means "public usefulness, utility or advantage, or what is productive of general benefit . . . ." Id. The court in *Olmstead* also advocated an interpretation of public use that could include private economic development when it made the following remarks about the far-reaching regional, and even national, effects of the water powered grist mill: "It would be difficult to conceive a greater public benefit than garnering up the waste waters of innumerable streams and rivers and ponds and lakes, and compelling them with a gigantic energy to turn machinery and drive mills, and thereby build up cities and villages, and extend the business, the wealth, the population and the prosperity of the state. It is obvious that those sections of the country which afford the greatest facilities for the business of manufacturing and the mechanic arts, must become the workshops and warehouses of other vast regions not possessing these advantages . . . . It is of incalculable importance to this state to keep pace with others in the progress of improvements, and to render to its citizens the fullest opportunity for success in an industrial competition." Id., 551.

The court's broad definition of public use in *Olmstead* was reaffirmed in *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 141 ("public use means 'public usefulness,

utility or advantage, or what is productive of general benefit' "), and later echoed in *Katz* v. *Brandon*, supra, 156 Conn. 532–33 ("The modern trend of authority is to expand and liberally construe the meaning of public purpose. The test of public use is . . . the right of the public to receive and enjoy its benefit." [Internal quotation marks omitted.]).

In *Hawaii Housing Authority*, the United States Supreme Court determined that a compensated taking is not proscribed by the takings clause when it is "rationally related to a conceivable public purpose . . . ." *Hawaii Housing Authority* v. *Midkiff*, supra, 467 U.S. 241. Accordingly, the definition of public use in General Statutes § 8-186, namely, "the continued growth of industry and business within the state," survives the plaintiffs' facial constitutional challenge inasmuch as our legislature rationally could have concluded that the taking of private property for such a purpose would be of general benefit to the public.[21]

---

[21] I note that the plaintiffs have not raised the issue of whether the statutory scheme is facially unconstitutional on the basis of a lack of adequate standards to ensure that the public purpose will be achieved. "When a legislative body retains a police power, articulated standards and guidelines to limit the exercise of the police power are unnecessary. . . . Police powers which are delegated, however, must include minimum standards and guidelines for their application. . . . The failure to provide standards and guidelines for the application of the police power constitutes a delegation of legislative power repugnant to the due process clause of the Fourteenth Amendment." (Citations omitted.) *Cary* v. *Rapid City*, 559 N.W.2d 891, 895, (S.D. 1997); see 16A Am. Jur. 2d 257, supra, § 320; see also *Berman* v. *Parker*, supra, 348 U.S. 35 (standards contained in redevelopment statute sufficiently definite to sustain delegation of authority to administrative agencies to execute plan for eliminating blight).

Chapter 132 of the General Statutes contains numerous technical specifications regarding the content and adoption of a plan, project financing, the acquisition and transfer of properties and other matters. See generally General Statutes § 8-186 et seq. There are no statutory guidelines and criteria, however, to ensure that the plan primarily will benefit the public and, thereafter, that the proposed public benefit will be achieved. This is in stark contrast to chapter 130 of the General Statutes, in which the public purpose is defined as the elimination of blight and detailed guidance is provided as

## B

### Whether the Primary Purpose of the Condemnations Is To Serve the Public Interest

The next step in the analysis is to consider, under the deferential standard of review, whether the primary purpose of the condemnations is to serve the public interest, with private benefits being incidental thereto, or whether private interests are paramount and the public purpose is incidental. In its discussion of this issue, the majority characterizes the trial court's determination that the takings were intended primarily to benefit the public as a finding of fact to be reviewed by this court under the clearly erroneous standard. See part II B of the majority opinion. The majority then concludes that the trial court's finding that the takings primarily were intended to serve the public interest, with private benefits being incidental thereto, was not clearly erroneous. See id.

I agree with the majority that the takings were *intended* primarily to benefit the public. I disagree, however, that the trial court's determination regarding the public purpose of the condemnations is a factual finding subject to deferential review.

"The question [of] what is a public use is always one of law"; 2 T. Cooley, Constitutional Limitations (8th Ed. 1927) p. 1141; accord *Poletown Neighborhood Council* v. *Detroit*, supra, 410 Mich. 639 (Fitzgerald, J., dissenting); or, as in the present case, a mixed question of fact and law, because the trial court's determination as to public use rests on numerous factual findings regarding the goals, motives and interests of the public officials and private parties associated with the project. See, e.g., *State* v. *Silva*, 65 Conn. App. 234, 255, 738 A.2d

---

to how that purpose is to be accomplished. See generally General Statutes § 8-124 et seq.

7 (mixed questions of fact and law involve application of legal standard to historical fact determinations), cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001). Accordingly, we review the trial court's factual findings for clear error but review de novo the court's legal determination that the takings primarily were intended to serve the public interest. See, e.g., *State* v. *Gibbs*, 254 Conn. 578, 592, 758 A.2d 327 (2000).

"[T]he line of demarcation between a use that is public and one that is strictly and entirely private is a line not eas[ily] . . . drawn." (Internal quotation marks omitted.) *Olmstead* v. *Camp*, supra, 33 Conn. 547. This is especially true in the present case, in which private interests potentially stand to gain significant financial benefits under the development plan. I nonetheless agree with the majority that the evidence in the record supports a finding that the condemnations of the plaintiffs' properties primarily were intended to serve the public interest, and that the development plan, on its face, and the goals and objectives set forth therein are in accord with chapter 132 of the General Statutes. Accordingly, there is no need to repeat in detail all of the facts upon which the majority relies.

The record clearly demonstrates that the development plan was not intended primarily to serve the interests of Pfizer, Inc., or any other private entity but, rather, to revitalize the local economy by creating temporary and permanent jobs, generating a significant increase in tax revenue, encouraging spin-off economic activities and maximizing public access to the waterfront. Furthermore, the proposed project is being undertaken in an economically "distressed" municipality in need of a stimulus to invigorate the local economy. Accordingly, the goals of the development plan are consistent with the important public interest described in § 8-186 of promoting the economic welfare of the state through the "growth of industry and business within the state"

and "meet[ing] the needs of industry and business . . . ." Nevertheless, the conclusion that the development plan was intended primarily to benefit the public, per se, is insufficient to justify the takings.

## C

### Whether the Development Plan Will Result in a Public Benefit

In my view, the development plan as a whole cannot be considered apart from the condemnations because the constitutionality of condemnations undertaken for the purpose of private economic development depends not only on the professed goals of the development plan, but also on the prospect of their achievement. Accordingly, the taking party must assume the burden of proving, by clear and convincing evidence, that the anticipated public benefit will be realized. The determination of whether the taking party has met this burden of proof involves an independent evaluation of the evidence by the court, with no deference granted to the local legislative authority. In the present case, the evidence fails to establish that the foregoing burden has been met.[22]

The record contains scant evidence to suggest that the predicted public benefit will be realized with any reasonable certainty. To the contrary, the evidence establishes that, at the time of the takings, there was no signed agreement to develop the properties, the economic climate was poor and the development plan contained no conditions pertaining to future development agreements that would ensure achievement of the intended public benefit if development were to occur.

The development plan calls for a hotel and conference center on parcel 1, residential dwellings on parcel

---

[22] In my view, the evidence in the record also is insufficient to establish that the preponderance of the evidence standard has been met.

2, commercial office space on parcel 3, parking and marina support on parcel 4A, marina and water-related uses on parcel 4B, commercial office and retail space on parcels 5A, 5B and 5C, waterfront commercial uses on parcel 6, and additional office space on parcel 7. Despite extensive negotiations, however, no development agreement, which the trial court described as a "necessary engine to start any development project," had been signed at the time of the takings. In fact, Marty Jones, president of Corcoran Jennison, the designated developer for parcels 1, 2 and 3, testified at a deposition that she could not even predict when such an agreement would be signed, although she was "optimistic" that it would be soon. Without an agreement, however, it is impossible to determine whether future development of the area primarily will benefit the public or even benefit the public at all. Several key project participants expressly recognized the importance of an agreement to such a determination in correspondence regarding the project and anticipated lawsuit.[23]

Nevertheless, some minimal evidence was admitted as to the terms of a "proposed" agreement,[24] and, insofar

[23] On March 6, 2002, Claire Gaudiani, president of the development corporation, sent an e-mail to several other project participants, including Jones and David Goebel, executive director of the development corporation, which stated: "What became clear during the executive committee meeting with the [development corporation] yesterday morning [is] that we absolutely posi[tively] need a fully signed and executable set of documents, including the real estate agreement, by May [1]. The importance of this fact to the law suit is apparently very high." The same sentiment was expressed by Goebel in an e-mail sent to Jones, among others, on March 27, 2001, when he stated that "concluding the development agreement prior to the start of the Institute law suit will go a long way to deflate the argument that property is being taken with no plan in place. In fact, we feel this is crucial." Corcoran Jennison also realized the importance of a signed development agreement when Jones testified in a deposition taken on June 22, 2001, that she had received communications from others involved in the project that such an agreement should be in place prior to commencement of the trial in order to demonstrate that the project was moving forward.

[24] The court's knowledge of the agreement is derived from the very brief document entered into evidence as plaintiff's exhibit JJJ and the testimony

as those terms provide for the leasing of parcels 1, 2 and 3 to Corcoran Jennison by the development corporation at a rate of $1 per year for a term of ninety-nine years, they appear to be more beneficial to the developer than to the city. Under the agreement, it appears that the city would be locked into a long-term commitment to a single developer, who then would be in a position to reap substantial financial rewards without a corresponding penalty if the developer does not perform as expected. In addition, the very generous terms of the proposed agreement are indicative of either an extremely weak real estate market or a possible violation of General Statutes § 8-200 (b) because that statute suggests that property acquired pursuant to chapter 132 of the General Statutes must be sold or leased to a developer at "fair market value" or "fair rental value . . . ." Accordingly, the terms of the unsigned, proposed agreement do not appear to be consistent with the long-term public interest.

Furthermore, the evidence in the record establishes that the real estate market at the time of the takings was depressed and that prospects, therefore, were poor that the contemplated public use could be achieved with any reasonable certainty. Specifically, the trial court stated that "[t]he [development plan] itself says that as of the date of its preparation its studies show that rent levels [of] class A office buildings have stabilized, but are below the level needed to support new speculative construction. In fact, historical values of class A office buildings have not recovered sufficiently to justify new construction except for end users." The trial court also referred to testimony that "[the city of]

of various witnesses and deponents. The document in evidence contains only the first page of the proposed agreement. That page refers to the acquisition and demolition of properties by the development corporation, but not to any obligation on the part of the developer or other terms regarding the leasing of the properties in question.

New London is still recovering from the recession of the early 1990s . . . market values are still well below replacement cost and new construction is generally not feasible. . . . [T]he demand for class A office space in New London at the present time is soft . . . ." (Internal quotation marks omitted.) Indeed, testimony revealed that newly constructed office buildings in Shaw's Cove, an area adjacent to the project area, had not been fully occupied for more than fifteen years. Similar testimony described unsuccessful efforts by the redevelopment agency, over the course of several years, to attract investor interest in the construction of commercial office space at still another nearby location.

Additional testimony revealed that commercial real estate brokers had received few inquiries from companies with similar needs to those of Pfizer, Inc., and that, because it is difficult for the city of New London to compete against the city of New Haven in the market for biotechnology-bioscience office space, it is not economically feasible to develop this type of office space without a definite end user that will pay the rent to support the cost. Specific testimony adduced as to parcel 3 revealed that, in light of the uncertainty surrounding demand and the feasibility of creating biotechnology-bioscience office space, and in light of the fact that office development on parcel 3 probably would be deferred until after the development of office space on parcel 2, any design should remain flexible to accommodate future demand. The trial court relied on testimony that "market conditions do not justify construction of new commercial space . . . on a speculative basis." (Internal quotation marks omitted.) Furthermore, the trial court noted that "buildings are not built without tenants and as of June, 2001, there were no tenant commitments as to . . . the new[ly] proposed office buildings." (Internal quotation marks omitted.) The court also relied on testimony that "flexibility

is needed in this type of planning. Market conditions change and sites are developed over decades not years. There must be an ability reserved to make alterations as market conditions change."

A close examination of the proposed plan from a financial standpoint also suggests that there were only limited prospects of a public benefit at the time of the takings. Although the trial court noted that the project ultimately would generate increased tax revenue, there apparently was no consideration of the loss in revenue that could result from the relocation of former residents and taxpayers out of the area during the ten, twenty or even thirty years that might be needed to fully implement the development plan.

Moreover, although the city tax assessor projected that annual tax revenue from the project, when fully implemented, was expected to increase sevenfold to approximately $2.6 million, she also testified that her projection was based on an estimate of the square footage to be constructed, a figure that was subject to change. Indeed, testimony confirmed that the square footage and proposed uses very likely would change over the course of the project. In addition, due to the lack of a development schedule, there was no testimony as to when the projected tax revenue would be realized. Accordingly, the tax assessor's revenue projection may not come to fruition if the area is not developed in the manner and in the time frame predicted.

For example, the projected receipt of $422,100 in annual revenue from parcel 4A does not take into account the tax assessor's opinion that the property may be exempt from taxation if developed for a museum owned by the federal government, as one proposal had suggested. State or nonprofit ownership of the museum would generate a portion of the projected revenue, but revenue would fall well below the $422,100 currently

estimated. Moreover, the tax assessor's opinion that the market value of a museum that costs $30 million to build would be only $18 million is yet another indication of the depressed real estate market. Finally, and perhaps most significantly, the expected public investment in the project area of close to $80 million for a potential increase in annual tax revenue of $680,544 to $1,249,843,[25] at best, hardly can be considered a major financial benefit to the public. Accordingly, the projected increase in tax revenue should not be accepted at face value and does not support the conclusion that the project will further the public good.

Various other elements of the plan also are problematical. The record contains no evidence that the indirect benefits projected under the plan, namely, spin-off economic activities and between 500 and 940 indirect new jobs, will indeed be realized. There also is no evidence as to when in the next thirty years such benefits might be realized. In addition, although the trial court relied on testimony that the city of New London has limited high end housing, it also noted that there was little explanation as to why seventy to ninety high end attached residences would significantly improve the overall housing situation in a distressed municipality. The trial court further noted that high end housing concentrated in one small area of the city would not be likely to have a multiplier effect. Accordingly, the only possible positive consequence of the housing to be constructed appears to be a limited increase in tax revenue. This revenue is impossible to evaluate, how-

---

[25] These figures, which differ from the figures to which the tax assessor testified, are the figures contained in the development plan and quoted in the majority opinion. According to the tax assessor, the annual property tax revenue derived from the project area was approximately $362,111 prior to project approval, but was expected to increase to approximately $2,603,696 following completion of the project. If borne out, this constitutes an increase of approximately $2,241,585, far more than that projected by the development plan.

ever, because it is not yet known whether a future development agreement will include a tax abatement incentive to encourage development of the property or other terms and conditions that may not be in accord with the general purposes set forth in the development plan or the applicable statutory scheme.

The development plan also contains few, if any, performance requirements for future developers. Section 6.2 of the plan, which concerns the disposition of the properties, contains a general description of restrictions on parcel use but no firm timetable for project implementation, no indication as to whether future developers will be offered tax abatements or other incentives that might not be in the public interest, and no indication of possible penalties if developers do not perform as required. Moreover, § 6.2.3 of the development plan provides that "[p]roceeds from sale of disposition parcels shall be used to offset costs of implementation of this [development plan]." The provision in the development plan that purports to lease parcels 1, 2 and 3 to a developer at the sum of $1 per year for a term of ninety-nine years is particularly troubling when viewed in this context.

The defendants note that the budget for the project is almost $80 million, of which approximately $31.1 million has been spent to date, that the project has been approved by numerous state and local agencies, that the city of New London has spent thousands of dollars planning road improvements to make the site more attractive to prospective tenants and that other properties in the project area have been acquired in accordance with the plan objectives. This has little bearing, however, on whether there is any reasonable certainty that the planned public benefit will be realized. As the trial court conceded, "the protections afforded by the [takings] clauses of the federal and state constitutions would be hollow indeed" if takings were found to be

constitutional merely because the condemning authority and various government agencies thought and acted as if they were so.

The record, therefore, fails to establish that there was any momentum in the project from a development standpoint or any reasonable development prospects for parcels 3 and 4A at the time of the takings. Evidence to the contrary consists of vague predictions of future demand. The trial court noted, for example, that according to the development plan, "the city [of New London] is at the *threshold* of major economic revitalization and the key catalyst is the Pfizer [Inc.] research facility"; (emphasis added); and that "a significant shortage of office space [was expected] by 2010," but none of the evidence in the record supports this conclusion. In most of the important economic development cases cited by the majority to support its analysis, developers had been identified and were prepared to develop the properties in question. See, e.g., *Poletown Neighborhood Council* v. *Detroit*, supra, 410 Mich. 628 (property to be conveyed to General Motors Corporation for construction of automobile assembly plant); *Southwestern Illinois Development Authority* v. *National City Environmental, LLC*, supra, 199 Ill. 2d 229–30 (property to be conveyed to Gateway International Motorsports Corporation for expansion of racetrack parking facilities); *Olmstead* v. *Camp*, supra, 33 Conn. 551 (property subject to taking to be used in operation of existing grist mill).

Although the trial court acknowledged that, for economic development policy to be practical, a substantial period of time might have to pass before a project plan can be accomplished, it nonetheless declared that "[t]he intent of chapter 132 [of the General Statutes] would be crippled if government intervention would only be feasible if immediate project development is possible—economically distressed communities are the very ones

where, despite state intervention, project accomplishment might be difficult." On the other hand, I would submit that government intervention to take non-blighted properties by eminent domain is unwarranted in *any* circumstance in which there is no realistic prospect of a future public benefit. In the present case, there is no development agreement or time frame within which the proposed development must take place; indeed, all of the evidence suggests that the real estate market is depressed and the development plan itself contains no detailed provisions to *ensure* that the future use will serve the public interest. Accordingly, the record in the present case does not contain clear and convincing evidence to establish that this portion of the test has been satisfied. I therefore would conclude that the takings are unconstitutional.

Having concluded that there is no reasonable certainty that the proposed public benefit will be accomplished, there is no need to consider whether the condemnations are reasonably necessary to implement the plan.[26] I therefore need not address the majority's analysis of that issue.

## IV

## CONCLUSION

In summary, I believe that chapter 132 of the General Statutes is constitutional on its face.[27] Additionally, there is very little evidence to support the plaintiffs' claim that the development plan was created primarily for the benefit of private interests. The benefits expressed in the development plan, namely, an

---

[26] I note, however, that I disagree with the majority's conclusion that the trial court improperly determined that the takings on parcel 4A were not reasonably necessary because the proposed use was too vague and uncertain. See part VI of the majority opinion.

[27] See footnote 21 of this opinion, however, for a brief discussion of constitutional concerns that the plaintiffs have not raised on appeal.

increased tax base, job creation and the revitalization of the city of New London, as well as other evidence presented at trial, support the majority's conclusion that the plan is consistent with the public purpose and the goals set forth in chapter 132 of the General Statutes. See part II of the majority opinion. Nevertheless, the takings of the plaintiffs' properties are unconstitutional because, in my view, the evidence is not clear and convincing that the property taken *actually* will be used for a public purpose.

To highlight this concern, consider the following hypothetical. A town is economically distressed and has seen no significant development for years. In good faith, and in accordance with the procedural prerequisites contained in chapter 132 of the General Statutes, the town creates a master plan of development in 1999 that designates an area within the city limits for mixed use development. A marketing study is completed while the plan is being drafted and demonstrates no significant shortage of office space until 2010, no immediate demand for hotel space without a corporate user that will subsidize the occupancy of up to one half of the projected 200 room facility, and no demonstrated demand for upscale residential units to fulfill local housing needs. Despite this scenario, the town proceeds with the plan of development and settles on the above uses.

Further efforts result in a determination regarding the scope of the project and the location and general size of various proposed buildings. The master plan is submitted to a public hearing and subsequently approved by the local governing body. The plan projects that the new development will create between 518 and 867 construction jobs and 1200 and 2300 direct or indirect permanent jobs, and will result in an estimated sevenfold increase in annual property tax revenue. The master plan does not include any minimum standards

that the contemplated private developer will be required to satisfy.[28] While the taking authority has had numerous discussions with a particular developer, there has been no agreement on the terms of a development agreement. Nevertheless, the taking authority purchases certain parcels of land in the economic development area and takes other properties by eminent domain. No one contends, under this scenario, that the properties acquired by eminent domain are not reasonably necessary for development to occur as provided in the master plan.

Now consider the following scenario. *Six months after the takings are completed*, an interested developer is located. The developer contends that the economic conditions of the town and region are such that the project is not economically feasible unless the development agreement requires the town and the taking authority to do the following: (1) remediate the environmental conditions affecting the property, (2) replace the road and utility infrastructure, and (3) take measures to reduce the risk of coastal flooding, all at a cost of more than $70 million. Additionally, the developer insists that the town abate property taxes on properties located in the development area for a period of years and, rather than require the developer to purchase the improved property at fair market value, enter into an agreement with the developer to lease the property for ninety-nine years for the sum of $1 per year. Furthermore, the developer agrees to commence construction only after he is able to find viable tenants for the property or when a particular economic index for the area indicates demand for the uses, such as when the vacancy rate for class A office space drops below a certain level.

---

[28] Such minimum standards might include a commencement date for the project, a construction schedule, a guaranteed number of jobs to be created, selection criteria for potential developers, financing requirements, the nature and timing of land disposition and a commitment as to the amount received in property taxes as a percentage of assessed value.

As I understand the majority's view, after according deference to the taking authority, the takings in the above scenario, which occur six months before any of the terms of the development agreement are known, would withstand a challenge by property owners who wish to remain in their homes. I, however, would find the takings to be, at best, premature. The majority has created a test that can aptly be described as the "Field of Dreams"[29] test. The majority assumes that if the enabling statute is constitutional, if the plan of development is drawn in good faith and if the plan merely states that there are economic benefits to be realized, that is enough. Thus, the test is premised on the concept that "if you build it, [they] will come," and fails to protect adequately the rights of private property owners.

I am not suggesting that an absolute guarantee is necessary to ensure that private economic development will occur as planned. Such a guarantee would be unrealistic in light of the fact that many unforeseen events could affect the plan's implementation. For example, positive economic trends might falter and committed developers might be confronted with unanticipated difficulties that impair their ability to carry out plan objectives. When such difficulties are apparent at the very outset of the planning process, however, a course of action should not be endorsed based entirely on speculation.

To conclude, I would grant the legislature no deference on this issue and place the burden on the taking authority to establish by clear and convincing evidence that the public benefit anticipated in the economic development agreement is reasonably ensured. This, in my view, cannot be accomplished without knowing initially what the actual public benefit will be. In the present case, it is entirely unknown whether the public

---

[29] Field of Dreams (Universal Studios 1989).

interest will be served. There are no assurances of a public use in the development plan; there was no signed development agreement at the time of the takings; and all of the evidence suggests that the economic climate will not support the project so that the public benefits can be realized. The determination of whether the private benefit will be incidental to the public benefit requires an examination of all of the pieces to the puzzle. Accordingly, I respectfully dissent from parts II, IV and VI of the majority opinion.

# APPENDIX

**FORT TRUMBULL MUNICIPAL DEVELOPMENT PLAN**
CITY OF NEW LONDON, CONNECTICUT
Prepared for: New London Development Corporation